## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THOMAS SCUDERI, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MAMMOTH ENERGY SERVICES, INC., ARTY STRAEHLA, and MARK LAYTON,<br><br>Defendants. | Civil Action No: CIV-19-522-SLP<br><br> **CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Thomas Scuderi ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mammoth Energy Services, Inc. ("Mammoth" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Mammoth securities from October 19, 2017 through June 5, 2019, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by

Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the Company's principal executive offices are located in this judicial district and alleged misstatements and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification incorporated by reference herein, purchased Mammoth securities during the Class Period and was economically damaged thereby.

7.      Defendant Mammoth purports to operate as an oilfield service company operating in three segments: Infrastructure Services, Pressure Pumping Services, and Natural Sand Proppant Services. The Company serves government-funded utilities, private and public investor owned

utilities, co-operative utilities, independent oil and natural gas producers and land-based drilling contractors in North America. Mammoth is a Delaware corporation and its principal executive offices are located at 14201 Caliber Drive, Suite 300, Oklahoma City, Oklahoma, 73134. Mammoth securities trade on the NASDAQ under the ticker symbol "TUSK."

8.     Defendant Arty Straehla ("Straehla") has been the Company's Chief Executive Officer ("CEO") and member of the Board of Directors since June 3, 2016.

9.     Defendant Mark Layton ("Layton) has been the Company's Chief Financial Officer ("CFO") since June 3, 2016.

10.    Defendants Straehla and Layton are collectively referred to herein as the "Individual Defendants."

11.    Each of the Individual Defendants:

   a.   directly participated in the management of the Company;

   b.   was directly involved in the day-to-day operations of the Company at the highest levels;

   c.   was privy to confidential proprietary information concerning the Company and its business and operations;

   d.   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   e.   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

   f.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.   approved or ratified these statements in violation of the federal securities laws.

12.     Mammoth is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Mammoth under *respondeat superior* and agency principles.

14.     Defendant Mammoth and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

15.     On October 19, 2017, Mammoth announced in a press release that its subsidiary, Cobra Acquisitions LLC ("Cobra"), entered into a contract with the Puerto Rico Electric Power Authority ("PREPA") to aid in the rebuilding of Puerto Rico's energy infrastructure, stating, in pertinent part:

> Mammoth Energy Services, Inc. ("Mammoth") (NASDAQ:TUSK) today announced that its wholly owned subsidiary, Cobra Acquisitions LLC, has signed a contract to aid in the restoration of utility infrastructure on the island of Puerto Rico. Cobra, a utility infrastructure business focused on the repair and construction of transmission and distribution (T&D) networks, will perform the work. The contract will commence immediately and is expected to generate revenue of up to $200 million over the initial 120 days.

> Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are honored to be chosen to help restore the electric utility infrastructure for the residents of Puerto Rico. After witnessing the destruction from Hurricane Maria first hand last weekend, where 85% of Puerto Rico's residents are currently living without electricity, we intend to work quickly both to help rebuild the electric grid and to help restore normalcy to people's lives."

> The work to be provided by Cobra includes the following:

> •     Comprehensive damage assessment of existing electrical grid.

- Engineering services to aid in the design of a new electric utility grid to Puerto Rico Electric Power Authority (PREPA) specifications.
- Construction services to rebuild the electric grid.
- Fully self-contained solution including all operational and life support related to operating within the disaster area without creating an additional strain on the local population.

The initial mobilization of construction equipment and personnel is expected to begin in the coming days with people currently in place performing an initial damage and engineering assessment to determine the full scope of work required. This contract will be incremental to Mammoth's existing energy service operations.

16.     On November 11, 2017, Mammoth filed a Form 10-Q with the SEC, which provided its financial results and position for the fiscal quarter ended September 30, 2017 (the "3Q 2017 10-Q"). The 3Q 2017 10-Q was signed by Defendants Straehla and Layton. The 3Q 2017 10-Q contained signed SOX certifications by Defendants Straehla and Layton attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

17.     The 3Q 2017 10-Q stated the following with respect to the Company's contract with PREPA:

On October 19, 2017, Cobra entered into a contract to aid in the restoration of utility infrastructure on the island of Puerto Rico. The contract provides for payments of up to $200.0 million, including an initial payment of $15.0 million at the time of signing. As of November 7, 2017, Cobra had entered into $32.7 million of commitments related to this contract and made prepayments and deposits of $12.6 million with respect to these commitments.

18.     On January 31, 2018, Mammoth filed a Form 8-K with the SEC announcing that, on January 28, 2018, "Cobra and PREPA amended the Initial PREPA Contract to increase the total contract amount by an additional $245.4 million to a total of $445.4 million."

19.     On February 28, 2018, Mammoth filed a Form 10-K with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Straehla and Layton. The 2017 10-K contained signed

SOX certifications by Defendants Straehla and Layton attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

20.     The 2017 10-K stated the following with respect to the Company's contract with PREPA:

> We currently have agreements in place with government-funded utilities, private utilities, public IOUs and Co-Ops. In particular, on October 19, 2017, one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, entered into an emergency master services agreement with PREPA (such agreement, as subsequently amended through December 21, 2017, is hereinafter referred to as the initial PREPA contract). The initial PREPA contract has a one-year term and provided for up to $200.0 million of services which was initially expected to be fully utilized within a 120-day period. The scope of the work provided for in the initial PREPA contract included labor, supervision, tools and equipment to perform storm repairs at various locations in Puerto Rico. The initial PREPA contract was fully applied to services performed by Cobra as of January 3, 2018. Due to the continuing need for Cobra's services, on January 28, 2018, Cobra and PREPA amended the initial PREPA contract to increase the total contract amount by an additional $245.4 million up to a total of $445.4 million. Under the terms of this amendment, the number of workers requested by PREPA and provided by Cobra increased to at least 882, up from 434 in the initial PREPA contract, and the billable daily rate for those workers was decreased. On February 27, 2017, Cobra and PREPA again amended the PREPA contract to further increase the contract amount by $500.0 million up to a total of $945.4 million. In addition to continuing its repair and restoration work, under the terms of this amendment Cobra will be able to source construction materials needed to rebuild the electrical infrastructure in Puerto Rico on a pass-through basis. To support its efforts, Cobra has two berthing barges with accommodations for approximately 550 people mobilized to Puerto Rico. In addition to its employees, Cobra also subcontracts additional resources where needed to assist in its repair efforts, including helicopters and pilots to erect towers and pull wire for reconnection, steel workers to fix transmission poles and rework steel damaged in the storm, road equipment and operators to carve access to work sites, tree services to clear brush and trees and security teams. Based on the current level of services provided, Cobra anticipates the additional amounts specified in the amendments will fund its activities in Puerto Rico through mid-2018.

21.     On May 4, 2018, Mammoth filed a Form 10-Q with the SEC, which provided its financial results and position for the fiscal quarter ended September 30, 2018 (the "1Q 2018 10-Q"). The 1Q 2018 10-Q was signed by Defendants Straehla and Layton. The 1Q 2018 10-Q

contained signed SOX certifications by Defendants Straehla and Layton attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

22.     The 1Q 2018 10-Q stated the following with respect to the Company's contract with PREPA:

> On October 19, 2017, our wholly owned subsidiary Cobra Acquisitions LLC, or Cobra, entered into an emergency master services agreement with PREPA for repairs to PREPA's electrical grid as a result of Hurricane Maria. During the first quarter of 2018, we executed two amendments to the contract, increasing the total contract value to $945.4 million from $200.0 million originally. At March 31, 2018, we had approximately 1,000 people, and approximately 600 pieces of equipment, deployed in Puerto Rico.

23.     On May 29, 2018, Mammoth announced in a press release that Cobra had entered into a second, $900 million contract with PREPA, stating, in pertinent part:

> OKLAHOMA CITY, May 29, 2018 (GLOBE NEWSWIRE) -- Mammoth Energy Services, Inc. ("Mammoth") (NASDAQ:TUSK) today announced that its wholly owned subsidiary, Cobra Acquisitions LLC ("Cobra"), signed a one-year $900 million contract with the Puerto Rico Electric Power Authority ("PREPA") to complete the restoration of the critical electrical transmission and distribution system components damaged as a result of Hurricane Maria as well as to support the initial phase of reconstruction of the electrical power system in Puerto Rico. Cobra has been working to restore electrical services in Puerto Rico since October 2017.
>
> **Request For Proposal (RFP) Process**
> In mid-February, the Commonwealth of Puerto Rico began a competitive RFP bid process (RFP #77844) to complete the restoration of critical electrical system components and to support the initial reconstruction phase of its electrical utility system following the impact of Hurricane Maria. ***This process involved the submission of bids from qualified infrastructure construction companies and an analysis by PREPA of each bidder's experience, asset base, financial capacity, understanding of the project and overall cost to perform the work needed.  After concluding the selection process, Cobra entered into a contract with PREPA on May 26, 2018.***
>
> **Restoration and Reconstruction Contract**
> Under the terms of the contract, Cobra is to perform hurricane restoration and

reconstruction services at various locations in PREPA's service area. Cobra is increasing its total resource count in Puerto Rico to expedite the completion of the restoration process. As the restoration process comes to an end, Cobra will continue to work with the Commonwealth of Puerto Rico, PREPA and various other federal and Commonwealth agencies to transition to the long task of reconstructing the Puerto Rico power grid of the future. This contract award is in addition to the original contract to provide restoration services that Cobra entered into in October 2017, as amended.

Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are very proud of our Cobra team in Puerto Rico and look forward to continuing our relationship with the Commonwealth of Puerto Rico, PREPA and the citizens of Puerto Rico. Through the team's hard work, professionalism and technical ability, we have been selected to lead this very important effort to complete the restoration phase and transition to the reconstruction phase of the electric utility system in Puerto Rico, which is expected to last for several years. The reconstruction of the electric utility infrastructure will improve the reliability and quality of service for the citizens of Puerto Rico."

[Emphasis added.]

24.     On August 8, 2018, Mammoth filed a Form 10-Q with the SEC, which provided its

financial results and position for the fiscal quarter ended June 30, 2018 (the "2Q 2018 10-Q"). The

2Q 2018 10-Q was signed by Defendants Straehla and Layton. The 2Q 2018 10-Q contained signed

SOX certifications by Defendants Straehla and Layton attesting to the accuracy of financial

reporting, the disclosure of any material changes to the Company's internal control over financial

reporting and the disclosure of all fraud.

25.     The 2Q 2018 10-Q stated the following with respect to the Company's contracts

with PREPA:

On May 26, 2018, our wholly owned subsidiary Cobra Acquisitions LLC, or Cobra, entered into a new master services agreement with the Puerto Rico Electric Power Authority, or PREPA, to complete the restoration of the electrical transmission and distribution system components damaged by Hurricane Maria and to support the initial phase of reconstruction of the electrical power system in Puerto Rico, which we refer to as the New PREPA Contract. Cobra has agreed to provide the labor, supervision, tools and materials necessary to provide the restoration and reconstruction services under the New PREPA Contract, which has a one-year term ending May 25, 2019 and provides for total payments not to exceed $900.0 million.

The New PREPA Contract was awarded at the conclusion of a request for proposal (RFP) bid process that began in February 2018. ***The New PREPA Contract is in addition to the contract that Cobra entered into in October 2017, as subsequently amended, to provide restoration services to PREPA.***

[Emphasis added.]

26.     On November 2, 2018, Mammoth filed a Form 10-Q with the SEC, which provided its financial results and position for the fiscal quarter ended September 30, 2018 (the "3Q 2018 10-Q"). The 3Q 2018 10-Q was signed by Defendants Straehla and Layton. The 3Q 2018 10-Q contained signed SOX certifications by Defendants Straehla and Layton attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

27.     The 3Q 2018 10-Q stated the following with respect to the Company's contracts with PREPA:

> In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, public investor owned utilities and cooperatives. Since we commenced operations in this line of business, substantially all of our infrastructure revenues has been generated from storm restoration work, primarily from PREPA due to damage caused by Hurricane Maria. On October 19, 2017, Cobra and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid. The one-year contract, as amended, provides for payments of up to $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900.0 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system in Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contracts, terminates the contracts, curtails our services prior to the end of the contract terms or otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which

could result in withholding or delayed payments to us or efforts to recover payments already made.

28.     On March 18, 2019, Mammoth filed a Form 10-K with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Straehla and Layton. The 2018 10-K contained signed SOX certifications by Defendants Straehla and Layton attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

29.     The 2018 10-K stated the following with respect to the Company's contracts with PREPA:

> We currently have agreements in place with government-funded utilities, private utilities, public IOUs and Co-Ops. To date, substantially all of our infrastructure services have been performed in Puerto Rico under two emergency master services agreements entered into by one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, with PREPA for up to an aggregate of approximately $1.8 billion of services. The scope of the work contemplated by these agreements includes labor, supervision, tools, equipment and materials to perform storm repair, restoration and reconstruction services at various locations in Puerto Rico. Cobra performed the full $945 million of services under the initial contract as of July 21, 2018. The second contract with PREPA has a one-year term ending on May 25, 2019 and provides for total payments not to exceed $900 million. As of December 31, 2018 and March 8, 2019, Cobra had performed an aggregate of $280 million and $354 million, respectively, of services under the second contract. Although we continue to perform services under the second contract, we expect these services will end by March 31, 2019, and we do not expect that any further work orders will be issued to Cobra under this contract prior to the May 25, 2019 termination date.

30.     On May 3, 2019, Mammoth filed a Form 10-Q with the SEC, which provided its financial results and position for the fiscal quarter ended March 31, 2019 (the "1Q 2019 10-Q"). The 1Q 2019 10-Q was signed by Defendants Straehla and Layton. The 1Q 2019 10-Q contained signed SOX certifications by Defendants Straehla and Layton attesting to the accuracy of financial

reporting, the disclosure of any material changes to the Company's internal control over financial

reporting and the disclosure of all fraud.

31.     The 1Q 2019 10-Q stated the following with respect to the Company's contracts

with PREPA:

> In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, public investor owned utilities and cooperatives. Since we commenced operations in this line of business, substantially all of our infrastructure revenues has been generated from storm restoration work, primarily from PREPA due to damage caused by Hurricane Maria. On October 19, 2017, Cobra and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid. The one-year contract, as amended, provides for payments of up to $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900.0 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system in Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contracts, terminates the contracts, curtails our services prior to the end of the contract terms or otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.

32.     The statements referenced in Paragraphs 15-31 were materially false and/or

misleading because they misrepresented and failed to disclose the following adverse facts

pertaining to the Company's business, operations, and prospects, which were known to Defendants

or recklessly disregarded by them. Specifically, Defendants made false and/or misleading

statements and/or failed to disclose that: (1) Mammoth's subsidiary, Cobra, improperly obtained

two infrastructure contracts with PREPA that totaled over $1.8 billion; (2) specifically, the

contracts were awarded as the result of improper steering and not a competitive RFP process; and

(3) as a result, Defendants' statements about Mammoth's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge**

33.     On May 24, 2019, the *Wall Street Journal* published an article entitled "FEMA Official Probed Over Puerto Rico Power Restoration," stating that the Federal Emergency Management Agency ("FEMA") Deputy Regional Administrator, who oversaw FEMA's response to the damage wrought by Hurricane Maria, was under investigation by the Department of Homeland Security ("DHS"), relieved of her duties and placed on administrative leave over allegations that she steered work to Cobra. The article stated, in relevant part:

> ***A high-ranking Federal Emergency Management Agency official who oversaw the reconstruction of Puerto Rico's electrical grid is under investigation by a government watchdog over allegations she steered work to a utility contractor, according to people familiar with the matter.***

> FEMA Deputy Regional Administrator Ahsha Tribble was relieved of her duties and placed on administrative leave last week amid a continuing probe by the Department of Homeland Security's Office of Inspector General, these people said.

> Ms. Tribble deployed to Puerto Rico after Hurricane Maria struck the U.S. island territory in September 2017 and spent the next year there coordinating FEMA's response to the storm-ravaged power system, according to her FEMA biography.

> ***The DHS Inspector General, which conducts investigations into FEMA, has probed her interactions with Cobra Acquisitions LLC, a grid-construction contractor hired by Puerto Rico's public electric utility after the hurricane, people familiar with the matter said. The investigation has also focused on whether Cobra gained an improper advantage in the contracting process, they said.***

> \*          \*          \*

> A FEMA spokeswoman said the agency can't comment on personnel matters. The DHS Inspector General said it couldn't confirm or deny the existence of any probe.

> Cobra's parent company didn't respond to requests for comment. Cobra signed separate contracts worth up to $900 million and $945 million to repair downed transmission and distribution lines with the bankrupt power monopoly known as Prepa, according to securities filings.

A Prepa spokeswoman said several utility officials and consultants were interviewed this week by Inspector General agents.

"It is a top priority for Prepa to assist and collaborate with investigations conducted by state or federal agencies," the spokeswoman said.

Cobra became Puerto Rico's primary general contractor for repairing the power grid in late 2017, filling a void in the power restoration efforts after the departure of another contractor, Whitefish Energy Holdings LLC.

Whitefish's contract with Puerto Rico came under intense scrutiny after FEMA raised concerns about how the $300 million deal was awarded and priced. Gov. Ricardo Rosselló canceled the Whitefish deal, and Puerto Rico increasingly came to rely on Cobra to turn the lights back on.

***But as Prepa's spending on contractors skyrocketed last year, utility officials raised concerns internally about Cobra's rates and why the company was doing so much of the power restoration work, according to people familiar with the matter.***

Ms. Tribble "wanted the work to get done and the power restored to Puerto Rico," Ms. Moore said. "Whoever did it, did it. She just wanted it to get done."

***Cobra has billed for more than $1.3 billion in emergency work through May 10, more than half the utility's total emergency spending since the hurricane, according to public records.***

Ms. Tribble served in the National Security Council and Energy Department during the Obama administration and was involved in the White House response to disasters including Hurricanes Sandy and Irene and the deadly West, Texas, chemical plant explosion, according to her FEMA biography.

At a February 2018 meeting of Puerto Rico's financial oversight board, Ms. Tribble said it was challenging to get utility contractors to do business with Prepa after the storm given its strained public finances. Whitefish and Cobra each "took a risk" in mobilizing to the island, she said.

(Emphasis added.)

34.     On this news, the Company's shares fell $1.25 per share or over 10% over the next three trading days on unusually high volume to close at $10.99 per share on May 29, 2019, damaging investors.

35.     Then, on June 5, 2019, while the market was open, the *Wall Street Journal* published an article entitled *Puerto Rico Grid Contractor Caught Up in Federal Probes*, stating

that the Federal Bureau of Investigation had "opened a related criminal inquiry" into the origin of Cobra's contracts with PREPA.

36.     On this news, the Company's shares fell $5.09 per share or over 45% over the next two trading days to close at $6.11 per share on June 6, 2019, further damaging investors.

37.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Mammoth securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Mammoth, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Mammoth securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the Exchange Act was violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Mammoth;

c.      whether the Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      whether Defendants caused Mammoth to issue false and misleading SEC filings during the Class Period;

e.      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

f.      whether the prices of Mammoth securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

g.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

44.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.     Mammoth shares met the requirements for listing, and were listed and actively traded NASDAQ, a highly efficient and automated market;

b.     As a public issuer, Mammoth filed periodic public reports with the SEC;

c.     Mammoth regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.     Mammoth was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

45.     Based upon the foregoing, the market for Mammoth securities promptly digested current information regarding Mammoth from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

46.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v.

United States, 406 U.S. 128 (1972), as Defendants omitted material information in their Class

Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

48.     This Count is asserted against Defendants based upon Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49.     During the Class Period, Defendants, individually and in concert, directly or

indirectly, disseminated or approved the false statements specified above, which they knew or

deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.

50. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a.     employed devices, schemes and artifices to defraud;

b.     made untrue statements of material facts or omitted to state material facts necessary

in order to make the statements made, in light of the circumstances under which

they were made, not misleading; or

c.     engaged in acts, practices and a course of business that operated as a fraud or deceit

upon Plaintiff and others similarly situated in connection with their purchases of

Mammoth securities during the Class Period.

51.     Defendants acted with scienter in that they knew that the public documents and

statements issued or disseminated in the name of Mammoth were materially false and misleading;

knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Mammoth, their control over, and/or receipt and/or modification of Mammoth's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Mammoth, participated in the fraudulent scheme alleged herein.

52.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Mammoth personnel to members of the investing public, including Plaintiff and the Class.

53.     As a result of the foregoing, the market price of Mammoth securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Mammoth securities during the Class Period in purchasing Mammoth securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

54.     Had Plaintiff and the other members of the Class been aware that the market price of Mammoth securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Mammoth securities at the artificially inflated prices that they did, or at all.

55. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

56. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Mammoth securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

57. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58. During the Class Period, the Individual Defendants participated in the operation and management of Mammoth, and conducted and participated, directly and indirectly, in the conduct of Mammoth's business affairs. Because of their senior positions, they knew the adverse non-public information about Mammoth's corporate governance and business prospects.

59. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Mammoth's business practices, and to correct promptly any public statements issued by Mammoth which had become materially false or misleading.

60. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Mammoth disseminated in the marketplace during the Class Period concerning the Company's corporate governance and business prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Mammoth to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were

"controlling persons" of Mammoth within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Mammoth securities.

61.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Mammoth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

A.     Declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

B.     Awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.     Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: June 7, 2019      Respectfully submitted,

*/s/ William B. Federman*
William B. Federman, OBA #2853
FEDERMAN & SHERWOOD
10205 North Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone:  (405) 235-1560
Facsimile:  (405) 239-2112
Email: wbf@federmanlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
(pro ha vice to be submitted)
Laurence M. Rosen, Esq.
(pro hac vice to be submitted)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
    lrosen@rosenlegal.com

*Counsel for Plaintiff*

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Mammoth Energy Services, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Mammoth Energy Services, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

First name:      Thomas
Middle initial:  B
Last name:       Scuderi
Address:
City:
State:
Zip:
Country:
Facsimile:
Phone:
Email:



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 02/01/2019 | 300 | 22.16 |
| Common Stock | 08/07/2018 | 200 | 38.05 |
| Common Stock | 08/08/2018 | 300 | 37.72 |
| Common Stock | 08/15/2018 | 200 | 33.46 |
| Common Stock | 08/17/2018 | 300 | 32.46 |
| Common Stock | 08/27/2018 | 31 | 29.82 |
| Common Stock | 08/28/2018 | 375 | 27.76 |
| Common Stock | 10/25/2018 | 185 | 24.21 |
| Common Stock | 11/16/2018 | 400 | 25.45 |
| Common Stock | 12/27/2018 | 164 | 25.45 |

**Certification for Thomas Scuderi (cont.)**

Sales:

| Type of Security | Sale Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 01/02/2019 | 200 | 19.26 |
| Common Stock | 01/25/2019 | 200 | 23.5 |
| Common Stock | 02/11/2019 | 200 | 21.3 |
| Common Stock | 03/21/2019 | 300 | 18.1 |
| Common Stock | 08/31/2018 | 300 | 27.76 |
| Common Stock | 12/28/2018 | 200 | 18.54 |
| Common Stock | 02/12/2019 | 200 | 22.2 |

7.  I have not served as a representative party on behalf of a class under the federal securities laws during the last three years, except if detailed below.

    Scuderi

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:          YES

By clicking on the button below, I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis.          YES

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 06/07/2019