# Exhibit 2

| | |
|---|---|
| IN RE MAMMOTH ENERGY SERVICES, INC. SECURITIES LITIGATION | Case No..: CIV-19-522-~~JSLP~~<br><br>CLASS ACTION<br><br>**[PROPOSED] SECOND~~FIRST~~ AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>*Jury Trial Demanded* |

Daniel, Vincent, and Sharon Furia (the "Furia Family" or "Lead Plaintiffs"), by and through their attorneys, allege upon personal knowledge as to themselves, and upon information and belief as to all other matters, based upon the investigation conducted by and through their attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), documents filed in the case of *United States of America v. Ahsha Nateef Tribble, Donald Keith Ellison and Jovanda R. Patterson*, Crim. No. 19-541 (D.P.R.), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant Mammoth Energy Services, Inc. ("Mammoth" or the "Company") common stock between October 19, 2017 and June 5, 2019, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

1

§§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      This case concerns a scheme by Mammoth's wholly-owned subsidiary, Cobra Acquisitions, LLC ("Cobra"), to bribe Federal Emergency Management Agency ("FEMA") officials to steer over $1.8-billion of business to Cobra/Mammoth to re-build Puerto Rico's power grid in the aftermath of Hurricane Maria. The contracts were with the Puerto Rican Energy Power Authority ("PREPA"). PREPA's ability to meet its payment obligations under the contracts, which was in bankruptcy at the time, was dependent on obtaining funding from FEMA.

3.      Cobra's President, Defendant Keith Ellison, was indicted in an indictment filed under seal dated September 3, 2019 for Conspiracy to Commit Bribery against the United States; Honest Services Wire Fraud; Disaster Fraud; and False Statements. FEMA officials Ahsha Nateef Tribble and Jovanda R. Patterson were also indicted. A copy of the indictment, *United States of America v. Ahsha Nateef Tribble, Donald Keith Ellison and Jovanda R. Patterson*, Crim. No. 19-541 (D.P.R.) is annexed hereto as Exhibit A and incorporated by reference herein.

4.      In their press release announcing the unsealed indictments on September 10, 2019, the United States Department of Justice said:

> The indictment alleges that the defendants used Tribble's positions in FEMA to benefit and enrich themselves and defraud the United States. . . . Following the passage of Hurricane María over Puerto Rico on September 20, 2017, Ahsha Nateef Tribble, Donald Keith Ellison, and Jovanda R. Patterson came to Puerto Rico as part of the recovery and restoration of Puerto Rico's electric power grid. In Tribble's position as Sector Lead and Deputy Director, she reported directly to the Federal

Coordinating Officer and was FEMA's primary leader as to the restoration of electric power on the island.

From October 2017 to April 2019, Tribble and Ellison developed a personal relationship wherein Ellison provided Tribble with things of value with the intent to influence Tribble's performance of official acts. Ellison provided Tribble with personal helicopter use, hotel accommodations, airfare, personal security services, and the use of a credit card. As part of Ellison's pattern of providing things of value to Tribble, he also secured employment within COBRA's affiliated companies for her friend, defendant Patterson. In exchange, Tribble performed official acts, including influencing, advising, and exerting pressure on PREPA and FEMA officials, in order to award restoration work to COBRA and accelerate payments to COBRA.[1]

5.     Mammoth's CEO, Defendant Arty Straehla, was also the CEO of Cobra. Straehla was involved in securing the initial Cobra contract from PREPA in October 2017. Almost immediately after the contract was awarded to Cobra, government officials and news reporters began to question the legitimacy of the contract award. In fact, in response to a question from a stock market analyst who was noting some of the news stories questioning how Cobra got its contract, Straehla responded that he and Ellison both went to Puerto Rico to work on obtaining the contract and said "we did everything absolutely right" and that he and Ellison gave "a very legitimate effort."

6.     Ellison, when questioned by *E&E News* on October 31, 2017 regarding the contract award said "We feel we had a really good package put together that would provide for the community without taking needed resources away from the island," he said, characterizing his company's relationship with PREPA as *a "standard bidding process for a storm contract."* (Emphasis added.)

---

[1] https://www.justice.gov/usao-pr/pr/fema-deputy-regional-administrator-former-president-cobra-acquisitions-llc-and-another.

7.	These statements, and other made during the Class Period, were false and materially misleading when made as Cobra did not obtain the PREPA contracts through "legitimate efforts" or by doing "everything absolutely right" or by having a "standard bidding process" but, instead, by bribing FEMA officials to steer the business to Cobra.

8.	On June 3, 2018 Tribble sent Ellison an email from her personal email account with the subject that $200 million in payments were being delayed and another work stoppage looming. Three days later, Mammoth re-filed a registration statement with the SEC to allow its two controlling shareholders, Wexford Capital LP and Gulfport Energy Corp., to sell four million shares of their Mammoth common stock. On June 15, 2018 Layton asked the SEC for accelerated approval of the dormant shelf-registration, accelerated approval was granted, and Wexford and Gulfport sold their four million shares of Mammoth common stock. Wexford sold 2,764,400 shares for total proceeds of $105,074,844 and Gulfport sold 1,235,600 shares for total proceeds of $46,965,156 on June 29, 2018. On June 18, 2018 Straehla and Layton attended a leadership meeting which included the senior officers of various Mammoth subsidiaries. CW1 is a former President of a Mammoth subsidiary and who attended the June 18, 2020 meeting. At this meeting, Straehla informed the attendees that Mammoth was "getting push back from PREPA" on outstanding payments. This was non-public information and could only have been known by Straehla from the information Tribble provided to Ellison.

9.	Neither Straehla nor Mammoth disclosed to their investors that PREPA might not pay Mammoth for the work it performed, and that work might be stopping.

10.     In sum, Ellison knew, or recklessly disregarded, that his statements about how Cobra obtained the PREPA contracts were false and that all statements made by Mammoth concerning how Mammoth obtained the PREPA contracts were false and misleading as they omitted to disclose the material facts that the contracts were secured through Ellison's bribing Tribble and hiring Patterson at Cobra which subjected Mammoth to forfeitures, fines, and penalties. Ellison's scienter can be attributed to Mammoth as Ellison was a senior officer of Cobra and Cobra's revenues and earnings were a highly significant part of Mammoth's revenues and earnings during the Class Period. Ellison's and Mammoth's scienter can be inferred from all the facts alleged in this Complaint.

11.     In sum, Straehla's scienter can be inferred from the fact that: (1) he was with Ellison in October 2017 when the first contract was awarded to Cobra and, as alleged in the indictment, the illegal conduct began in October 2017; (2) he was put on notice of the potential for wrongdoing by all the news stories and government investigations concerning the contract award; (3) Straehla misrepresented that Cobra had prior infrastructure repair experience and that its contract provisions were different than the contract provisions found in Whitefish Energy, which had its contract terminated a few days after it was signed; (4) in July 2018 Cobra hired Patterson from FEMA at three times her government salary, creating not only the appearance but an actual conflict of interest with PREPA; and (5) Straehla failed to inform investors that Ellison was being questioned by the FBI and Homeland security on March 15, 2019 or that Ellison was terminated from Cobra on June 7, 2019, the same day Straehla publicly defended Cobra's conduct in Puerto Rico. Straehla signed the first contract with PREPA (the "First PREPA Contract") on behalf of Cobra and

a provision in that contract provided: "COBRA has the continuous obligation to disclose to PREPA all information and circumstances of its relations with clients and third persons and any interest which could reasonable influence PREPA when executing the contract or during its term. COBRA was to avoid even the appearance of the existence of conflicting interests." Indictment ¶ 25(e). Straehla's scienter can be inferred from all the facts alleged in this Complaint.

12.     The contracts to rebuild Puerto Rico's power grid was a huge financial win for Mammoth. The work accounted for 55% of the Company's total revenue in the fourth quarter of 2017, and 60% of the Company's total revenue for all of 2018. Mammoth's stock price increased from $14.49 per share at the start of the Class Period to a Class Period high of $40.88 per share – an increase of more than 180%.

13.     Mammoth investors began to learn of the wrongdoing beginning on March 15, 2019. On that day, Straehla surprised investors by stating that Mammoth was "in the process of leaving the island completely within the next 60 days" and that "there can be no assurances that we will be able to secure contracts for any of this work."[2] Unbeknownst to investors, on that same day, Ellison was being interviewed by agents from the Federal Bureau of Investigation and the Department of Homeland Security regarding Cobra's contract awards in Puerto Rico. Plus, on March 15, 2018, CW1 was contacted by an FBI agent, Brad Lynch, but CW1 was instructed by a Mammoth executive to ignore the call and not return it. Mammoths' stock price fell 12% on March 15, 2019, or $2.50 per share.

---

[2] Mammoth Energy Services Inc., 4Q18 and Fiscal 2018 – Earnings Call Transcript, dated March 15, 2019, at 2-3.

14.     On May 24, 2019, investors began to learn of the illegal conduct which allowed Cobra to obtain the PREPA contracts. That day, *The Wall Street Journal* published an article titled "*FEMA Official Probed Over Puerto Rico Power Restoration*," in which it reported that the FEMA Deputy Regional Administrator who oversaw FEMA's response to the damage caused by Hurricane Maria, Ahsha Nateef Tribble, was under investigation by the Department of Homeland Security and had been placed on administrative leave over allegations that she improperly steered work to Mammoth's subsidiary, Cobra. The Wall Street Journal's story was published in the middle of the day on May 24, 2019 and Mammoth's stock price fell from its intra-day high of $12.40 per share to close at $11.74 per share, a 5% drop. Mammoths' stock price had closed at $12.24 on May 23, 2019.

15.     On June 5, 2019, at 3:44 pm—shortly before the markets closed, *The Wall Street Journal* published another article, titled "*Puerto Rico Grid Contractor Caught Up in Federal Probes*" in which it reported that the "The Federal Bureau of Investigation and the Department of Homeland Security's Inspector General are looking into the work of a Mammoth Energy Services Inc. subsidiary in Puerto Rico, examining how the Oklahoma City-based company came to dominate the power restoration efforts there since 2017". The article also reported that the FBI had "opened a related criminal inquiry". Mammoth's stock price fell from its closing price on the prior day, $11.20 per share, to close at $9.53 per share on June 5 and continued to fall to close at $6.11 per share on June 6, 2019, a 45% drop.

16.     In an article published on September 10, 2019, United States Attorney for the District of Puerto Rico, Rosa Emilia Rodriguez-Velez told *Caribbean Business* that

"the investigation remains underway." Mammoth's stock price fell from its intra-day high of $4.25 per share on September 10, 2019 to close at $3.19 per share a few days later.

17. All totaled, almost $325 million in Mammoth's market capitalization was wiped out.

## JURISDICTION AND VENUE

18. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

20. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the Company's principal executive offices are located in this judicial district and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

21. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ, a national securities exchange.

## PARTIES

22. Lead Plaintiff Daniel Furia purchased shares of Mammoth common stock as set forth in his certification filed with the Court, ECF 22-1 at 8-9. He purchased his stock

at artificially inflated prices during the Class Period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

23. Lead Plaintiff Sharon Furia purchased shares of Mammoth common stock as set forth in her certification filed with the Court, ECF 22-1 at 11-12. She purchased her stock at artificially inflated prices during the Class Period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

24. Lead Plaintiff Vincent Furia purchased shares of Mammoth common stock as set forth in his certification filed with the Court, ECF 22-1 at 14-15. He purchased his stock at artificially inflated prices during the Class Period and has been damages by the revelation of the Company's material misrepresentations and material omissions.

25. Collectively, Daniel, Sharon and Vincent Furia are referred to throughout this complaint as the "Lead Plaintiffs."

26. Defendant Mammoth Energy Services, Inc. was incorporated pursuant to the laws of Delaware and maintains its principal executive offices in Oklahoma City, Oklahoma. The Company's stock trades on the NASDAQ under the ticker symbol "TUSK". Mammoth's principal place of business is at 14201 Caliber Drive, Suite 300, Oklahoma City, Oklahoma.

27. Defendant Arty Straehla ("Straehla") has been the Chief Executive Officer, and a Director, of Mammoth since June 3, 2016. Straehla has also been Cobra's Chief Executive Officer since its formation in 2017. Defendant Straehla signed Mammoth's annual reports filed on Form 10-K for the years 2017 and 2018, as well as Mammoth's

quarterly reports filed on Form 10-Q for: the fourth quarter of 2017; the first, second, and third quarters of 2018; and the first quarter of 2019.

28. Defendant Mark Layton ("Layton") has been the Chief Financial Officer and Secretary of Mammoth since June 3, 2016. Defendant Layton signed Mammoth's annual reports filed on Form 10-K for the years 2017 and 2018, as well as Mammoth's quarterly reports filed on Form 10-Q for: the fourth quarter of 2017, the first, second, and third quarters of 2018; and the first quarter of 2019.

29. Defendant Donald Keith Ellison was President of Mammoth's wholly owned subsidiary, Cobra Acquisitions, LLC, from January 2017 until he was terminated on June 7, 2019.

30. Collectively, Straehla, Layton and Ellison are, at times, referred to as the "Individual Defendants".

31. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being

concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

**RELEVANT NON-PARTIES**

32. Cobra Acquisitions LLC is a wholly-owned subsidiary of Mammoth and was formed in 2017. Cobra's principal place of business is the same as Mammoth's, 14201 Caliber Drive, Suite 300, Oklahoma City, Oklahoma. Cobra and Mammoth share a website, www.mammothenergy.com, and a telephone number and Ellison did not have a "@cobra" email address but, instead, his email address was "@mammothenergy.com".

~~32.~~33. Ahsha Nateef Tribble ("Tribble") was the FEMA Region II Deputy Regional Administrator, assigned to work in Puerto Rico as part of FEMA's response to Hurricane Maria from October 2017, until she was placed on administrative leave in mid-May of 2019. From October 2017 to September 2018, Tribble was Sector Lead for Power and Infrastructure in Puerto Rico and part of the Office of the FEMA Federal Coordinating Officer in Puerto Rico as Recovery Office Deputy Director – Infrastructure Directorate/Disaster Recovery Manager.

~~33.~~34. Jovanda R. Patterson ("Patterson" or "JoJo"), was a FEMA Deputy Chief of Staff, assigned to San Juan, Puerto Rico from October 2017 to March 2018. Patterson resigned from her position with FEMA in July 2018, whereupon she began working for Mammoth's wholly owned subsidiary, Cobra Logistics Holdings, LLC.

35. CW1 is a former President of a Mammoth subsidiary. CW1's tenure at Mammoth began on May 31, 2018. CW1 left Mammoth after Ellison was indicted. CW1 attended Leadership Meetings at Mammoth which were meetings of senior officers and

division heads of the various Mammoth subsidiaries. The meetings were run by Straehla and attended by Layton.

## FACTUAL ALLEGATIONS

**A.    Background.**

34.36. Mammoth was incorporated in Delaware in June 2016 as a wholly-owned subsidiary of Mammoth Energy Partners, LP, a Delaware limited liability company. Mammoth was formed by Wexford and Gulfport and Mammoth sold common stock to the public in an IPO which closed on October 19, 2016. Mammoth did not conduct any material business operations prior to becoming a public company.[3]

35.37. In 2017, Mammoth expanded its operations into the electrical infrastructure business with the formation of Cobra, and the acquisitions of Higher Power Electrical, LLC and 5 Star Electric, LLC.

---

[3] Form 10-K, filed with the SEC on March 15, 2019, at 57.

**B.    Hurricane Maria Devastates Puerto Rico.**

36.38. Hurricane Maria made landfall in Puerto Rico on September 20, 2017, causing extensive damage to the island's electrical power system. That same day, President Donald Trump issued a major disaster declaration for Puerto Rico (the "Declaration"). PREPA was the government-owned monopoly responsible for electricity generation, power distribution and power transmission in Puerto Rico.

37.39. FEMA is the federal agency tasked with assisting the public once the President declares that a state of emergency or major disaster exists. FEMA coordinates the federal government's role in preparing for, preventing, mitigating the effects of, responding to, and recovering from all domestic disasters.

38.40. Pursuant to the Declaration, FEMA was authorized to provide Individual Assistance, Public Assistance ("PA"), and Hazard Mitigation to Puerto Rico. Through its PA program, FEMA provided supplemental Federal disaster grant assistance for debris removal, emergency protective measures, and the restoration of disaster-damaged, publicly owned facilities and the facilities of certain private nonprofit organizations. The PA program also encouraged protection of these damaged facilities from future events by providing assistance for hazard mitigation measures.

39.41. FEMA processed PA grant funding according to the type of work the applicant undertook. Eligible work had to be required as a result of the declared incident, be located in the designated area, be the legal responsibility of the applicant, and be undertaken at a reasonable cost. Eligible applicants include states, federally recognized

tribal governments, U.S. territories, local governments, and certain private non-profit organizations. Puerto Rico was an eligible applicant.

40.42. From in or about October 2017 to in or about September 2018, Tribble was Sector Lead for Power and Infrastructure in Puerto Rico ("Sector Lead") as part of FEMA's response to Hurricane Maria. She was also designated as Recovery Office Deputy Director – Infrastructure Directorate/Disaster Recovery Manager ("Recovery Manager") in the Office of the FEMA Federal Coordinating Officer in Puerto Rico. Her official duties included, but were not limited to, approval of requisition for supplies and services and approval of worksheets submitted as part of the PA program.

41.43. Starting in or about October 2017 and up until March 2018, Patterson was a FEMA Deputy Chief of Staff assigned to San Juan, Puerto Rico. Patterson resigned from her position with FEMA on or about July 2018 and was hired by Cobra at more than three times her FEMA salary.

**C. Cobra Enters Into 2 Contracts With PREPA, plus Amendments, All Totaling $1.845 Billion.**

42.44. Cobra entered into the First PREPA Contract on October 19, 2017. The contract was expected to generate $200 million over a 120-day period. Mammoth issued a press release on October 19, 2017, stating in pertinent part:

> Mammoth Energy Services, Inc. ("Mammoth") (NASDAQ: TUSK) today announced that its wholly owned subsidiary, Cobra Acquisitions LLC, has signed a contract to aid in the restoration of utility infrastructure on the island of Puerto Rico. Cobra, a utility infrastructure business focused on the repair and construction of transmission and distribution (T&D) networks, will perform the work. **The contract will commence**

**immediately and is expected to generate revenue of up to $200 million over the initial 120 days.**

Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are honored to be chosen to help restore the electric utility infrastructure for the residents of Puerto Rico. After witnessing the destruction from Hurricane Maria first hand last weekend, where 85% of Puerto Rico's residents are currently living without electricity, we intend to work quickly both to help rebuild the electric grid and to help restore normalcy to people's lives."

The work to be provided by Cobra includes the following:

- Comprehensive damage assessment of existing electrical grid.

- Engineering services to aid in the design of a new electric utility grid to Puerto Rico Electric Power Authority (PREPA) specifications.

- Construction services to rebuild the electric grid.

- Fully self-contained solution including all operational and life support related to operating within the disaster area without creating an additional strain on the local population.

The initial mobilization of construction equipment and personnel is expected to begin in the coming days with people currently in place performing an initial damage and engineering assessment to determine the full scope of work required. This contract will be incremental to Mammoth's existing energy service operations.

~~43.~~45. Pursuant to Article 21, of the First PREPA Contract, Cobra and its representatives had the continuous obligation to disclose to PREPA all information and circumstances of its relations with clients and third persons and any interest which could reasonably influence PREPA when executing the contract or during its terms. Cobra was to avoid even the appearance of the existence of conflicting interests. Indictment ¶ 25(e). Specifically, Article 21 provided (Emphasis added):

ARTICLE 21: <u>Conflict of Interest</u>

The Contractor certifies that none of its representatives under this Contract receive payment or compensation of any nature, for services rendered regularly through an appointment to a governmental agency, body, public corporation or municipality of Puerto Rico. The Contractor also certifies that he may have consulting services contracts with other governmental agencies or bodies, but such condition does not constitute a conflict of interest for the Contractor.

The Contractor acknowledges that in executing the services pursuant to Contract **it has a duty of complete loyalty towards PREPA** which includes not having adverse interests to those of PREPA related to the services. Those adverse interests include representation of clients which have or may have opposed interests to those of PREPA in relation to the services. **Also, the Contractor shall have the continuous obligation to disclose to PREPA all information and circumstances of its relations with clients and third persons and any interest which could reasonably influence PREPA when executing this Agreement or during its term**.

1) The Contractor represents conflicting interests when on behalf of a client he must contend for that which it is his duty to oppose to comply with its obligations with another previous, present or potential client. Also, the Contractor represents conflicting interests when his conduct is described as such in the canons of ethic applicable to the Contractor and his personnel or in the laws or regulations of the Commonwealth of Puerto Rico.

2) In the event that any of the partners, directors or employees of the Contractor should incur in the conduct described herein, said conduct shall constitute a violation to the prohibitions provided herein. **The Contractor shall avoid even the appearance of the existence of conflicting interests.**

3) The Contractor acknowledges that the PREPA's Chief of Supply Chain Division and Contracting Officer shall have the power to intervene the acts of the Contractor and/or its agents, employees, and subcontractors regarding the enforcement of the prohibitions contained herein. In the event that PREPA should discover the existence of adverse interests with the Contractor, the Chief of Supply Chain Division and Contracting Officer shall inform the Contractor, in writing, of PREPA's intention to terminate this Contract within a thirty (30) day

period. During said period, the Contractor may request a meeting with the Chief of Supply Chain Division and Contracting Officer to present his arguments regarding the alleged conflict of interests, which meeting shall be granted by PREPA in every case of alleged conflict of interests. In the event that the Contractor does not request such a meeting during the specified thirty (30) day period or the controversy is not satisfactorily settled during the meeting, this Contract shall be cancelled.

4) The Contractor certifies that, at the time of award of this Contract, it does not have any other contractual relation that can enter in a conflict of interest with this Contract. The Contractor also certifies that no public employee has any personal or economical interest in this Contract.

44.46. In addition to representing and signing on behalf of Cobra in the execution of the First PREPA Contract, Straehla represented and signed on behalf of Cobra in all five amendments to the First PREPA Contract. The conflict of interest provision contained in Article 21 remained in effect for the full term of the First PREPA Contract.

45.47. On January 31, 2018 Mammoth filed a Form 8-K with the SEC disclosing that, on January 28, 2018, "Cobra and PREPA amended the Initial PREPA Contract to increase the total contract amount by an additional $245.4 million to a total of $445.4 million." In addition to increasing the value of the First PREPA Contract, Cobra warranted in this amendment ("Amendment No. 4"), that the scope of work as provided under the First PREPA Contract and its Amendments was performed consistent with all applicable FEMA laws, regulations, and eligibility guidelines and only included work eligible for FEMA reimbursement assistance. Indictment ¶ 30. Among the various changes made pursuant to Amendment No. 4, were the following provisions:

17

8. Anti-corruption Code for a New Puerto Rico: Contractor agrees to comply with the provisions of Act 2-2018, known as the Anti-Corruption Code for a New Puerto Rico, as the same may be amended from time to time.[4]

9. Government Ethics Act: The Contractor hereby certifies that it is in compliance with Act 1 of January 3, 2012, as amended, known as the Ethics Act of the Government of Puerto Rico, which, stipulates that, no employee or executive of the Contractor, nor any member of his/he[r] immediate family (spouse, dependent children or other members of his/her household or any individual whose financial affairs are under the control of the employee) shall have any direct or indirect pecuniary interest in the Services to be rendered under this Agreement, except as may be expressly authorized by the Governor of Puerto Rico in consultation with the Secretary of Treasury and the Secretary of Justice of the Government.

46.48. In their 2018 First Quarter 10-Q, Mammoth disclosed that "During the first quarter of 2018, we executed two amendments to the [PREPA] contract, increasing the total contract value to $945.4 million from $200.0 million originally." This included Amendment No. 5 to the First PREPA Contract, entered into on February 27, 2018, which increased the total value of the contract by an additional $500 million. Straehla *and* Ellison

---

[4] Act 2-2018 was passed into law in Puerto Rico "to compile into a single statute the **public policy on zero tolerance for corruption**, strengthen the tools to fight corruption, broaden the protections available to individuals who report acts of corruption; and for other related purposes." In recognition of the severe and pervasive corruption issues that plagued Puerto Rico, under the heading "STATEMENT OF MOTIVES," Act 2-2018 provides: "**Corruption is an evil that affects all levels of our society. This continues to be a serious and sensitive issue** due to the failed anti-corruption public policies implemented by previous administrations. This evil erodes public trust in institutions and the mere conduct of one of its members may lay to waste the collective-group effort of an organization. . . ." *See* http://www.oslpr.org/download/en/2018/A-002-2018.pdf. (Emphasis added).

represented Cobra together in executing Amendment No. 5 and *both* signed the amendment on Cobra's behalf.

47.49. Mammoth issued a press release announcing the Second PREPA Contract on May 29, 2018, titled "Cobra Signs New $900 million Contract to Finish the Restoration of Critical Electrical Services and Support the Initial Phase of Reconstruction of the Electrical Utility System in Puerto Rico." The press release stated in pertinent part:

**Request For Proposal (RFP) Process**

In mid-February, the Commonwealth of Puerto Rico began a competitive RFP bid process (RFP #77844) to complete the restoration of critical electrical system components and to support the initial reconstruction phase of its electrical utility system following the impact of Hurricane Maria. This process involved the submission of bids from qualified infrastructure construction companies and an analysis by PREPA of each bidder's experience, asset base, financial capacity, understanding of the project and overall cost to perform the work needed. After concluding the selection process, Cobra entered into a contract with PREPA on May 26, 2018.

**Restoration and Reconstruction Contract**

\*       \*       \*

Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are very proud of our Cobra team in Puerto Rico. Through the team's hard work, professionalism and technical ability, we have been selected to lead this very important effort to complete the restoration phase and transition to the reconstruction phase of the electric utility system in Puerto Rico, which is expected to last for several years. The reconstruction of the electric utility infrastructure will improve the reliability and quality of service for the citizens of Puerto Rico."

48.50. The press release, along with a copy of the Second PREPA Contract were included as exhibits to Mammoth's Form 8-K filed with the SEC on May 31, 2018. Straehla represented Cobra in executing the Second PREPA Contract, which contained a conflict of

interest provision under Article 21 that was identical to Article 21 of the First PREPA Contract, as described in paragraph 43 above. Under Article 49 of the Second PREPA Contract, titled "Compliance with Commonwealth of Puerto Rico Contracting Requirements," Straehla certified that Cobra and its representatives were in compliance with, among other ethical regulations and laws, the "Anti-Corruption Code for a New Puerto Rico" – a certification that Straehla had previously made in Amendment No. 4 to the First PREPA Contract as described in paragraph 45 above.

49.51. All totaled, the PREPA contracts could result in potential revenue of $1.845 billion for Mammoth.

### D. Defendants Publicly Discuss the First PREPA Contract Award.

50.52. After announcing the award of the First PREPA Contract, on October 20, 2017, Mammoth held a conference call with analysts. Defendants Straehla and Layton participated on this conference call, along with Donald Peter Crist, Mammoth's Director of Investor Relations. During the conference call, Straehla stated in pertinent part:

> As the press release states, Mammoth signed a contract worth up to $200 million in revenue over the next 120 days. We expect this to be ongoing work after that point in time. We hope this leads to additional work in rebuilding the infrastructure for the emergency situation.

> Our team has been in Puerto Rico for the past week, and I personally was in Puerto Rico over the past weekend, and I can tell you firsthand that there is a dire need for this aid. Most of Puerto Rico's population is currently living without power. We intend to work quickly to restore power and a sense of normalcy to the people of Puerto Rico.

> Under the terms of the contract, we will provide construction services to restore the transmission and distribution networks and substation infrastructure. Cobra will provide a self-contained solution to the citizens of Puerto Rico aid in their time of need.

To accomplish this without being a burden on -- an already strained society, we will provide accommodations, freshwater generation and our own medical facilities for our workers. We have personnel performing an additional -- an initial damage assessment with construction crews and equipment set to be mobilized to the island in the coming days. We anticipate having our full complement of personnel and utility construction equipment in Puerto Rico shortly.

51.53. In response to a question from an analyst as to the Company's "margin expectations," Layton responded in pertinent part:

…we expect that this contract will have a significant impact on both Q4 '17 and Q1 2018. Further, we look forward to discussing our Q3 results in the coming weeks. We're in the preliminary assessment of damage and there are a number of variables and storm work but we expect this to be accretive to our corporate margin.

52.54. In response to a question from an analyst as to what "the payment terms [are] going to look like," Straehla responded:

This contract included a $15 million upfront payment and from that point -- and then we also put in the contract that it will be -- we will be paid -- we will bill twice weekly. And the contract is with a PREPA, but **it was drafted and -- in the room every step of the way with FEMA.** So there is -- **it does comply with FEMA reimbursement requirements. So -- and quite honestly, we wouldn't have entered this contract if we didn't think we would -- if we didn't think we'd get paid.** And we feel very, very strongly about that. And again, we negotiated the $15 million payment upfront to start with the mobilization efforts. [Emphasis added.]

## E. The First PREPA Contract Draws Immediate Scrutiny.

53.55. The First  PREPA Contract drew immediate scrutiny from the U.S. government and the press for a number of reasons, including: Cobra's lack of prior experience; the absence of a normal bidding process; and because PREPA had signed a

$300 million contract with Whitefish Energy – a firm with only two full-time employees, based in the same hometown of then-Interior Secretary, Ryan Zinke – just two days prior to entering into the contract with Cobra. However, Mammoth assured the public that the First PREPA Contract was above-board, that the provisions that landed Whitefish in hot water did not exist in Cobra's contract and the majority of negative attention focused on Whitefish.

54.56. On October 26, 2017, *Vox* published an article titled "*Puerto Rico just hired 2 contractors with little experience to fix its broken power grid*."[5] The article stated in pertinent part:

> Puerto Rico's power crisis has improved little a month after Hurricane Mari[a] took out the power grid. As of Tuesday, 76 percent of power users still didn't have electricity.

> In response, Puerto Rico's public power company has awarded big contracts to US energy companies with no experience responding to a major disaster. Generally, experienced utility crews take on the daunting task of repairing power grids in most US disaster zones.

> Neither contract was awarded through a regular bidding process either, though it could be optional under a technical rule from the Federal Emergency Management Agency. Still, the decision to forgo an official process concerns experts and set off alarm bells in Washington, . . .

> \* \* \*

> **Arty Straehla**, the CEO of Mammoth (the parent company of Cobra), **said in a conference call on Friday that Cobra** does infrastructure repairs for utility companies across the Midwest. The company, founded in 2017 according to SEC filings, has 275 full-time employees, he said,

---

[5] https://www.vox.com/policy-and-politics/2017/10/26/16533512/puerto-rico-power-contracts.

and **recently completed electrical work in Texas and Florida after the hurricanes**.

**In a follow-up conversation with Vox, a spokesperson for [Cobra] was unable to give further details about Cobra's contracts in Texas and Florida, or any of the clients they have served. The company has not won any federal contracts in the past or handled contracts for the state of Texas, based on a search of government procurement databases**.

Straehla said Cobra planned to send about 500 workers to Puerto Rico in the coming days. PREPA already put down a $15 million deposit to start work on the grid, he said, though the contract didn't go through a bidding process.

**"[The contract] was drafted in the room and every step of the way with FEMA, so it does comply with FEMA reimbursement," Straehla said. "We wouldn't have entered this contract if we didn't think we would get paid."**

Still, two former FEMA officials told Vox they are concerned about Puerto Rico's decision to award such large contracts outside the regular bidding process, normally required for federal reimbursements. [Emphasis added.]

55.57. On October 31, 2017, *E&E News* published an article titled "*Echoes of Whitefish Surface in $200M Puerto Rico grid deal*."[6] The article stated in pertinent part:

Two days [prior to the Cobra contract], PREPA had approved a separate $300 million grid repair deal with Whitefish Energy, a small contracting firm that hails from Interior Secretary Ryan Zinke's hometown of Whitefish, Mont.

The costly terms of PREPA's deal with Whitefish came under intense scrutiny after they were made public, and Ramos [PREPA's executive director] ultimately announced he would move to cancel the contract Sunday after calls from Puerto Rico's governor to end the deal.

Several U.S. lawmakers, including Rep. Raja Krishnamoorthi (D-Ill.), a former official in Illinois' anti-corruption unit, voiced concerns about

---

[6] https://www.eenews.net/stories/1060065137/print.

language in the Whitefish contract that appeared aimed at avoiding government oversight.

"In no event shall PREPA, the Commonwealth of Puerto Rico, the [Federal Emergency Management Agency] Administrator, the Comptroller General of the United States, or any of their authorized representatives have the right to audit or review the cost and profit elements of the labor rates specified herein," the document stated.

The same language appears word for word in PREPA's arrangement with Cobra, according to a copy of the contract provided to E&E News. The news publication *Caribbean Business* posted a copy of the same document on Oct. 20, the day after it was finalized.

However, the section directly above that statement in both contracts grants those same government entities "access to any books, documents, papers, and records of the Contractor" for up to three years of the final payment under the Contract.

A Cobra spokesman said the contract "imposes extensive disclosure obligations on Cobra in favor of all appropriate governmental authorities" and said there had been no requests to change the language in the documentation.

**PREPA's deal with Cobra also states that FEMA officials had the chance to review the arrangement, finding it "an acceptable form to qualify for funding from FEMA or other U.S. Governmental agencies."**

That same line landed Whitefish Energy and PREPA in hot water after FEMA representatives claimed they had not reviewed the contract and that FEMA also had "significant concerns" with its contents. **Representatives for FEMA did not respond to a request for comment on the agency's oversight of Cobra, but Mammoth Energy executives said in a recent conference call that FEMA was closely involved in reviewing its subsidiary's interactions with PREPA, in apparent contrast to Whitefish.**

*     *     *

Reached by phone for comment, Cobra Energy President Keith Ellison defended his company's contract while noting that he could only speak in a personal, unofficial capacity. **"We feel we had a really good package**

**put together that would provide for the community without taking needed resources away from the island**," he said, **characterizing his company's relationship with PREPA as a "standard bidding process for a storm contract**."

Ellison deferred official comment on specific contractual language to Mammoth representatives. He also suggested E&E News reach out to PREPA about its choice of "boilerplate" contract language.

A PREPA spokeswoman did not respond to a question about the contents of the contract with Cobra. The company's executive director said in a press conference Sunday that he had not been aware of the controversial language in the Whitefish contract until it was reported on in the press, despite the fact that he had signed off on the Cobra contract containing identical language on Oct. 19.

**Cobra said in an emailed statement that the company's team met with representatives from FEMA, the Army Corps of Engineers "and other key agencies" during a trip to Puerto Rico in mid-October**.

"Management met with PREPA authorities at their command center and described the company's experience, ability to mobilize quickly and its plan to aid in the restoration of power to the island," the statement read. The company pointed out that it was also involved in recovery efforts in Texas and Florida following Hurricanes Harvey and Irma.

Cobra added that it has a 60-person "advance crew" on the island starting to set up operations, with more than 500 people set to mobilize there in the coming weeks.

Ellison said his "biggest concerns" with the restoration progress so far stem from getting access to raw materials for rebuilding the grid, which have been difficult to shuffle into the island through clogged ports. . . .

~~56.~~58. On October 31, 2017, *The Intercept* published an article titled "*There's A Shady Puerto Rico Contract You Didn't Hear About*," which also raised questions about the First PREPA Contract. Concerning the October 20, 2017 call with investors in which Straehla claimed that Cobra "hired an experienced management team with an average of

25 years of industry experience at much larger companies to begin the process of entering

the energy infrastructure business," the article noted:

> **The stated expertise and experience may be a bit misleading. By phone, Wilson [Mammoth's spokesman] clarified to The Intercept that it was four top managers of Cobra that together hold an average of 25 years experience in the utility sector, though he was unable to provide more information as to those executives' names, which companies or utilities they had worked for, or the specific nature of their utility experience**. While he and executives on the call said Cobra had been involved in grid restoration work following hurricanes Irma and Harvey, the company currently has no ongoing storm-related contracts outside of Puerto Rico. . . .

> Neither Wilson nor the call offered much detail on how the contract originally came about, either. "Our leadership team went to Puerto Rico proactively to meet the authorities there and offer our services and expertise," Mammoth wrote in a statement shortly after the contract was signed. "We did not have a previous relationship with the team at PREPA. We flew around the island to examine the situation, presented our expertise in storm response and utility infrastructure, including working in Texas and Florida to respond to the recent hurricanes, and look forward to helping Puerto Rico recover."

57.59. On November 2, 2017, the House Committee on Energy & Commerce held

a hearing on the energy infrastructure recovery efforts in the wake of Hurricane Maria. In

his opening remarks, Ranking Member Frank Pallone, Jr. (D-NJ), expressed concerns

about the manner in which contracts were awarded, stating in pertinent part:

> I am also troubled by the maze of contracts with numerous companies for overlapping missions—a patchwork that is failing to turn the lights back on in Puerto Rico. It needs to change now. **I am deeply concerned by the terms of the contracts PREPA signed with** Whitefish and **Cobra Acquisitions, which went so far as to bar PREPA from holding the companies liable for delayed completion of grid repair work or letting the government audit their work**.

58.60. Charles Alexander, Director of Contingency Operations for the U.S. Army Corps of Engineers, testified at the hearing. Mr. Alexander testified in response to a question from House Representative Fred Upton (R-MI) as follows:

> Mr. Upton: **Did the Corps have any advance knowledge of working with PREPA prior to the contract that they established with** Whitefish and **Cobra?** Were you aware of that contract before it was signed?

> Mr. Alexander: **No, sir, we were not.** We were engaged in our temporary power mission under the Stafford Act, and we have been working that since the 6th of September. The news that PREPA had independently committed in a contract to another company, we were not consulted; we were not aware.[7]

59.61. On November 2, 2017, Mammoth held a call with investors to discuss the Company's 3Q17 financial results. During the call, James Wicklund from Credit Suisse AG asked Straehla:

> Cobra has made the news lately because of Puerto Rico, but not just Puerto Rico but because of another company that's operating there, and I know you're both called to Washington. I don't expect you to make any comments about the Montana-based company, **but I don't think you guys have hired the Secretary of Interior's son as an intern[8]**, and I know you guys have more than 2 full-time employees. So, we won't talk about the Montana company, but can you talk about how you guys expect to address the hearings in Washington on Puerto Rico?

---

[7] House Committee on Energy & Commerce, "The 2017 Hurricane Season: A Review of Emergency Response and Energy Infrastructure Recovery Efforts" November 2, 2017, Hearing Transcript at 43.

[8] This is an apparent reference to the fact that Interior Secretary Zinke's son briefly worked at Whitefish. *See* https://thehill.com/policy/energy-environment/357562-zinke-i-had-absolutely-nothing-to-do-with-whitefish-contract. As alleged herein, Cobra/Mammoth directly hired FEMA official Patterson in July 2018 as a favor to Tribble.

Straehla responded:

> Yes, we haven't – there has not been anything. **And I will tell you, we are absolutely – we did everything absolutely right**. Let me give just a little bit of backdrop of how we did this. We did this the old-fashioned way on the 13[th] of October – and we had this competency within our group. We had performed extremely well when the hurricanes, unfortunately, hit South Texas when Harvey and Irma went through. So we had this ability, built on our logistics group that we have, built on our lodging group that we have and experience. **So myself and my President [Ellison] flew down to Puerto Rico on the 13[th] of October. We met with people, started meeting on Saturday at the convention center where everybody was there, that's the command and control center. We went from meeting to meeting, talking with FEMA officials, talking with the governors, officials, talking with officials from PREPA, that resulted in a meeting that evening – Saturday evening around 7:00 p.m. with PREPA**. We had a fully self-contained plan that nobody else has – had put together for them. That includes having berthing barge, that includes housing our folks. We have, in fact, began the logistics aspect of that with the first barge departed on the 29[th] loaded with 75 pieces of equipment, mostly buckets and diggers. Yesterday, another barge departed from Fourchon, Louisiana, with 28 pieces of equipment. We'll have more barges departing. We've actually sent large cargo planes full of equipment as well. So our mobilization, t**he way that we have done this, it's been right from the very beginning**, and our goal and our operational is to get the lights turn back on in Puerto Rico with our team. **We've got a very** …

James Wicklund interjected:

> **A very legitimate effort, a very legitimate effort**.

To which Straehla confirmed:

> **Yes, sir**.

~~60.~~62. A November 3, 2017 article published in *The Atlantic* titled "*The Puerto Rico Power Scandal Expands*,"[9] noted that Cobra's contract with PREPA had drawn attention

---

[9] https://www.theatlantic.com/politics/archive/2017/11/puerto-rico-whitefish-cobra-fema-contracts/544892/.

from various federal authorities, including that, "According to a congressional committee staff member in communication with the office, the Department of Homeland Security's Inspector General may also be probing the Cobra contract."

~~61.~~63. On November 6, 2017, *CNN* published an article titled "*Here's the other small firm that won a big Puerto Rico power deal*,"[10] reporting that the Cobra deal is "one of two major contracts greenlighted by PREPA that have come under scrutiny on Capitol Hill since recovery efforts began on the island over a month ago." The article also reported that "PREPA, the embattled state-owned utility led by executive director Ricardo Ramos, has faced scrutiny over how these fledgling companies won such lucrative deals over larger, more established utilities," and that "many question whether PREPA followed the appropriate steps in awarding the contracts." The article further reported that Representative Peter DeFazio, a Democrat from Oregon, asked Brock Long, the head of FEMA, at a House hearing whether he or anyone at FEMA approved the Cobra contract or the prior $300 million contract between Whitefish and PREPA related to energy restoration after Hurricane Maria. *Long's response was that "[t]here's not a lawyer within FEMA that would have ever approved that contract." Long also added that "it was not our contract [a]nd the other thing to be clear here is we don't approve contracts."* (Emphasis added.)

~~62.~~64. On December 1, 2017, then-Senator Claire McCaskill, acting in her capacity as the Ranking Member of the United States Senate Committee on Homeland Security and Governmental Affairs, sent a letter to Straehla requesting information concerning Cobra's

---

[10] https://money.cnn.com/2017/11/06/news/economy/cobra-power-deal-puerto-rico/index.html.

role in the restoration efforts in Puerto Rico (the "McCaskill Letter"). The McCaskill Letter requested that Straehla provide detailed information and documents with respect to bidding, negotiation, and the execution of the First PREPA Contract, including information concerning FEMA or any other federal agency's involvement in the process. The McCaskill Letter further stated that the Committee "is concerned about the company's apparent attempt to circumvent federal oversight." The contents of the McCaskill Letter are set forth below:

> Dear Mr. Straehla:
>
> I write to request information about the role of Cobra Acquisitions, LLC (Cobra), a wholly owned subsidiary of Mammoth Energy Services, Inc., in the restoration of Puerto Rico's electrical grid in the wake of Hurricane Maria.
>
> As of November 30, over two months since Hurricane Maria made landfall, more than one third of the island remains without power. As federal agencies continue to work with the Puerto Rico Electric Power Authority (PREPA) to restore power, it is imperative that any taxpayer dollars used in this effort are spent effectively and are not subject to waste, fraud, or abuse. Recent revelations surrounding the $300 million contract that PREPA awarded to Whitefish Energy Holdings, LLC, have raised concerns about the management and oversight of federal funds used in the power restoration efforts.
>
> On October 19, 2017, PREPA awarded a $200 million contract to Cobra to perform work that includes a "comprehensive damage assessment of the existing electrical grid," "engineering services to aid in the design of a new electric utility grid," and "construction services to rebuild the electric grid." Recent reports suggest that PREPA plans to use disaster aid funds from the Federal Emergency Management Agency (FEMA) to pay Cobra under this contract. Additionally, **you reportedly stated that FEMA played a role during the contracting process and was "in the room every step of the way**."
>
> In light of these indications that PREPA plans to use FEMA disaster relief fuds to pay Cobra, **I am concerned about the company's apparent**

**attempt to circumvent federal oversight**. A publicly released copy of the contract shows that Cobra and PREPA agreed to the following:

> In no event shall PREPA, the Commonwealth of Puerto Rico, the FEMA Administrator, [or] the Comptroller General of the United States . . . have the right to audit or review the cost and profit elements of the labor rates specified herein.

This clause is in direct conflict with both PREPA and FEMA's obligations to ensure that any costs – including labor rates – associated with taxpayer-funded contracts are fair and reasonable.

In order to assist this Committee with its oversight of federal spending and disaster response efforts, I request that you provide the following information as soon as possible, but no later than December 22, 2017.

1. Please describe the contracting process, including bid submission and negotiations, between PREPA and Cobra. If officials from FEMA, the U.S. Army Corps of Engineers, or any other federal agency were involved in the contracting process between PREPA and Cobra, please explain their roles.

2. Please describe any representations made by PREPA to Cobra regarding PREPA's ability to obtain FEMA Public Assistance funding and utilize such funding to pay for costs associated with PREPA's contract with Cobra.

3. Please explain the purpose of "ARTICLE 59: <u>Access to Records</u>," included in the October 19, 2017 contract between PREPA and Cobra. What is the legal basis for the stated prohibition on the ability to "audit or review the cost and profit elements of the labor rates specified [in the contract]?"

4. Please provide a copy of the following documents:

    a. The contract executed by PREPA and Cobra on October 19, 2017, and all exhibits, amendments and addenda;

    b. Any other agreements between PREPA and Cobra related to the restoration of power in Puerto Rico;

c. The request for proposals, or similar notice of opportunity, released by PREPA;

d. All formal proposals or other responses provided by Cobra to PREPA prior to the award of the contract;

e. All communications between Cobra and PREPA related to the restoration of power in Puerto Rico;

f. All communications between Cobra and any employee or representative of the federal government related to Cobra's contract with PREPA; and,

g. All subcontracts awarded by Cobra related to its contract with PREPA.

5. Please describe the work that Cobra plans to complete under its contract with PREPA, and the work that has been completed to date.

6. Please describe Cobra's role in restoring power to areas affected by Hurricanes Harvey and Irma, and identify all entities, (e.g. state or local agencies) with which Cobra entered into an agreement related to the restoration of energy infrastructure.

**F.     The First PREPA Contract Is Amended.**

~~63.~~65. On November 1, 2017 PREPA and Cobra amended the First PREPA contract ("Amendment No. 1"). These amendments are set forth below. Defendant Straehla signed the amended contract for Cobra. The amendments removed the provisions barring the government's right to audit or review the costs and profit elements of the contracts and the other removed the representation from PREPA that FEMA reviewed and approved the contracts.

~~64.~~66. The original version of Article 59(a) provided in pertinent part:

ARTICLE 59: Access to Records

1) The Contractor agrees to provide PREPA, the Commonwealth of Puerto Rico, the FEMA Administrator, the Comptroller General of the United States, or any of their authorized representatives access to any books, documents, papers, and records of the Contractor which are directly pertinent to this Contract for the purposes of making audits, examinations, excerpts, and transcriptions, during the Contractor's performance of the Contract and for up to three (3) years after Contractor's receipt of final payment under the Contract. *In no event shall PREPA, the Commonwealth of Puerto Rico, the FEMA Administrator, the Comptroller General of the United States, or any of their authorized representatives have the right to audit or review the cost and profit elements of the labor rates specified herein.*

65.67. The amended version of Article 59(a) removed the sentence, underlined and italicized above. As discussed *infra* at paragraph 126, both FEMA and the Department of Homeland Security of Inspector General ("DHS OIG") would later determine that FEMA's eligibility determination of the Cobra contract was unsound and unsupported.

66.68. The original version of Article 68 provided:

ARTICLE 68: Penalties, Fines, and Disallowed Costs.

*By executing this Contract, PREPA hereby represents and warrants that FEMA has reviewed and approved of this Contract, and confirmed that this Contract is an acceptable form to qualify for funding from FEMA or other U.S. Governmental agencies.* If, as a result of any uncured violation of applicable law by Contractor, any U.S. Federal agency or the Commonwealth of Puerto Rico disallows or demands repayment for costs incurred in the performance of this Contract, or if any penalty is imposed due to an act or omission by the Contractor, the Contractor shall be solely responsible for such penalty, disallowed costs, or repayment demand, to the extent of its fault and/or responsibility, and shall reimburse PREPA in full within ten (10) days of receiving notice from PREPA of such penalty, disallowance, or repayment demand. Any monies paid by the Contractor pursuant to this provision shall not relieve the Contractor of liability to PREPA for damages sustained by PREPA by virtue of any other provision of this Contract.

67.69. The amended version of Article 68 removed the sentence, underlined and italicized above, which stated that FEMA had reviewed and approved of the contract. By agreeing to and acknowledging these amendments, Straehla and Mammoth knew, or recklessly disregarded, that their ability to get paid, and PREPA reimbursed by FEMA, was significantly higher and at risk as Article 68 removes PREPA's acknowledgement that FEMA reviewed and approved the contract. It also eliminated Straehla's purported public justification for why Cobra's contract award was different from the Whitefish contract award.

**G.      Cobra Hires FEMA Official Patterson In July 2018.**

68.70. As set forth in the indictment, Cobra hired Patterson from FEMA to benefit Patterson, Tribble, Cobra, and Mammoth.

69.71. On March 22, 2018, Tribble sent an email from her personal account to Ellison at his personal email account, in which Tribble inquired about Ellison's intent to help Tribble's friend and FEMA's Deputy Chief of Staff in San Juan, Puerto Rico, Jovanda R. Patterson ("JoJo"), secure a position with Cobra. Tribble also expressed concern that Patterson's salary would be inadequate for a move to New York. Ellison responded to Tribble:

> I ran into JoJo last night at Ben & Jerry's. I asked her directly if she was serious. She said yes, I told her to get with Michelle to start the paperwork. I was dead serious and sincere when I said I would take care of her. She will be our rotation coordinator located here in PR to start with.

Indictment ¶ 60.

70.72. On March 24, 2018, Tribble sent an email through her personal account with the subject line "Connecting you by gmail" to Patterson and Ellison at their personal accounts, stating "Jo – Per our convo." Indictment ¶ 61.

71.73. That same day, Patterson sent an email through her personal account to Ellison at his personal account, stating, "Hey Sir, I wanted to reach out to get information before I text Michelle. I know your busy so I truly hate to bother you." Indictment ¶ 62.

72.74. On April 7, 2018, Tribble and Ellison received emails to their personal accounts from Patterson's personal account, stating "Thank you both for everything!!! My day will be great when I get a picture of Ahsha [Tribble] getting her treatment today please. J Patterson." That same day, Ellison responded to Tribble and Patterson, "I'm on it. I will get her down there at 1pm." Indictment ¶ 66.

73.75. On May 8, 2018, while engaged in employment negotiations with Cobra, Patterson, in her capacity as a FEMA employee, completed a customer Past Performance Evaluation for Cobra Logistics as part of a vendor bid process. Indictment ¶ 121.

74.76. On June 1, 2018, Cobra's Director of Human Resources and Administration emailed an "Offer Letter" to Patterson at her personal account. The email tendered a job offer in Business Development for Cobra Logistics, a subsidiary of Cobra. The Offer Letter stated that Patterson's annual salary would be $160,000 with bonus opportunity up to 30% of her annual salary, plus per diem, bringing her potential compensation to $274,000. As of January 7, 2018, Patterson's annual FEMA salary was less than $100,000. Indictment ¶ 74.

**H.     Tribble Alerts Ellison About A Potential Non-Payment of $200 Million, Ellison Shares This Information With Straehla and Wexford and Gulfport sell $150 Million Worth of Stock.**

75.77. After Cobra was awarded the First PREPA Contract, on November 1, 2017 Mammoth filed a Form S-3 registration statement with the SEC for Wexford and Gulfport to sell, collectively, four million shares of Mammoth common stock. On November 27, 2017 Layton received a letter from the SEC that raised a number of questions concerning Mammoth's quarterly and annual filings. In addition, the letter stated that Mammoth had to resolve those questions before the SEC would be in a position to accelerate the effectiveness of 2017 Registration Statement. Layton responded, on December 12, 2017, that Mammoth "will not request acceleration of the effectiveness of the Form S-3 until" the SEC's comments "are resolved." Mammoth took no steps thereafter to effectuate the offering until June 2018.

76.78. On June 3, 2018, Tribble forwarded a chain of emails between herself and a PREPA consultant regarding monies PREPA owed Cobra, from her FEMA account to her personal account. She then sent the emails from her personal account to Ellison's personal email account. The subject line on the email chain was "$200M behind in payment to Cobra – stop work looming again." Indictment ¶ 76.

77.79. On June 6, 2018, three days after Ellison received the above email from Tribble, Mammoth filed a Form S-3/A with the SEC to effectuate the secondary offering so Wexford and Gulfport could sell their four million shares of stock.

78.80. On June 15, 2015 Layton wrote the SEC that "Mammoth Energy Services, Inc., . . . respectfully requests that the effective date for the Registration Statement on Form

S-3 . . ., filed with the Securities and Exchange Commission . . . on November 1, 2017, as amended by Amendment No. 1 filed with the Commission on June 6, 2018, be accelerated to June 19, 2018 . . . or as soon thereafter as practicable." On June 19, 2018 the SEC granted effectiveness thereby enabling Wexford and Gulfport to sell their shares.

81.    On June 18, 2018, Straehla and Layton attended a Leadership Meeting of senior officers and division heads of various Mammoth subsidiaries. There were approximately 15 to 20 attendees at the meeting. CW1, who attended this meeting, said that Straehla informed the attendees that PREPA was "pushing back" on making payments to Mammoth. Straehla stated that he was not sure if Mammoth would collect all of the monies owed to it by PREPA.

82.    In June 2018, information relating to PREPA "pushing back" on making payments to Mammoth was non-public information and was the information Tribble shared with Ellison just a few weeks earlier. It is more than reasonable to presume that Ellison relayed this information to Straehla who repeated it at the Leadership Meeting that was attended by Layton, and CW1, among others.

79.83. The secondary offering was declared effective on June 26, 2018. In this offering, Wexford sold 2,764,400 shares for total proceeds of $105,074,844 and Gulfport sold 1,235,600 shares for total proceeds of $46,965,156. Both Wexford and Gulfport have designees on Mammoth's Board of Directors with Wexford's designee being the Chairman of the Board.

**I.      The FBI and Homeland Security Interview Ellison in March 2019.**

37

80.84. On March 15, 2019, Ellison met with agents from the FBI and Department of Homeland Security Office of the Inspector General at his farm in LaGrange, Georgia, concerning activities related to Puerto Rico. During the interview, Ellison stated to the federal law enforcement agents that he had no personal relationship with Tribble and that his only connection to her was in relation to business. Ellison also told the agents that he had never taken a helicopter trip with Tribble. Indictment ¶¶ 119-120.

81.85. That same day, Mammoth's Vice President and General Counsel, Rusty LaForge, resigned from the Company. LaForge's resignation was not made public until April 26, 2019.[11] Mammoth did not provide a reason for LaForge's resignation, but the move appeared to be abrupt. LaForge was unemployed for three months following his resignation.[12]

86. On March 15, 2019 CW1 was contacted by an FBI agent, Brad Lynch, who left a voice mail for CW1. CW1 contacted Jim Butler of Mammoth about the call. Butler told CW1 he would contact Straehla. Butler called CW1 back and told CW1 that Straehla said to ignore the call and not return it. CW1 followed those instructions.

82.87. On April 26, 2019, FBI agents obtained warrants in the District of Puerto Rico to seize the vast majority of Ellison's assets including:

- Funds up to the amount of $578,380.00 in a JP Morgan Chase checking account in Ellison's name – the government seized $71,551.40;

- Funds up to the amount of $2,175,943.11 in a JP Morgan Chase savings account in Ellison's name – the government seized $276,583.84;

---

[11] Schedule 14A, filed with the SEC on April 26, 2019, at 13.
[12] *See* https://www.linkedin.com/in/rusty-laforge-6b48215/.

- Funds up to the amount of $107,995.72 in a JP Morgan Chase savings account in Ellison and his wife's name – the government seized $100,306.70;

- Funds up to the amount of $1,000,000 in a Charles Schwab & Co., Inc. account in Ellison's name – the government seized $1,000,000;

- A 2018 Invincible 40-foot catamaran, which Ellison paid $660,640 for – the government seized the catamaran; and

- A 2018 Ford F-150 XL pickup truck, which Ellison paid $30,000 for – the government seized the pickup truck.

According to FBI Special Agent Juan Carlos Lopez, all of the property seized was procured by Ellison after 2017. *See* Declaration of Juan Carlos Lopez, dated June 18, 2019, *Ellison v. United States*, No. 3:19-cv-03341-SI (N.D. Cal.) (ECF No. 26-1) (the "Lopez Declaration"). In addition to the seized assets described above, the FBI had seized Ellison's remaining assets – including more than $3 million in a Charles Schwab account.[13]

83. 88. On May 14, 2019, Tribble was relieved of her duties and placed on administrative leave at FEMA as a result of the federal investigation into her alleged illegal conduct in steering contracts to Cobra.[14]

**J.      The Truth Begins to Emerge But Straehla Misrepresents That PREPA Is Holding Up Additional Payments.**

---

[13] *See* Plaintiff's Reply Regarding Plaintiff's Motion for a Temporary Restraining Order and Motion to Unseal Affidavits and Other Supporting Documents in Support of Seizure Warrant, dated June 26, 2019, *Ellison v. United States*, No. 3:19-mc-80167-JST (N.D. Cal.) (ECF No. 29) at 2-3.

[14] https://www.noticel.com/ahora/tribunales/funcionaria-de-fema-y-ejecutivo-de-cobra-arrestados-por-fraude-en-aee/1119126601.

89. Prior to the March 15, 2019 conference call to discuss Mammoth's fourth quarter and year-end earnings, CW1 attended a a Leadership Meeting during which Straehla stated that Mammoth/Cobra was leaving Puerto Rico because PREPA was not going to pay Mammoth/Cobra on approximately $280 million in outstanding invoices. Straehla said because PREPA was not going to pay, that "we are pulling out." Layton attended this meeting.

84.90. On March 15, 2019 Mammoth held an analyst call to discuss its financial results for the fiscal fourth quarter ended December 31, 2018. In addition to announcing lower-than-expected earnings for the fiscal quarter, Straehla surprised the market when he revealed that "Our staffing levels declined during the first quarter of 2019 and we are currently in the process of winding down our operations in Puerto Rico, with the expectation of leaving the island completely within the next 60 days."[15]

91. Straehla omitted to reveal that PREPA would not be paying Mammoth/Cobra for outstanding invoices and that this was real reason why Mammoth was pulling out of Puerto Rico.

85.92. On March 19, 2019 stock market analyst Jacob Lundberg of Credit Suisse lowered its rating of Mammoth in response to the "abrupt end of Cobra's work on the island" and "uncertainty" regarding the Company's potential to secure additional contracts in Puerto Rico.

---

[15] Mammoth Energy Services Inc., 4Q18 and Fiscal 2018 – Earnings Call Transcript, dated March 15, 2019, at 2-3.

86.93. Barclays stock market analyst Dave Anderson wrote, on March 15, 2019, that Mammoth's backlog was reduced to $765 from $1.2 billion largely from the removal of future work in Puerto Rico. He wrote that "It appears the Puerto Rico story is taking a pause."

87.94. Mammoth's stock price fell $2.50 per share, or over 12%, from its closing price of $20.28 per share on March 14, 2019 to a closing price of $17.78 per share on March 15, 2019.

88.95. On May 24, 2019, when the *Wall Street Journal* published an article titled, "*FEMA Official Probed Over Puerto Rico Power Restoration*." The article stated in pertinent part:

> A high-ranking Federal Emergency Management Agency official who oversaw the reconstruction of Puerto Rico's electrical grid is under investigation by a government watchdog over allegations she steered work to a utility contractor, according to people familiar with the matter.
>
> FEMA Deputy Regional Administrator Ahsha Tribble was relieved of her duties and placed on administrative leave last week amid a continuing probe by the Department of Homeland Security's Office of Inspector General, these people said.
>
> Ms. Tribble deployed to Puerto Rico after Hurricane Maria struck the U.S. island territory in September 2017 and spent the next year there coordinating FEMA's response to the storm-ravaged power system, according to her FEMA biography.
>
> The DHS Inspector General, which conducts investigations into FEMA, has probed her interactions with Cobra Acquisitions LLC, a grid-construction contractor hired by Puerto Rico's public electric utility after the hurricane, people familiar with the matter said. The investigation has also focused on whether Cobra gained an improper advantage in the contracting process, they said.

89.96. The article also noted that "Cobra's parent company didn't respond to requests for comment."

90.97. At 3:44 pm, approximately one-half an hour before the close of trading on June 5, 2019, the *Wall Street Journal* published an article titled, "*Puerto Rico Grid Contractor Caught Up in Federal Probes*." This article stated in pertinent part:

> An electric utility contractor that turned Puerto Rico's lights back on after Hurricane Maria now is ensnared in contract-steering probes as federal authorities scrutinize billions of dollars in public reconstruction spending across the U.S. territory.
>
> The Federal Bureau of Investigation and the Department of Homeland Security's Inspector General are looking into the work of a Mammoth Energy Services Inc. subsidiary in Puerto Rico, examining how the Oklahoma City-based company came to dominate the power restoration efforts there since 2017, people familiar with the matter said.
>
> Inspector General investigators separately have probed the company's rates for linemen, equipment and security under $1.85 billion in contracts with the Puerto Rico Electric Power Authority, the bankrupt public monopoly known as Prepa, according to documents reviewed by The Wall Street Journal. . . .
>
> \*   \*   \*
>
> The FBI has opened a related criminal inquiry, people close to the matter said. The FBI's San Juan field office didn't respond to a request for comment.
>
> Cobra took on a central role in the relief efforts after another company was fired early on and the U.S. Army Corps of Engineers wound down its efforts on the island last year. Cobra didn't respond to a request for comment.
>
> Investigators also are examining Cobra President Keith Ellison and his interactions with Ms. Tribble, people familiar with the matter said. Ms. Tribble's attorneys have denied she favored Cobra improperly, saying it was [PREPA] employees who allocated contract work on the power grid. In response to inquiries from Congress, FEMA has denied the contract-steering allegations, a person familiar with the matter said.

Mr. Ellison's attorney Bill Leone said Cobra's billings were "heavily reviewed and inspected" in a process involving dozens of people and several agencies.

"It's almost inconceivable that any one person, certainly not a FEMA employee, could override or compromise that process," he said.

The company was first hired in October 2017 under a $200 million deal to repair damaged power lines in the chaotic aftermath of Hurricane Maria, which knocked out power to 100% of the utility's customers.

By itself, that deal boosted total revenue for Cobra's parent by 87% compared with 2016. . . .

*     *     *

Cobra signed a separate $900 million deal in May 2018 as one of three companies selected by [PREPA] for additional repair work. [PREPA] executives clashed repeatedly with FEMA over the next few months, raising questions about why Cobra was being relied on so heavily, people familiar with the matter said.

The two other contractors, Foreman Electric and MasTec Inc., haven't done any work since being selected, despite having signed their own contracts with [PREPA], according to their spokesmen. Cobra has billed more than $1.4 billion overall, of which $903 million has been reimbursed by FEMA, a [PREPA] spokeswoman said.

~~91.~~98. On June 7, 2019, Mammoth issued a press release titled "Mammoth Issues

Statement Regarding Its Work in Puerto Rico." The Press Release stated, in pertinent part:

> Following Hurricane Maria in Puerto Rico and its complete destruction of the Island's power grid, Mammoth, through its wholly owned subsidiary Cobra, made a proposal to do reconstruction work to help restore power and rebuild Puerto Rico's grid. This solicitation was reviewed by the Puerto Rico Electric Power Authority (PREPA) and Cobra was awarded an initial $200 million reconstruction contract in 2017. Through five separate amendments to the original contract, the aggregate contract amount was eventually increased to up to $945 million. A second contract, in the amount of up to $900 million, was awarded to Cobra by PREPA in response to a Request For Proposals (RFP) process.

*     *     *

All of the agreements relating to the work provided by Cobra were negotiated, and entered into, with PREPA. The detailed agreements set forth the rates charged by Cobra and well as other information regarding the services to be performed. PREPA was assisted by various agencies including the Office of Contract and Procurement Compliance (OCPC), the Financial Oversight and Management Board (FOMB), the Governor's Office and the Central Office of Recovery, Reconstruction and Resiliency (COR3). In addition, PREPA's outside counsel, which is also representing PREPA in its chapter 11 bankruptcy case, participated in negotiating the agreements with Cobra, and various other parties had oversight roles as a result of PREPA's bankruptcy filing.

PREPA regularly and thoroughly reviewed Cobra's work. In addition to ongoing oversight of the services performed to ensure that work was being provided in a thorough and professional manner and consistent with industry standards, PREPA performed a detailed review of invoices submitted by Cobra to ensure that all payments were made in accordance with the contracts and in connection with services that had been properly provided. **When work was completed on an individual project basis, an invoice was issued to PREPA for the specific project. As of April 10, 2019, Cobra submitted approximately $1,296 million in invoices and received approximately $1,057 million in payments.**

Given the magnitude of the total costs of the project and its importance to the Island's economy, Cobra has faced significant governmental scrutiny since the commencement of the work. Cobra has met with various congressional members visiting the Island to review the work and assess the damage. **In addition, Cobra has been in contact with a number of US government agencies and local Puerto Rico authorities throughout the process. Further, it has been reported that an independent evaluation of Cobra's work by the Rand Corporation said that the contract rates charged for its services were reasonable** considering the "situational uncertainty that prevailed" after Hurricane Maria.

**Mammoth stands by the quality and reasonableness of its work and welcomes an open inquiry into its performance.** [Emphasis added.]

~~92.~~99. Mammoth's June 7, 2019 press release omitted to disclose the material fact

that Ellison had been terminated from his employment with the Company on June 7,

2019.[16] Nor does the press release reveal the ongoing criminal investigation of Ellison, the fact that Ellison had met with federal investigators regarding his relationship with Tribble, or that Ellison had nearly all of his assets seized. Plus, just one week after the press release, on June 12, 2019, Ellison filed a declaration in a lawsuit seeking to have his assets returned in which he revealed that Mammoth was paying his legal bills.[17]

93.100.　　　Additionally, the statement in the press release, that "As of April 10, 2019, Cobra has submitted approximately $1,296 million in invoices and received approximately $1,057 million in payments" omits to disclose that Cobra had not received a single payment from PREPA since May 24, 2019 – the day that the *Wall Street Journal* first exposed the investigation.[18] On September 30, 2019, Cobra filed a Motion for Allowance and Payment of Administrative Expense Claims in a case related to PREPA's bankruptcy.[19] In the motion, Cobra states that it "has made every reasonable effort to obtain payment without resorting to legal action" and that:

> **Cobra has not received any payment from PREPA since May 24, 2019. Since May 24, 2019,** Cobra has flown executives and counsel to

[16] *See* Declaration of Donald Keith Ellison, dated June 26, 2019, *Ellison v. United States*, No. 3:19-mc-80167-JST (N.D. Cal.) (ECF No. 29-1) at ¶ 1 (stating that he was employed by Cobra until June 7, 2019); Cobra Acquisitions LLC's Opposition to the Joint Urgent Motion of the Oversight Board, PREPA, and AAFAF to Extend All Applicable Deadlines to Cobra Acquisitions LLC's Motion for Allowance and Payment of Administrative Expense Claims, dated October 15, 2019, *In re The Financial Oversight and Management Board for Puerto Rico*, No. 17-BK-3283-LTS (D.P.R.) (ECF No. 8850) at 8 (stating that Ellison was "terminated from his employment by Cobra").
[17] Declaration of Donald Keith Ellison, dated June 12, 2019, *Ellison v. United States*, No. 4:19-mc-70167-JST (N.D. Cal.) (ECF No. 1-4) at ¶ 8.
[18] *See* Cobra Acquisitions LLC's Motion for Allowance and Payment of Administrative Expense Claims, dated Sept. 30, 2019, *In re The Financial Oversight and Management Board for Puerto Rico*, No. 17-BK-3283-LTS (D.P.R.) (ECF No. 8789) at 14.
[19] *Id*.

Puerto Rico to meet with PREPA on at least five occasions in an attempt to resolve the payment issues without court involvement. Despite promises made by PREPA officials, payments have not been forthcoming, even for invoices that PREPA does not dispute in any way.[20]

94.101.    On August 1, 2019, Mammoth issued a press release announcing its 2Q19 financial results. Straehla stated in the press release:

> The second quarter of 2019 was a challenging environment as further capital restraint by our oilfield customers continued to apply downward pressure on pricing and resulted in several completions being delayed or canceled with short notice. In addition, we worked through the challenges of demobilizing our equipment from Puerto Rico. As a result of current market conditions, we have begun to right size our operations and we expect this process to be completed in the coming months. Demand for infrastructure services remains high with the competencies and experience of our crews allowing for unique bidding opportunities in both the US and overseas. **While our work in Puerto Rico has ended, we have continued to receive payments from PREPA, with $42 million received in the second quarter of 2019**. . . .

95.102.    Straehla's statement regarding continued payments from PREPA was false and misleading. As discussed in paragraph 10093 above, Cobra had not received a single payment from PREPA since May 24, 2019, despite making every "reasonable effort to obtain payment without resorting to legal action."

**K.    Ellison, Tribble, and Patterson Are Indicted.**

96.103.    On September 3, 2019, following a grand jury investigation, Ellison was indicted in the District of Puerto Rico, charging him with eight criminal offenses, including: Conspiracy to Commit Bribery against the United States; Honest Services Wire Fraud; Disaster Fraud; and False Statements. Tribble and Patterson were also charged in

---

[20] *Id*. at 14-15.

the indictment. The charges relate to Cobra's contracts with PREPA, as discussed in paragraphs 2-4, 44-8842-83 above.

97.104. The Indictment was unsealed on September 10, 2019. A Department of Justice press release issued that day revealed that the investigation had been going on for the past year, and stated in pertinent part: "This investigation was a top priority for the Department of Homeland Security (DHS) Office of Inspector General (OIG), which dedicated significant personnel and resources **over the last year** to investigate the defendants and the events outlined in today's indictment."[21] (Emphasis added.)

98.105. In addition to the assets described in paragraph 8782 above, the Indictment revealed that the FBI subsequently seized an additional $3.4 million from Ellison, a boat trailer, and two tractors. The government is also seeking forfeiture of two homes in Panama City Beach, Florida, purchased by Ellison in 2018 for a combined $1.185 million, as well as a 178-acre farm that Ellison purchased in 2018 for $854,000.[22]

99.106. While the Indictment does not mention Straehla by name, it is clear that Straehla is "Individual A," referred to throughout the Indictment. In discussing the First PREPA Contract and amendments thereto, as well as the Second PREPA Contract, the Indictment states that in each instance, Cobra was represented by "Individual A." *See* Indictment ¶¶ 25-28, 30-32. Copies of the contracts and amendments included as exhibits to Mammoth's filings with the SEC reveal that Straehla represented Cobra in each instance.

---

[21] https://www.justice.gov/usao-pr/pr/fema-deputy-regional-administrator-former-president-cobra-acquisitions-llc-and-another.

[22]*See* Bill of Particulars (Forfeiture), dated October 4, 2019, *United States v. Tribble, et. al,* Crim. No. 19-541 (FAB) (ECF No. 45).

In an article published on September 10, 2019 in *Caribbean Business*, titled "*U.S. District Attorney on FEMA, Cobra fraud: We cannot reveal identity of Individual A*," United States Attorney for the District of Puerto Rico, Rosa Emilia Rodriguez-Velez, declined to identify Individual A, noting that the investigation is still ongoing.[23]

---

[23] *See* https://caribbeanbusiness.com/u-s-district-attorney-on-fema-cobra-fraud-we-cannot-reveal-identity-of-individual-a/.

## COBRA IS AN IMPORTANT AND MATERIAL PART
## OF MAMMOTH'S BUSINESS AND OPERATION

A. **The PREPA Contracts Contributed the Vast Majority
of Mammoth's Revenues and Earnings**

~~100.~~107. As set forth below, throughout the Class Period, Defendants repeatedly touted Cobra's contracts with PREPA as a critical driver of Mammoth's strong financial performance.

~~101.~~108. Prior to the award of the First PREPA Contract, Mammoth had revenues of $74.4 million and a net loss of $4.9 million in its first quarter of 2017; revenues of $98.3 million in its second quarter of 2017 and a net loss of $1.2 million; and revenues of $149.3 million in its third quarter of 2017 and a net loss of $800,000. After the contract award, Mammoth had revenues of $369 million in its fourth quarter of 2017 and earnings of $65.9 million.

~~102.~~109. As stated in the press release announcing the First Cobra Contract, "[t]he contract will commence immediately and is expected to generate revenue of up to $200 million over the initial 120 days." The PREPA contract represented an increase of 87% over the $230.6 million in total revenues that Mammoth reported for all of fiscal 2016.

~~103.~~110. Throughout the Class Period, Defendants continued to highlight the financial benefits that Mammoth was reaping from Cobra's work with PREPA. For example:

- On a February 22, 2018 earnings call, Straehla stated, "Turning to infrastructure. As many of you saw, over the past three weeks, we announced the extension of the contract in Puerto Rico from $200 million to approximately $445 million. Once the work of restoring power is complete, we anticipate a shift to reconstructing the electrical

infrastructure on the island to both modernize and provide better protection from future natural disasters. Given our performance to date, during the restoration phase, we are hopeful that we will participate in the rebuilding phase which will occur over the next several years."

- In a May 2, 2018 press release announcing Mammoth's 1Q18 financial results, Straehla stated, "The first quarter was our third sequential record quarter on an EBITDA basis, which was underpinned by the hard work performed by our teams in Puerto Rico."

- On an earnings call held the next day, Straehla stated, "The quarter was driven by successful execution within our infrastructure segment." Later in the call, Straehla emphasized, "While Mark [Layton] will elaborate further on our financial performance in his comments, I wanted to point out a few key highlights I am particularly proud of. Our infrastructure segment [Cobra] made up approximately 65% of our overall revenue during the first quarter underscoring our differentiation."

- On an August 7, 2018 earnings call, Straehla stated, "While Mark [Layton] will elaborate further on our financial performance in his comments, I wanted to point out a few key highlights I am particularly proud of. Our infrastructure division [Cobra] performed exceptionally well in Puerto Rico."

- In an October 31, 2018 press release announcing Mammoth's 3Q18 financial results, Straehla stated, "The third quarter . . . was a record quarter on a net income basis. . . . While the third quarter was challenging for oil field services, we were pleased with the execution in our infrastructure business [Cobra]."

- On an earnings call held the next day, Straehla told investors, "While Mark [Layton] will elaborate further - - elaborate further on our financial performance in his comments, I wanted to point out a few key highlights. Cobra continues to perform exceptionally well."

- In a March 14, 2019 press release announcing Mammoth's 4Q18 and fiscal 2018 financial results, the Company stated, "The infrastructure segment [Cobra] contributed revenues of $1.1 billion for the year

ended December 31, 2018, a 382% increase from $222.4 million for the year ended December 31, 2017."

- On an earnings call held the next day, Straehla touted to investors, "2018 was a very good year for Mammoth. We saw year-over-year growth across all of our business clients but most notably in our infrastructure segment."

104.111.    To be sure, Mammoth's largest stream of revenue throughout the Class Period was derived from Cobra's ever-expanding contracts with PREPA. As stated in the Company's 2018 Form 10-K filed with the SEC on March 15, 2019: "**PREPA was our largest customer for the year ended December 31, 2018 accounting for approximately 60% of our revenue and our second largest customer for the year ended December 31, 2017 accounting for approximately 29% of our revenue.**"[24] Given that the First Cobra Contract was signed in late-October of 2017, the 29% of total revenue derived from PREPA that year came in the fourth quarter alone. Thus, PREPA accounted for 55% of Mammoth's $369 million 4Q17 revenue. Even as Cobra's work in Puerto Rico came to an end in the first quarter of 2019, PREPA accounted for nearly 33% of Mammoth's 1Q19 revenue.[25] The table below reflects the percentage of Mammoth's infrastructure segment revenue derived from PREPA as well as the percentage of Mammoth's total revenue derived from PREPA:

---

[24]Form 10-K filed with the SEC on March 15, 2019 at 23 (Emphasis added).
[25] *See* Form 10-Q filed with the SEC on May 2, 2019 at 31 (reporting total revenue of $262 million, $109 million of which was from infrastructure, and PREPA accounting for 79% of infrastructure revenue).

| Quarter | Infrastructure Revenue | PREPA Revenue | % of Infrastructure Revenue Derived from PREPA | Total Revenue | % of Total Revenue Derived from PREPA |
|---|---|---|---|---|---|
| 4Q17 | $209.2 | $203.1M | 97% | $369M | 55% |
| 1Q18 | $325.5 | $318.4M | 98% | $494.2M | 64% |
| 2Q18 | $360M | $347M | 96% | $533.6M | 65% |
| 3Q18 | $237M | $220M | 93% | $384M | 57% |
| 4Q18 | $159.6M | $132M | 82% | $278.2M | 47% |
| FY18 | $1.082B | $1.017B | 94% | $1.690B | 60% |
| 1Q19 | $108.7M | $85.9M | 79% | $262.1M | 33% |
| 2Q19 | $41.8M | $10.9M | 27% | $181.8M | 6% |

B. **Mammoth's Transition To An Infrastructure Services Company Underscored the Importance of Cobra To Mammoth.**

~~105.~~112. Throughout the Class Period, Defendants emphasized to investors that Mammoth planned to expand its infrastructure services, offered through Cobra, to become a significant component in the Company's long-term operating plans.

~~106.~~113. Beginning with the October 20, 2017 conference call, Straehla provided background on Mammoth's reasons for entering the infrastructure industry and proceeded to inform investors of the Company's plans to rapidly expand its infrastructure segment beyond the initial work in Puerto Rico.

~~107.~~114. Straehla discussed Mammoth's plans to turn Cobra's infrastructure operations into "a core business" for the Company in a January 30, 2018 article published in The Daily Oklahoman, titled "Mammoth Energy's Puerto Rico contract expanded." The article provides, in pertinent part:

> Mammoth primarily is an oil-field services company that provides hydraulic fracturing and the sand and other products needed for the well

completion process, but the company bought Cobra in 2016 and quickly expanded the utility business to provide services throughout much of the country. "Our focus is on rebuilding and working for investor-owned utilities, co-ops and county governments," Straehla said. "**As we go forward, we're going to be focused on building infrastructure services**." The experience gained in Puerto Rico likely will help the company even after the restoration work is completed, he said. "We think the infrastructure spending going to continue to grow. For the U.S. as a whole, our infrastructure is pretty old," Straehla said. "**There is a lot of modernization to do. That's going to be a core business for us going forward**." [Emphasis added.]

108.115.      On Mammoth's February 22, 2018 earnings call, Straehla emphasized to investors that the Company hoped to secure additional infrastructure work in Puerto Rico for years to come, stating "we are hopeful that we will participate in the rebuilding phase which will occur over the next several years[,]" and "we think we have an opportunity to be there for years."

109.116.      On Mammoth's May 3, 2018 earnings call, Straehla explained to investors that the Company's "[e]xpansion into infrastructure activities was targeted specifically to lessen the impacts of the volatility seen over recent years in the commodity markets and stabilizing our earnings potential."

110.117.      On Mammoth's November 1, 2018 earnings call, Straehla made clear to investors that the Company planned to transition from being an oilfield services company to an industrial company through the growth of the infrastructure segment. Specifically, Straehla stated:

> Following our rapid oilfield expansion in 2017, we deliberately chose to transition our asset base from a pure oilfield service company to a diversified industrial company. We are attracted to the reduced cyclicality, stable cash flows and contracted nature into which we can effectively deploy our cash flow.

This transition to an industrial company can clearly be seen in our financial results with 64% of our revenues over the past 12 months coming from our Infrastructure segment. Our M&A focus remains on the industrial side of our business, which should push the percentage of industrial revenues even higher, if we are able to find attractive opportunities. [Emphasis added.]

111.118.　Later in the call, James Wicklund from Credit Suisse AG, asked Straehla about the Company's transition plans:

You talk, Arty, about you're becoming a diversified industrial company and you're transitioning to industrial and you [] note 64% of revenues on a trailing basis this quarter were from Infrastructure. How does one actually go about changing from one type of company to another? I mean, what do you guys have to do to change your SIC code or whatever, so that you actually fall in benchmarks that industrial portfolio managers look at, rather than just, or in addition to, what oilfield services managers are benchmarking?

Straehla answered:

Yes. That's – very, very interesting question on how we make that transition, and Don Christ has worked extremely hard – that was one of the things that we had discussed early in the second quarter and we've been working with MSCI to get that changed.

Our trailing 12 months – you have to have revenues that are over 60% and attributed to that particular industry, and we've done that. And we are actively engaged in calling them. How quick that process will take, we're dependent on other people for that, so we don't know the – how expedited it will be, but **we are making that attempt to change our GICS code to – our General Industrial code, to and overall industrial company**.

112.119.　Cobra was a critical revenue, earnings and growth driver of Mammoth. Mammoth's stock price increased after Cobra was awarded the First PREPA contract, continued to trade a high levels during the time period in which Cobra was

receiving work and payments from PREPA, and began to decline after the market learned that Cobra's work in Puerto Rico would be coming to an end.

## THE FALSE AND MISLEADING STATEMENTS

113.120. Throughout the Class Period, Defendants made a number of statements in SEC filings, press releases, and communications with stock market analysts and investors that were materially false and misleading or omitted to disclose information necessary in order to make the statements that were made not materially misleading.

### *Statements concerning the announcement of the First PREPA Contract*

114.121. The Class Period begins on October 19, 2017. On that date, Mammoth announced in a press release that its subsidiary, Cobra, entered into the First PREPA Contract to aid in the rebuilding of Puerto Rico's energy infrastructure, stating in pertinent part:

> Mammoth Energy Services, Inc. ("Mammoth") (NASDAQ:TUSK) today announced that its wholly owned subsidiary, Cobra Acquisitions LLC, has signed a contract to aid in the restoration of utility infrastructure on the island of Puerto Rico. Cobra, a utility infrastructure business focused on the repair and construction of transmission and distribution (T&D) networks, will perform the work. The contract will commence immediately and is expected to generate revenue of up to $200 million over the initial 120 days.

> Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are honored to be chosen to help restore the electric utility infrastructure for the residents of Puerto Rico. After witnessing the destruction from Hurricane Maria first hand last weekend, where 85% of Puerto Rico's residents are currently living without electricity, we intend to work quickly both to help rebuild the electric grid and to help restore normalcy to people's lives."

> \*    \*    \*

> The initial mobilization of construction equipment and personnel is expected to begin in the coming days with people currently in place performing an initial damage and engineering assessment to determine the full scope of work required. This contract will be incremental to Mammoth's existing energy service operations.

115.122.    The following day, on October 20, 2017, Mammoth held a conference call with analysts. Defendants Straehla and Layton participated on this conference call, along with Donald Peter Crist, Mammoth's Director of Investor Relations. During the call, in response to a question from an analyst as to what "the payment terms [are] going to look like", Defendant Straehla responded:

> This contract included a $15 million upfront payment and from that point -- and then we also put in the contract that it will be -- we will be paid -- we will bill twice weekly. And **the contract is with a PREPA, but it was drafted and -- in the room every step of the way with FEMA**. So there is -- it does comply with FEMA reimbursement requirements. So -- and quite honestly, **we wouldn't have entered this contract if we didn't think we would -- if we didn't think we'd get paid. And we feel very, very strongly about that**. And again, we negotiated the $15 million payment upfront to start with the mobilization efforts. [Emphasis added.]

116.123.    This statement was false and misleading when made. Straehla misled investors by providing assurance that Mammoth would be paid under the terms of the contract as it "was drafted and – in the room every step of the way with FEMA." By suggesting that FEMA was "in the room," *i.e.*, reviewed and approved the contract, Straehla attempted to provide comfort that Mammoth would be paid: "we wouldn't have entered this contract if we didn't think we would – if we didn't think we'd get paid.  And we feel very, very strongly about that." Plus, the FEMA official who was "in the room" was Tribble, who Ellison was bribing to steer work to Cobra. Indeed, just twelve days after

he made this statement, Straehla signed an amendment to the contract which removed language that "PREPA represents and warrants" that FEMA had reviewed and approved the contract, as alleged in paragraph 65~~63~~ above. Indeed, as alleged in paragraphs 63-64~~61–62~~ above, and 205-06~~196–97~~ below, FEMA did not review or approve of the contracts and it was materially false and misleading to assure investors that Mammoth would get paid because FEMA purportedly approved the contract.

~~117.~~124.     On October 31, 2017, *E&E News* published an article titled "*Echoes of Whitefish Surface in $200M Puerto Rico grid deal*."[26] The article stated in pertinent part:

> Two days [prior to the Cobra contract], PREPA had approved a separate $300 million grid repair deal with Whitefish Energy, a small contracting firm that hails from Interior Secretary Ryan Zinke's hometown of Whitefish, Mont.
>
> The costly terms of PREPA's deal with Whitefish came under intense scrutiny after they were made public, and Ramos [PREPA's executive director] ultimately announced he would move to cancel the contract Sunday after calls from Puerto Rico's governor to end the deal.
>
> Several U.S. lawmakers, including Rep. Raja Krishnamoorthi (D-Ill.), a former official in Illinois' anti-corruption unit, voiced concerns about language in the Whitefish contract that appeared aimed at avoiding government oversight.
>
> "In no event shall PREPA, the Commonwealth of Puerto Rico, the [Federal Emergency Management Agency] Administrator, the Comptroller General of the United States, or any of their authorized representatives have the right to audit or review the cost and profit elements of the labor rates specified herein," the document stated.
>
> The same language appears word for word in PREPA's arrangement with Cobra, according to a copy of the contract provided to E&E News. The news publication *Caribbean Business* posted a copy of the same document on Oct. 20, the day after it was finalized.

---

[26] https://www.eenews.net/stories/1060065137/print.

However, the section directly above that statement in both contracts grants those same government entities "access to any books, documents, papers, and records of the Contractor" for up to three years of the final payment under the Contract.

A Cobra spokesman said the contract "imposes extensive disclosure obligations on Cobra in favor of all appropriate governmental authorities" and said there had been no requests to change the language in the documentation.

**PREPA's deal with Cobra also states that FEMA officials had the chance to review the arrangement, finding it "an acceptable form to qualify for funding from FEMA or other U.S. Governmental agencies."**

That same line landed Whitefish Energy and PREPA in hot water after FEMA representatives claimed they had not reviewed the contract and that FEMA also had "significant concerns" with its contents. Representatives for FEMA did not respond to a request for comment on the agency's oversight of Cobra, **but Mammoth Energy executives said in a recent conference call that FEMA was closely involved in reviewing its subsidiary's interactions with PREPA, in apparent contrast to Whitefish.**

*   *   *

Reached by phone for comment, Cobra Energy President Keith Ellison defended his company's contract while noting that he could only speak in a personal, unofficial capacity. "**We feel we had a really good package put together that would provide for the community without taking needed resources away from the island**," he said, **characterizing his company's relationship with PREPA as a "standard bidding process for a storm contract**."

Ellison deferred official comment on specific contractual language to Mammoth representatives. He also suggested E&E News reach out to PREPA about its choice of "boilerplate" contract language.

**Arty Straehla**, the CEO of Mammoth (the parent company of Cobra), **said in a conference call on Friday that Cobra** does infrastructure repairs for utility companies across the Midwest. The company, founded in 2017 according to SEC filings, has 275 full-time employees, he said,

and **recently completed electrical work in Texas and Florida after the hurricanes**.

**In a follow-up conversation with Vox, a spokesperson for the company was unable to give further details about Cobra's contracts in Texas and Florida, or any of the clients they have served. The company has not won any federal contracts in the past or handled contracts for the state of Texas, based on a search of government procurement databases**.

Straehla said Cobra planned to send about 500 workers to Puerto Rico in the coming days. PREPA already put down a $15 million deposit to start work on the grid, he said, though the contract didn't go through a bidding process.

**"[The contract] was drafted in the room and every step of the way with FEMA, so it does comply with FEMA reimbursement," Straehla said. "We wouldn't have entered this contract if we didn't think we would get paid."**

~~118.~~125.      Ellison's statement was false and misleading when made. Cobra and Mammoth were able to secure their contract with PREPA not because they "had a really good package put together" but because Ellison was bribing Tribble to obtain the PREPA contracts. He falsely stated that Cobra's relationship with PREPA was a "standard bidding process for a storm contract" as it was anything but. It was based on illicit payments and bribes.

~~119.~~126.      Straehla's statements about Cobra's prior infrastructure experience were false and misleading as he was attempting deflect criticism that Cobra lacked prior experience by falsely stating that Cobra has performed electrical work in Texas and Florida. Additionally, Straehla's statement about the contract being "drafted in the room and every step of the way with FEMA" was false and materially misleading as Straehla

was attempting to assure investors that FEMA approved the contracts and that the risk of non-payment to Mammoth was minimal. In fact, Tribble was the FEMA official "in the room" and FEMA never reviewed or approved any of the Cobra contracts. Straehla also attempted to assure investors that, unlike Whitefish, Cobra's contract was tacitly approved by FEMA to distinguish Cobra from the problems that plagued Whitefish. In fact, on November 1, 2017 Straehla signed an amendment to the First PREPA contract removing the language that "PREPA represents and warrants" that FEMA had reviewed and approved the contract."

*The 3Q17 Earnings Call*

~~120.~~127.    On November 2, 2017, Mammoth held a call with investors and analysts to discuss the Company's 3Q17 financial results. During the call, James Wicklund from Credit Suisse AG asked Defendant Straehla:

> Cobra has made the news lately because of Puerto Rico, but not just Puerto Rico but because of another company that's operating there, and I know you're both called to Washington. I don't expect you to make any comments about the Montana-based company, but I don't think you guvs have hired the Secretary of Interior's son as an intern, and I know you guys have more than 2 full-time employees. So we won't talk about the Montana company, but can you talk about how you guys expect to address the hearings in Washington on Puerto Rico?

Straehla responded:

> Yes, we haven't – there has not been anything. **And I will tell you, we are absolutely – we did everything absolutely right**. Let me give just a little bit of backdrop of how we did this. We did this the old-fashioned way on the 13th of October – and we had this competency within our group. We had performed extremely well when the hurricanes, unfortunately, hit South Texas when Harvey and Irma went through. So we had this ability, built on our logistics group that we have, built on our lodging group that we have and experience. **So myself and my President [Ellison] flew**

**down to Puerto Rico on the 13ᵗʰ of October. We met with people, started meeting on Saturday at the convention center where everybody was there, that's the command and control center. We went from meeting to meeting, talking with FEMA officials, talking with the governors, officials, talking with officials from PREPA, that resulted in a meeting that evening – Saturday evening around 7:00 p.m. with PREPA**. We had a fully self-contained plan that nobody else has – had put together for them. That includes having berthing barge, that includes housing our folks. We have, in fact, began the logistics aspect of that with the first barge departed on the 29ᵗʰ loaded with 75 pieces of equipment, mostly buckets and diggers. Yesterday, another barge departed from Fourchon, Louisiana, with 28 pieces of equipment. We'll have more barges departing. We've actually sent large cargo planes full of equipment as well. So our mobilization, t**he way that we have done this, it's been right from the very beginning**, and our goal and our operational is to get the lights turn back on in Puerto Rico with our team. **We've got a very** …

James Wicklund interjected:

**A very legitimate effort, a very legitimate effort**.

To which Straehla confirmed:

**Yes, sir**.

~~121.~~128.     Staehla's statements above that "we did absolutely everything right," "the way that we have done this, it's been right from the very beginning," and that he and Ellison put forth a "very legitimate effort" were materially false and misleading when made.  Cobra and Mammoth were able to secure their contracts due to Ellison bribing FEMA officials which is not "right" nor legitimate. Plus, Straehla knew Cobra's contract with PREPA contained the same objectionable provision that was contained in the Whitefish contract, which led to that contract being cancelled and knew that the contract was negotiated and approved without FEMA's approval. Straehla falsely attempted to distinguish Cobra's contract from the problems that plagued the Whitefish contract. Plus,

the day before this call, on November 1, 2017 Straehla signed an amendment to the First PREPA contract removing the language that "PREPA represents and warrants" that FEMA had reviewed and approved the contract."

***The November 13, 2017 10-Q (The "3Q17 10-Q")***

~~122.~~129.     On November 13, 2017, Mammoth filed 2017 Third Quarter Form 10-Q with the SEC, which contained the following false and misleading statements in a subpart to Item 1A Risk Factors:

> ***One of our energy services subsidiaries recently entered into a contract with the Puerto Rico Electric Power Authority, or PREPA, which provides for payments to us of up to $200.0 million.  PREPA is currently subject to pending bankruptcy proceeding.  In the event that PREPA does not have or does not obtain the funds necessary to satisfy its payment obligations to our subsidiary under the contract or terminates the contract prior to the end of the contract term, our financial condition, results of operations and cash flows could be materially and adversely affected.***[27]

> On October 19, 2017, our energy services subsidiary Cobra Acquisitions LLC, or Cobra, and PREPA entered into an energy master services agreement for repairs to PREPA's electrical grid as a result of Hurricane Maria.  The one-year contract provides for payments of up to $200.0 million, including an initial payment of $15.0 million.  As of November 7, 2017, Cobra had entered into $32.7 million of commitments related to this contract and made prepayments and deposits of $12.6 million with respect to these commitments.  PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency, or FEMA, or other sources.  PREPA's contracting practices in connection with restoration and repair of PREPA's electrical grid in Puerto Rico, and the terms of certain of those contracts, have been subject to critical comment and are the subject of review and hearings by U.S. federal and Puerto Rican governmental entities. Recently, a contract for restoration and repair services entered into by PREPA with an unrelated third party was terminated by PREPA.   In the event that PREPA does not have or does not obtain the funds necessary to satisfy its

---

[27] Section heading emphasis in original.

obligations to Cobra under the contract or terminates the contract prior to the end of the contract term, our financial condition, results of operations and cash flows could be materially and adversely affected.

123.130.    The statement above was false and misleading when made and omitted to disclose material facts necessary to make the statement made not misleading: (1) Mammoth failed to disclose that Cobra entered into the same contract provision as did the "unrelated third party," Whitefish, whose contract was terminated by PREPA; (2) Mammoth failed to disclose that FEMA did not review or approve the PREPA contract Cobra entered into with PREPA thereby putting Mammoth's ability to collect on the work performed at greater risk; and (3) Mammoth failed to reveal that Cobra obtained the PREPA contracts due to Ellison's bribing FEMA officials.

***The January 29, 2018 Press Release & January 31, 2018 8-K***

124.131.    On January 29, 2018, Mammoth issued a press release titled "Cobra's Puerto Rico Contract Increased to Approximately $445 million; Update on Puerto Rico Activities," which contained the following false and misleading statements:

Contract Increase

On January 28, 2018, the Puerto Rico Electric Power Authority ("PREPA") and Cobra executed a contract amendment that expanded the aggregate contract amount by approximately $245 million to address work requirements. The original $200 million contract value was effective on October 19, 2017 and fully utilized during the fourth quarter of 2017 due to the substantially greater deployment of resources. This contract amendment allows for continued deployment of resources into 2018.

Under the terms of the amended contract, the number of skilled workers requested by PREPA and provided by Cobra has increased to at least 880, up from 434, and the billable daily rate of those workers has been decreased. A copy of the amendment will be filed as an exhibit to the Form

8-K that will be filed with the Securities and Exchange Commission ("SEC") in conjunction with this release.

Arty Straehla, Mammoth's Chief Executive Officer, stated, "We are proud that **through our team's hard work and professionalism PREPA has elected to increase the value of our contract. Our team is working closely with PREPA, FEMA, the US Army Corps of Engineers** and other governmental agencies and, together, we are making significant progress to restore power to the affected areas in an orderly fashion. **Furthermore, at the request of PREPA, FEMA reviewed our original contract with PREPA and our rates of service.** In a letter dated December 23, 2017, FEMA determined that PREPA awarded our contract in compliance with emergency procurement provisions of the Commonwealth of Puerto Rico and Executive Orders issued as a result of the disaster, and also determined the costs under the contract to be reasonable." (Emphasis added.)

~~125.~~132.　　On January 31, 2018, Mammoth filed Form 8-K with the SEC, signed by Layton, which, in addition to including the press release described above as an exhibit, contained the following false and misleading statements:

The Initial PREPA Contract has a one-year term and provided for up to $200.0 million of services which was initially expected to be fully utilized within a 120-day period. The scope of the work provided for in the Initial PREPA Contract included labor, supervision, tools and equipment to perform the storm repairs at various locations in Puerto Rico. The specific repair projects that Cobra works on, including power lines, towers and overall infrastructure, are assigned by PREPA. Once assigned, Cobra, together with PREPA and other governmental agencies, undertake an assessment of the project, which includes an evaluation of the severity of the damage, the work to be performed, the issues anticipated to be encountered during the restoration of the power to the applicable substations, transmission and/or distribution lines and the estimated timeline for completion of the work. Cobra is in communication with PREPA and other governmental agencies as it performs its work and also provides PREPA and other governmental agencies a written report on the status of each project on a daily basis to maintain an open line of communication, make modifications to the scope, timing and performance requirements and ensure compliance with its contract with PREPA. Cobra is paid a daily blended rate that covers, among other things, lineman, equipment, lodging, power, water, meals, laundry, security and

management. Accordingly, revenue is recognized on a daily basis as it is time-based rather than based on completion of work or other milestones.

Subsequent to Cobra's initial mobilization to Puerto Rico, PREPA asked Cobra to increase its staffing on multiple occasions. As a result of the increased services performed by Cobra, the $200.0 million allocation under the Initial PREPA Contract was fully applied to services performed by Cobra during the fourth quarter of 2017. Due to the continuing need for Cobra's services, on January 28, 2018, Cobra and PREPA amended the Initial PREPA Contract to increase the total contract amount by an additional $245.4 million to a total of $445.4 million (the "Amendment"). Under the terms of the Amendment, the number of workers requested by PREPA and provided by Cobra increased to at least 882, up from 434 in the Initial PREPA Contract, and the billable daily rate for those workers was decreased. Based on the current level of services provided, Cobra anticipates the additional amount specified in the Amendment will fund an additional 77 days of its services.

**PREPA's ability to meet its payment obligations under the Initial PREPA Contract and the Amendment is largely dependent upon funding from the Federal Emergency Management Agency ("FEMA"). By letter dated December 23, 2017, FEMA notified the Puerto Rico Governor's authorized representative that, at the request of PREPA, FEMA reviewed the Initial PREPA Contract with Cobra and rates for service.** In its letter, FEMA stated that "[u]nder the exigent circumstances after Hurricane Maria, PREPA awarded this contract in compliance with the emergency procurement provisions of the Government of Puerto Rico and Executive Orders issued as a result of the disaster ... [and] **FEMA has also determined the costs under this contract to be reasonable**."

Cobra intends to seek additional repair and restoration work for PREPA's electric grid beyond the service period provided for in the Amendment, as well as work rebuilding and modernizing PREPA's electrical grid once the repair and restoration phase is complete. However, there can be no assurance that Cobra will be successful is securing this additional work.

~~126.~~133.     The statements in paragraphs ~~131-32~~124-25 above were false and misleading when made and they omitted to disclose material facts necessary to make the statements that were made not misleading. *First*, the statements concerning the December

23, 2017 FEMA legal review and cost reasonableness letter (the "FEMA Letter") were false and misleading because Defendants omitted to disclose that the FEMA Letter was the product of Ellison's illicit relationship with Tribble. As alleged in the Indictment:

- On December 8, 2017, Ellison emailed Tribble regarding the status of FEMA's legal review, and asked her, "Are you in a position as we spoke to go on the record?" (Indictment ¶ 50);

- In response, Tribble provided Ellison with an update on the review, had "worked with the [Puerto Rican] Governor" to assist Cobra with obtaining information from PREPA, and was going to PREPA in person the next morning to assist Cobra (*Id*. ¶ 51); and

- Tribble had taken official action to cause the FEMA Letter to be sent from FEMA's Federal Coordinating Officer to the Puerto Rico Government's Authorized Representative. (*Id*. ¶ 47(a).

Without the FEMA Letter, PREPA would not have increased the value of the First PREPA Contract by $245 million because, as noted in the Form 8-K above, PREPA's ability to meet its payment obligations was dependent on obtaining funding from FEMA. That FEMA's determination that the eligibility for reimbursement and costs under the PREPA contract were the product of Tribble's malfeasance on behalf of Ellison and Cobra was confirmed in a July 3, 2019 report issued by the Department of Homeland Security Office of Inspector General titled "FEMA's Eligibility Determination of Puerto Rico Electric Power Authority's Contract with Cobra Acquisitions LLC." The report found, among other things, that:

> FEMA conducted an analysis of the Cobra contract rates and determined that contract costs were reasonable and eligible for the PA program. However, **FEMA's eligibility determination was not sound** because it did not evaluate the actual time and materials costs for reasonableness and because its analyses of contract rates for labor, equipment, and other costs were not always logical, complete, and supported. . . . As a result, FEMA approved a

> PA grant and reimbursed millions of dollars for Cobra contract costs based on an unsound eligibility determination. (Emphasis added.)

The report further noted that based on the findings, "FEMA will make a final determination of the eligibility of the contract costs and disallow any costs that are not reasonable." The estimated completion date of the final evaluation is May 29, 2020.

127.134.    *Second*, the statements highlighting Cobra's close working relationship with FEMA and other government agencies as a reason for the Company's success in obtaining the additional $245 million under Amendment No. 4 were false and misleading because Defendants omitted to disclose that Ellison's bribing Tribble created a conflict of interest between Cobra and PREPA in violation of Article 21 of the First PREPA Contract (¶ 4543). Ellison's relationship with Tribble also rendered Cobra in violation of the "Anti-Corruption Code for a New Puerto Rico," which, pursuant to Amendment No. 4, Cobra had agreed to comply with (¶ 4745). Amendment No. 4 was signed by Straehla and included as an exhibit to the January 31, 2018 Form 8-K.

128.135.    *Third*, Defendants' statement that "Cobra intends to seek additional repair and restoration work for PREPA's electric grid beyond the service period provided for in the Amendment, as well as work rebuilding and modernizing PREPA's electrical grid once the repair and restoration phase is complete" was materially false and misleading because the Company's prospects of securing such additional work would be all but eliminated if the nature of Ellison and Tribble's relationship came to light.

***The February 22, 2018 Earnings Call***

~~129.~~136.     On February 22, 2018, Mammoth held a call with investors and analysts to discuss its 4Q17 and fiscal 2017 financial results. During the call, Straehla made the following false and misleading statements:

> Turning to infrastructure. As many of you saw, over the past 3 weeks, we announced the extension of the contract in Puerto Rico from $200 million to approximately $445 million. Once the work of restoring the power is complete, we anticipate a shift to reconstructing the electrical infrastructure on the island to both modernize and provide better protection from future natural disasters. Given our performance to date, during the restoration phase, we are hopeful that we will participate in the rebuilding phase which will occur over the next several years.

~~130.~~137.     Straehla's representation about the Company's "performance to date" could lead to it participating in additional work in rebuilding the electric grid in Puerto Rico was false and misleading when made because it omitted to disclose that Cobra obtained its contract with PREPA, and the contract extension, not because of the Company's "performance" but because Ellison was bribing Tribble.

~~131.~~138.     During the question and answer portion of the call, stock market analyst Thomas Moll from Stephens Inc., asked:

> Okay, great. And then moving on to infrastructure. Once you perform the remainder of the extended contract and get to the total $445 million in Puerto Rico, what's a reasonable timeframe for investors to get an update on what the go-forward might look like there? I know you mentioned that there's at least potential for not months or quarters, but years of work. And granted, we won't have great visibility on to what the total scope looks like, but just, when should we expect the next update from you?

To which Straehla responded:

> Well, Tommy. What typically happens in this type of situation is you go from restoration to reconstruction. And certainly, we have been a very big

part of the restoration efforts. We have approximately 939 men on the island right now. We have a variety of equipment. **Certainly, with our contacts, and what we're -- what we are actually doing, and the way our team has gone out and executed, we think we have an opportunity to be there for years. But it's a process that you go through. It's RFP process, and as those occur and certainly, there's no certainty**. But we think that -- we think restoration is still going to last a while longer. As you've seen in many articles, it's not completed yet of getting the power on completely before you go to that reconstruction phase, but **we anticipate being there a while, and as we get material information, we will pass it on to our investors**. But I do want to tell you that one of the things that is mentioned in the call and everything previously was that we have over $500 million of backlog in total, in our infrastructure business. And we have grown our footprint significantly in north -- in the continental United States. Our team is executing at a very high level on many, many fronts.

~~132.~~139.     Later in the call, stock market analyst John Daniel from Simmons &

Company International asked:

Okay. Final one for me, and this can be my dummy question for the day. I may be a little bit dumb, but you mentioned the – how you go through the RFP process in Puerto Rico. Can you speak to just what the competitive landscape is for people bidding against you down there? And then just talk about whether that process is more complicated or less than what you do in the United States?

Straehla answered:

Yes, it's not -- it's always a competitive-type approach to do it. And it -- **you may've seen the Wall Street Journal article this morning where Fluor is exiting the island. Fluor worked for the Army Corps of Engineers, we work for PREPA. And we were the one that, early on, went in and started working for PREPA, and I think it's paid huge dividends for us**. So you have some competitors that are exiting, you'll have other competitors that'll want to come in and take part in it. Remember that as you go from restoration to reconstruction, the reconstruction process can go on for years. And I -- the point that I usually make is that super storm Sandy that occurred in 2012 timeframe, they are still doing reconstruction in New York that is FEMA backed to this day. So it could go on for 5 to 6 years. And the Puerto Rican infrastructure was in very poor shape. They had a bankrupt group that was running it, being

PREPA, and they just didn't have the money to keep their infrastructure up to the common aspects and the common standards and the newer technology. So we think that it'll -- it has an opportunity to go on for several years. And we think with the execution of our team, and what they've done, we will have a -- and the amount of people that we have there and the amount of equipment we have there, **we will have a competitive advantage to get some of that work**. (Emphasis added.)

~~133.~~140. Straehla's statements on the February 22, 2018 earnings call concerning the RFP process to secure additional work were false and misleading when made and omitted to disclose material facts necessary to make the statements that were made not misleading as he failed to disclose that: (1) Cobra had an unfair advantage in any RFP process due to Ellison's relationship with Tribble and his bribing her to procure and steer work to Cobra; (2) due to the wrongful conduct by Ellison and Tribble, there was a reasonable likelihood that Mammoth would not be paid for some, or all of its work for PREPA, and Mammoth would be unlikely to secure additional work from PREPA in the future; and (3) due to the criminal acts committed by Ellison and Tribble, Mammoth was exposing itself to potential civil and criminal penalties, and costly litigation. The omitted facts were necessary in order to make the statements made not misleading.

***The February 28, 2018 Form 10-K (the "2017 10-K)***

~~134.~~141. On February 28, 2018, Mammoth filed its Form 10-K for the year ended December 31, 2017, which contained the following false and misleading statements in a subpart to Item 1 Business:

> We currently have agreements in place with government-funded utilities, private utilities, public IOUs and Co-Ops. In particular, on October 19, 2017, one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, entered into an emergency master services agreement with PREPA (such

agreement, as subsequently amended through December 21, 2017, is hereinafter referred to as the initial PREPA contract). The initial PREPA contract has a one-year term and provided for up to $200.0 million of services which was initially expected to be fully utilized within a 120-day period. The scope of the work provided for in the initial PREPA contract included labor, supervision, tools and equipment to perform storm repairs at various locations in Puerto Rico. The initial PREPA contract was fully applied to services performed by Cobra as of January 3, 2018. Due to the continuing need for Cobra's services, on January 28, 2018, Cobra and PREPA amended the initial PREPA contract to increase the total contract amount by an additional $245.4 million up to a total of $445.4 million. Under the terms of this amendment, the number of workers requested by PREPA and provided by Cobra increased to at least 882, up from 434 in the initial PREPA contract, and the billable daily rate for those workers was decreased. On February 27, 2017, Cobra and PREPA again amended the PREPA contract to further increase the contract amount by $500.0 million up to a total of $945.4 million. In addition to continuing its repair and restoration work, under the terms of this amendment Cobra will be able to source construction materials needed to rebuild the electrical infrastructure in Puerto Rico on a pass-through basis. To support its efforts, Cobra has two berthing barges with accommodations for approximately 550 people mobilized to Puerto Rico. In addition to its employees, Cobra also subcontracts additional resources where needed to assist in its repair efforts, including helicopters and pilots to erect towers and pull wire for reconnection, steel workers to fix transmission poles and rework steel damaged in the storm, road equipment and operators to carve access to work sites, tree services to clear brush and trees and security teams. Based on the current level of services provided, Cobra anticipates the additional amounts specified in the amendments will fund its activities in Puerto Rico through mid-2018.

*　　*　　*

*Regulation of Infrastructure Services*

**In our infrastructure business, our operations are subject to various federal, state and local laws and regulations including**:

- licensing, permitting and inspection requirements applicable to contractors, electricians and engineers;

- regulations related to worker safety;

- permitting and inspection requirements applicable to construction projects;

- wage and hour regulations;

- building and electrical codes; and

- **special bidding, procurement and other requirements on government projects**.

We believe that we have all the licenses required to conduct our energy infrastructure services and that **we are in substantial compliance with applicable regulatory requirements**. Our failure to comply with applicable regulations could result in substantial fines or revocation of our operating licenses, as well as give rise to termination or cancellation rights under our contracts or disqualify us from future bidding opportunities.

135.142.  Defendants' statements in the 2017 10-K were false and misleading when made because they omitted to disclose material facts necessary to make the statements that were made not misleading. Defendants statements concerning the January 28, 2018 and February 27, 2018 Amendments to the First PREPA Contract were materially false and misleading because they omitted to disclose that the PREPA work was improperly procured and steered to Mammoth's subsidiary as a result of the bribery scheme perpetrated by Ellison and Tribble.

136.143.  As a result of the foregoing, it was materially false and misleading for Defendants to state in the 2017 10-K, that "We believe that . . . we are in substantial compliance with applicable regulatory requirements" for "special bidding, procurement and other requirements on government projects", when, in fact, the Company was in violation of: the conflict of interest provision under Article 21 to the First PREPA Contract (¶ 4543); the Anti-Corruption Code for a New Puerto Rico, which pursuant to Amendment

No. 4, Defendants had agreed to comply with (¶ 4745); and federal law as a result of Ellison bribing Tribble to steer the contracts and work to Cobra and Cobra violated the terms of its contract by hiring Patterson from FEMA creating a conflict of interest and/or the appearance of a conflict of interest,.

137.144. The 2017 10-K also contained the following false and misleading statements in a subpart to Item 1A Risk Factors:

> ***Our customer base is concentrated and the loss of one or more of our significant customers, or their failure to pay the amounts they owe us, could cause our revenue to decline substantially.***
>
> Our top five customers accounted for approximately 71% and 80%, respectively, of our revenue for the years ended December 31, 2017 and 2016. Gulfport was our largest customer for the years ended December 31, 2017 and 2016 accounting for approximately 30% and 57 %, respectively, of our revenue. PREPA was second largest customer for the year ended December 31, 2017 accounting for approximately 29% of our revenue. It is likely that we will continue to derive a significant portion of our revenue from a relatively small number of customers in the future. If a major customer decided not to continue to use our services, our revenue would decline and our operating results and financial condition could be harmed. In addition, we are subject to credit risk due to the concentration of our customer base. Any nonperformance by our counterparties, including their failure to pay the amounts they owe us on a timely basis or at all, either as a result of changes in financial and economic conditions or otherwise, could have an adverse impact on our operating results and could adversely affect our liquidity.
>
> \*   \*   \*
>
> One of our infrastructure services subsidiaries recently entered into a contract with PREPA, which, as amended, provides for payments to us of up to $945.4 million. PREPA is currently subject to pending bankruptcy proceedings. In the event that PREPA does not have or does not obtain the funds necessary to satisfy its payment obligations to our subsidiary under the contract or terminates the contract prior to the end of the contract term, our financial condition, results of operations and cash flows could be materially and adversely affected.

On October 19, 2017, one of our subsidiaries, Cobra, and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid as a result of Hurricane Maria. The one-year contract, as amended through February 27, 2018, provides for payments of up to $945.4 million. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, **PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency, or FEMA**, or other sources. **PREPA's contracting practices in connection with restoration and repair of PREPA's electrical grid in Puerto Rico, and the terms of certain of those contracts, have been subject to critical comment and are the subject of review and hearings by U.S. federal and Puerto Rican governmental entities**. Recently, a contract for restoration and repair services entered into by PREPA with an unrelated third party was terminated by PREPA. In the event that PREPA does not have or does not obtain the funds necessary to satisfy its current obligations to Cobra under the contract or terminates the contract prior to the end of the contract term, our financial condition, results of operations and cash flows could be materially and adversely affected. **In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.**

\* \* \*

*We provide the majority of our infrastructure services to one customer, and the termination of this relationship could adversely affect our operations.*

We provide infrastructure services that focus on the repair, maintenance and construction of transmission and distribution networks. The majority of our revenue from this business has been derived from PREPA pursuant to a contract entered into on October 19, 2017, as subsequently amended, with a term of up to one year. **We cannot assure you that we will be able to continue our contract with PREPA on favorable terms and conditions or at all**. Likewise, we cannot assure you that we will be able to obtain one or more replacement contracts with other customers sufficient to continue providing the level of services as we currently do with PREPA. **The termination of our relationship with PREPA could have a material adverse effect on our business, financial condition,**

**results of operations and cash flows**. (Emphasis in bold added, emphasis in bold and italics in original.)

~~138.~~145.    These purported risk disclosures were false and misleading when made and omitted to disclose material facts necessary to make the statements made not misleading in that: (1) Mammoth failed to disclose that Cobra entered into the same contract provision as did the "unrelated third party," Whitefish, whose contract was terminated by PREPA; (2) Mammoth failed to disclose that FEMA did not review or approve the PREPA contract Cobra entered into with PREPA, thereby putting Mammoth's ability to collect on the work performed at greater risk; and (3) Mammoth failed to warn investors Mammoth's ability to be reimbursed by PREPA for its work was at risk, and subject to recovery, because Cobra secured its contracts through a scheme whereby Ellison was bribing Tribble to steer the contracts and procure work for Cobra. The omitted facts were necessary in order to make the statements made by Mammoth not materially misleading.

### *The May 3, 2018 10-Q (the "1Q18 10-Q")*

~~139.~~146.    On May 3, 2018, Mammoth filed Form 10-Q with the SEC, which contained the following false and misleading statements:

> In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, IOUs and Co-Ops. Since we commenced operations in this line of business, substantially all of our infrastructure revenues has been generated from storm restoration work, including revenue from PREPA due to the damage by Hurricane Maria. Our contract with PREPA, as amended during the first quarter of 2018, provides for 2018 revenue of approximately $745 million for services estimated to be performed through mid-2018. Cobra intends to seek additional repair and restoration work for PREPA's electric grid as well as work rebuilding and

modernizing PREPA's electric grid once the repair and restoration phase is complete. However, there can be no assurance that Cobra will be successful in securing any additional work. Further, PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. **In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contract, terminates the contract or curtails our services prior to the end of the contract term, our financial condition, results of operations and cash flows could be materially and adversely affected**. **In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.**

~~140.~~147.	The above statements made in the 1Q18 10-Q were materially false and misleading when made because Defendants omitted to disclose material facts necessary to make the statements that were made not misleading. Defendants omitted to disclose that: 1 – FEMA did not review or approve Cobra's contract with PREPA leaving Mammoth at heightened risk to not be reimbursed for the work it performed; 2- Mammoth was at risk of its payments being withheld or delayed, and the amounts already paid to it subject to being repaid because Ellison was bribing Tribble to steer the contracts and work to Cobra; and 3 – Cobra's ability to secure additional work was at risk because it obtained its existing work by bribing FEMA officials.

~~141.~~148.	The 1Q18 10-Q was also false and misleading because under the section Item 1A Risk Factors, Defendants stated "Other than set forth below, there have been no material changes to the Risk Factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2017." None of the additional risk factors

listed relate to PREPA or Mammoth's infrastructure business. Thus, the 1Q18 10-Q risk factors were false and misleading when made because they omitted to disclose the risks described in paragraph 145138 above. The facts omitted from the 2017 10-K, omitted again in the 1Q18 10-Q, were necessary in order to make the statements made by Mammoth not materially misleading.

### The May 3, 2018 Earnings Call

142.149.     On May 3, 2018, Defendants held an earnings call with analysts and investors. In addition to reiterating the false statements concerning PREPA contained in the 1Q18 10-Q, discussed in paragraphs 139-40 above, Straehla made the following false and misleading statements in response to questions from analysts about the ongoing RFP process with PREPA. Specifically, stock market analyst Daniel Joseph Burke from Johnson Rice & Company asked Straehla:

> I guess, I will start out with a couple on Puerto Rico, if you don't mind. Arty, can you maybe update us, I know it's essentially a public process, but where the RFP process might stand for potential reconstruction work on the island?

To which Straehla responded:

> Sure, Daniel. The RFP process has begun and in earnest, there's nothing to really announce right now, but we are working through the processes as PREPA and the Puerto Rican government are. **We think we have a competitive advantage**, in that we have nearly 1,000 people and 600 pieces of equipment. So we think that as we go forward, **we are looking forward to [the] possibility of getting that RFP. We think it's – we expect to be very competitive**.

143.150.     Stock market analyst John Daniel from Simmons & Company International also posed a question concerning the RFP process:

Fair enough. I guess the last one for me, the Puerto Rico contract, that gets the most questions from clients. And I know you've mentioned nothing formal to announce now but there's, I guess, the RFP process with respect to reconstruction. When would you expect to have any visibility on an outcome from that?

Straehla answered:

We think that something will come within the next 30 days. **It's generally a very competitive long process,** but we would hope – it started actually in February time frame, and we would like to see – we expect to see something in the next 30 days.

~~144.~~151.    Straehla's statement that "we have a competitive advantage" was false and misleading and omitted to disclose the material fact that Cobra's "competitive advantage" was that Ellison was bribing Tribble to steer work and contracts to Cobra and Mammoth. Straehla's statement that "it's generally a very competitive long process" was also misleading as this was not a competitive process as Ellison was bribing Tribble to steer work and contracts to Cobra and Mammoth.

*The May 29, 2018 Press Release & May 31, 2018 Form 8-K*

~~145.~~152.    On May 29, 2018, Mammoth issued a press release titled "Cobra Signs New $900 million Contract to Finish the Restoration of Critical Electrical Services and Support the Initial Phase of Reconstruction of the Electrical Utility System in Puerto Rico." The press release contained the following false and misleading statements:

Request For Proposal (RFP) Process

In mid-February, the Commonwealth of Puerto Rico began a competitive RFP bid process (RFP #77844) to complete the restoration of critical electrical system components and to support the initial reconstruction phase of its electrical utility system following the impact of Hurricane Maria. **This process involved the submission of bids from qualified infrastructure construction companies and an analysis by PREPA of**

**each bidder's experience, asset base, financial capacity, understanding of the project and overall cost to perform the work needed. After concluding the selection process, Cobra entered into a contract with PREPA on May 26, 2018**.

**Restoration and Reconstruction Contract**

\* \* \*

Arty Straehla, Mammoth's Chief Executive Officer, stated, "**We are very proud of our Cobra team in Puerto Rico. Through the team's hard work, professionalism and technical ability, we have been selected to lead this very important effort** to complete the restoration phase and transition to the reconstruction phase of the electric utility system in Puerto Rico, which is expected to last for several years. The reconstruction of the electric utility infrastructure will improve the reliability and quality of service for the citizens of Puerto Rico."

146.153. Defendants' statements in the press release concerning the RFP process were materially false and misleading when made. It was false and misleading for Defendants to state that the process was competitive and to describe the rigorous process that securing the bid required, when, in fact, the Company had an unfair advantage over other contractors as a result of Ellison bribing Tribble's to procure and steer PREPA work to Cobra.

147.154. On May 31, 2018, Mammoth filed a Form 8-K with the SEC, signed by Defendant Layton, which, in addition to including the press release described above as an exhibit, contained a copy of the Second PREPA Contract, signed by Straehla.

148.155. The Second PREPA Contract contained the same conflict of interest provision under Article 21 that was contained in the First PREPA Contract (¶¶ 45, 5043, 48). As such, Cobra was to avoid even the appearance of the existence of conflicting interests. Straehla also certified in the Second PREPA Contract, that Cobra and its

representatives were in compliance with various ethical regulations and laws, including the "Anti-Corruption Code for a New Puerto Rico" – a certification that Straehla had previously made when he signed Amendment No. 4 to the First PREPA Contract (¶ 47, 5045, 48). Defendants' statements contained in the press release and Form 8-K were therefore false and misleading when made because, in fact, Cobra was not in compliance with the conflict of interest provision of Article 21, or the Anti-Corruption Code for a New Puerto Rico contained in Article 49 of the Second PREPA Contract. The omitted facts put Mammoth at risk of not being paid for some, or all of its work for PREPA, and exposed Mammoth to potential civil and criminal penalties, and costly litigation, and were necessary in order to make the statements made not materially misleading.

***The June 6, 2018 S-3/A***

149.156.    As discussed in paragraphs 77-8375-79, on June 6, 2018, Mammoth filed a Form S-3/A with the SEC to effectuate the secondary offering so Wexford and Gulfport could sell their four million shares of stock. The S-3/A was declared effective on June 19, 2018, and contained the following false and misleading statements:

> ***Our customer base is concentrated and the loss of one or more of our significant customers, or their failure to pay the amounts they owe us, could cause our revenue to decline substantially.***
>
> Our top five customers accounted for approximately 71% and 80%, respectively, of our revenue for the years ended December 31, 2017 and 2016. Gulfport Energy Corporation, or Gulfport, was our largest customer for the years ended December 31, 2017 and 2016 accounting for approximately 30% and 57%, respectively, of our revenue. Puerto Rico Electric Power Authority, or PREPA, was our second largest customer for the year ended December 31, 2017 accounting for approximately 29% of our revenue. For the three months ended March 31, 2018, PREPA was our largest

customer and Gulfport was our second largest customer, representing 64% and 12%, respectively, of our total revenue for such period. It is likely that we will continue to derive a significant portion of our revenue from a relatively small number of customers in the future. If a major customer decided not to continue to use our services, our revenue would decline and our operating results and financial condition could be harmed. In addition, we are subject to credit risk due to the concentration of our customer base. Any nonperformance by our counterparties, including their failure to pay the amounts they owe us on a timely basis or at all, either as a result of changes in financial and economic conditions or otherwise, could have an adverse impact on our operating results and could adversely affect our liquidity.

***One of our infrastructure services subsidiaries has entered into service contracts with PREPA, which provide for aggregate payments to us of up to approximately $1.8 billion. PREPA is currently subject to pending bankruptcy proceedings. In the event that PREPA does not have or does not obtain the funds necessary to satisfy its payment obligations to our subsidiary under the contracts or terminates the contracts prior to the end of their terms, our financial condition, results of operations and cash flows could be materially and adversely affected.***

On October 19, 2017, one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid as a result of Hurricane Maria. The one-year contract, as amended through February 27, 2018, provides for payments of up to $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900.0 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system on Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contracts will be largely dependent upon funding from the Federal Emergency Management Agency, or FEMA, or other sources. PREPA's contracting practices in connection with restoration and repair of PREPA's electrical grid on Puerto Rico, and the terms of certain of those contracts, have been subject to critical comment and are the subject of review and hearings by U.S. federal and Puerto Rican governmental entities. In 2017, a contract for restoration and repair services entered into by PREPA with an unrelated third party was terminated by PREPA. In the event that PREPA does not have or does not obtain the funds necessary to satisfy its current obligations to Cobra under the contracts or terminates the contracts prior to the end of the contract terms, our financial condition, results of operations and cash flows could be materially and adversely affected. In addition,

government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.

***We provide the majority of our infrastructure services to one customer, and the termination of this relationship could adversely affect our operations.***

We provide infrastructure services that focus on the repair, maintenance and construction of transmission and distribution networks. The majority of our revenue from this business is derived from PREPA pursuant to contracts entered into on October 19, 2017, as subsequently amended, and on May 26, 2018, each with a term of up to one year. We cannot assure you that we will be able to continue our contracts with PREPA on favorable terms and conditions or at all. Likewise, we cannot assure you that we will be able to obtain one or more replacement contracts with other customers sufficient to continue providing the level of services as we currently do with PREPA. The termination of our relationship with PREPA could have a material adverse effect on our business, financial condition, results of operations and cash flows.

~~150.~~157.     These purported risk factors failed to warn investors that Mammoth's ability to be reimbursed by PREPA for its work was at risk, and subject to recovery, because Cobra secured its contracts through a scheme whereby Ellison was bribing Tribble to steer the contracts and procure work for Cobra. These purported risks factors further failed to disclose that Cobra's own contracts with PREPA were among the "certain of those contracts" entered into by PREPA that were subject to review by U.S. federal authorities. The omitted facts were necessary in order to make the statements made not materially misleading.

~~151.~~158.     Defendants statements in the S-3/A concerning the possibility of delayed payments were also materially false and misleading because Ellison was informed by Tribble about a work stoppage due to PREPA being $200 million behind in payments

to Cobra just three days prior to Mammoth filing the S-3/A. The omitted facts were necessary in order to make the statements made not materially misleading.[28] Ellison shared this information with Straehla who repeated that PREPA was "pushing back" on payments at a meeting, attended by Layton, on June 18, 2018. The S-3/A was signed by Defendants Straehla and Layton.

***The August 7, 2018 10-Q (the "2Q18 10-Q")***

152.159. On August 7, 2018, Mammoth filed Form 10-Q with the SEC, which contained the following false and misleading statements:

> In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, public investor owned utilities and cooperatives. Since we commenced operations in this line of business, substantially all of our infrastructure revenues has been generated from storm restoration work, primarily from PREPA due to damage caused by Hurricane Maria. On October 19, 2017, Cobra and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid. The one-year contract, as amended, provides for payments of up to $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900.0 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system in Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contracts, terminates the contracts or curtails our services prior to the end of the contract terms, our financial condition, results of operations and cash flows could be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government

---

[28] Mammoth filed a Prospectus Supplement to the S-3/A on June 28, 2019, which contained additional risk disclosures, none of which pertained to the false and misleading risk disclosures identified above.

representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.

153.160.     The above statements made in the 2Q18 10-Q were materially false and misleading when made because Defendants omitted to disclose material facts necessary to make the statements that were made not misleading. Defendants omitted to disclose that: (1) FEMA did not review or approve Cobra's contract with PREPA, leaving Mammoth at heightened risk to not be reimbursed for the work it performed; (2) Mammoth was at risk of its payments being withheld or delayed, and the amounts already paid to it subject to being repaid because Ellison was bribing Tribble to steer the contracts and work to Cobra; (3) Cobra's ability to secure additional work was at risk because it obtained its existing work by bribing FEMA officials; (4) Cobra hired a FEMA employee who provided prior assistance with obtaining work from PREPA at a salary nearly three times what she earned at FEMA, thereby placing the Company in violation of the conflict of interest provision in Article 21 and the Anti-Corruption provision in Article 49 of the Second PREPA Contract.

154.161.     Defendants statements in 2Q18 10-Q concerning the possibility of delayed payments were also materially false and misleading because Ellison was informed by Tribble about a work stoppage due to PREPA being $200 million behind in payments to Cobra.

***The August 7, 2018 Earnings Call***

155.162.     On August 7, 2018, Defendants held an earnings call with analysts and investors. In addition to reiterating the false statements concerning PREPA contained

84

in the 2Q18 10-Q, discussed in paragraphs 159-61152-54 above, Defendant Straehla made the following false and misleading statement:

> Now let me give you an update on our current operations, starting with the infrastructure division. Our team has been in Puerto Rico for over 275 days or nearly 10 months as of today. **We continue to work closely with PREPA and other governmental agencies** to improve the resiliency of the energy infrastructure network and have begun the task of reconstructing parts of the electrical grid to both harden it and provide better protection from future storms.

156.163. Straehla's statement that "We continue to work closely with PREPA and other governmental agencies" was materially false and misleading when made because it omitted to disclose that the Company's "work[ing] closely with . . . other governmental agencies" – FEMA – consisted of Ellison bribing Tribble to procure and steer work from PREPA to Cobra.

157.164. During the question and answer portion of the call, Straehla made the following false and misleading statements in response to questions from analysts concerning ongoing and future work in Puerto Rico:

Thomas Allen Moll from Stephens Inc., asked Straehla:

> So I wanted to start on Puerto Rico. As you roll onto the new contract there, how do you expect the number of personnel on the island to fluctuate over the next few quarters? How does the top line evolve along with that? And then, as well, on the margin side, how should we think about that?

Straehla responded:

> Well, Tommy, let me, first of all, say that our team -- our infrastructure team in Puerto Rico has executed at a tremendously high level, and we are very proud of the work that they have done.

As you know, we are nearing the end of the restoration phase and going to reconstruction. We increased our personnel on the island during the past quarter and it'll start falling somewhat as it comes back to much more normalcy.

What occurred was that the Corps of Engineers, when they exited the island, there was still quite a bit of restoration work and we took our increases up. With that said, we're still about 700 on the island today. Now that's down from a high of about 1,000.

So this -- we still view this as long-term work. We have the $900 million contract **that we won during the course of the second quarter,** and we feel like that as we make the transition to reconstruction, we still have a long time to be on the island.

158.165. Straehla's statement that Mammoth "won" the $900 million contract was false and misleading when made. Mammoth/Cobra did not competitively win any contracts but, instead, was awarded the contract because Ellison was bribing Tribble to procure work and steer work to Cobra.

*The November 1, 2018 10-Q (the "3Q18 10-Q")*

159.166. On November 1, 2018, Mammoth filed Form 10-Q with the SEC, which contained the following false and misleading statements:

In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, public investor owned utilities and cooperatives. Since we commenced operations in this line of business, substantially all of our infrastructure revenues has been generated from storm restoration work, primarily from PREPA due to damage caused by Hurricane Maria. On October 19, 2017, Cobra and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid. The one-year contract, as amended, provides for payments of up to $945.4 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900.0 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system in Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a

result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contracts, terminates the contracts, curtails our services prior to the end of the contract terms or otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected. **In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.**

The demand for our infrastructure services in the continental United States has increased since we expanded into the infrastructure business. Our infrastructure teams are working for multiple utilities primarily across the northeastern, midwestern and southwestern portions of the United States. We believe we will be able to continue to grow our customer base in the continental United States and increase the backlog of work over the coming years. In Puerto Rico, the reconstruction process is just beginning with significant front-end engineering required prior to the reconstruction of the electric grid. Staffing levels in Puerto Rico have fluctuated between 500 and 600 people over the past 60 days and we anticipate a ramp up in reconstruction projects throughout 2019.

~~160.~~167.     The above statements made in the 3Q18 10-Q were materially false and misleading when made because Defendants omitted to disclose material facts necessary to make the statements that were made not misleading. Defendants omitted to disclose that: (1) FEMA did not review or approve Cobra's contract with PREPA leaving Mammoth at heightened risk to not be reimbursed for the work it performed; (2) Mammoth was at risk of its payments being withheld or delayed, and the amounts already paid to it subject to being repaid because Ellison was bribing Tribble to steer the contracts and work to Cobra; (3) Cobra's ability to secure additional work was at risk because it obtained its existing work by bribing FEMA officials; (4) Cobra hired a FEMA employee who provided

prior assistance with obtaining work from PREPA at a salary nearly three times what she earned at FEMA, thereby placing the Company in violation of the conflict of interest provision in Article 21 (¶¶ 45, 5043, 48), and the Anti-Corruption provision in Article 49 of the Second PREPA Contract (¶¶ 47, 5045, 48).

***The March 15, 2019 10-K (the "2018 10-K")***

161.168.    On March 15, 2019, Mammoth filed Form 10-K with the SEC, which contained the following false and misleading statements:

> We currently have agreements in place with government-funded utilities, private utilities, public IOUs and Co-Ops. To date, substantially all of our infrastructure services have been performed in Puerto Rico under two emergency master services agreements entered into by one of our subsidiaries, Cobra Acquisitions LLC, or Cobra, with PREPA for up to an aggregate of approximately $1.8 billion of services. The scope of the work contemplated by these agreements includes labor, supervision, tools, equipment and materials to perform storm repair, restoration and reconstruction services at various locations in Puerto Rico. Cobra performed the full $945 million of services under the initial contract as of July 21, 2018. The second contract with PREPA has a one-year term ending on May 25, 2019 and provides for total payments not to exceed $900 million. As of December 31, 2018 and March 8, 2019, Cobra had performed an aggregate of $280 million and $354 million, respectively, of services under the second contract. Although we continue to perform services under the second contract, we expect these services will end by March 31, 2019, and we do not expect that any further work orders will be issued to Cobra under this contract prior to the May 25, 2019 termination date.
>
> As previously reported, during the third quarter of 2018, our staffing levels in Puerto Rico fluctuated between 500 and 600 people. During the fourth quarter of 2018, our staffing levels generally ranged from 475 to 550, dropping to approximately 130 at year end for a period of three days due to the holidays. To date in 2019, our staffing levels in Puerto Rico have decreased from approximately 500 in January to 200 as of March 8, 2019. We currently expect our staffing levels in Puerto Rico to decline to approximately 50 by early April 2019 as we complete the work contemplated by our existing work orders and undertake demobilization

efforts. For additional information regarding our services to PREPA, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.

\* \* \*

### *Regulation of Infrastructure Services*

**In our infrastructure business, our operations are subject to various federal, state and local laws and regulations including**:

- licensing, permitting and inspection requirements applicable to contractors, electricians and engineers;

- regulations related to worker safety;

- permitting and inspection requirements applicable to construction projects;

- wage and hour regulations;

- building and electrical codes; and

- **special bidding, procurement and other requirements on government projects**.

**We believe that** we have all the licenses required to conduct our energy infrastructure services and that **we are in substantial compliance with applicable regulatory requirements**. Our failure to comply with applicable regulations could result in substantial fines or revocation of our operating licenses, as well as give rise to termination or cancellation rights under our contracts or disqualify us from future bidding opportunities.

~~162.~~169.     Defendants' statements in the 2018 10-K were false and misleading when made because they omitted to disclose that the PREPA work was improperly procured and steered to Mammoth's subsidiary as a result of Ellison bribing Tribble to steer work to Cobra.

163.170. Additionally, Defendants' statements in the 2018 10-K that "Although we continue to perform services under the second contract, we expect these services will end by March 31, 2019, and we do not expect that any further work orders will be issued to Cobra under this contract prior to the May 25, 2019 termination date", was false and misleading because, in fact, Defendants did not expect any additional work under the contract because the fraudulent scheme was beginning to unravel. The very day that the 2018 10-K was issued, Ellison was meeting with FBI and DHS OIG agents regarding activities in Puerto Rico (¶ 8480). That same day, Mammoth's general counsel, Rusty LaForge, abruptly resigned from the Company – a fact Mammoth did not disclose until the end of April 2019 (¶ 8581).

164.171. As a result of the foregoing, it was materially false and misleading for Defendants to state in the 2018 10-K, that "We believe that . . . we are in substantial compliance with applicable regulatory requirements" for "special bidding, procurement and other requirements on government projects", when, in fact, the Company was in violation of: the conflict of interest provision under Article 21 to the First and Second PREPA Contracts (¶¶ 45, 5043, 48); the Anti-Corruption Code for a New Puerto Rico, which pursuant to Amendment No. 4 of the First PREPA Contract and as well as the Second PREPA Contract, Defendants had agreed to comply with (¶¶ 47, 5045, 48); and federal law as a result of Ellison and Tribble's fraudulent scheme to procure and steer PREPA work to Mammoth's subsidiary and Cobra violated the terms of its contract by hiring Patterson from FEMA creating a conflict of interest and/or the appearance of a conflict of interest.

165.172.     The 2018 10-K also contained the following false and misleading statements in a subpart to Item 1A Risk Factors: Item 1A Risk Factors:

> ***Our customer base is concentrated and the loss of one or more of our significant customers, or their failure to pay the amounts they owe us, could cause our revenue to decline substantially.***
>
> Our top five customers accounted for approximately 77% and 71%, respectively, of our revenue for the years ended December 31, 2018 and 2017. PREPA was our largest customer for the year ended December 31, 2018 accounting for approximately 60% of our revenue and our second largest customer for the year ended December 31, 2017 accounting for approximately 29% of our revenue. Gulfport was our second largest customer for the year ended December 31, 2018 accounting for approximately 8% of our revenue and our largest customer for the year ended December 31, 2017 accounting for approximately 30% of our revenue. It is likely that we will continue to derive a significant portion of our revenue from a relatively small number of customers in the future. If a major customer decided not to continue to use our services, our revenue would decline and our operating results and financial condition could be harmed. In addition, we are subject to credit risk due to the concentration of our customer base. In particular, as of December 31, 2018, PREPA owed us approximately $225 million for services performed on or before December 31, 2018. As of March 8, 2019, the amount owed to us by PREPA had increased to approximately $281 million. Any nonperformance by our counterparties, including their failure to pay the amounts they owe us on a timely basis or at all, either as a result of changes in financial and economic conditions or otherwise, could have an adverse impact on our operating results and could adversely affect our liquidity.
>
> ***Cobra, one of our infrastructure services subsidiaries, has entered into service contracts with PREPA, which provide for aggregate payments to us of up to approximately $1.8 billion. PREPA is currently subject to pending bankruptcy proceedings. In the event that PREPA (i) does not have or does not obtain the funds necessary to satisfy its payment obligations to our subsidiary under the contracts, (ii) obtains the necessary funds but refuses to pay the amounts owed to us, (iii) terminates the contracts or curtails our services prior to the end of the contract terms or (iv) otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected.***

On October 19, 2017, one of our subsidiaries, Cobra, and PREPA entered into an emergency master services agreement for repairs to PREPA's electrical grid as a result of Hurricane Maria. The one-year contract, as amended, provided for payments of up to $945 million. On May 26, 2018, Cobra and PREPA entered into a new one-year, $900 million master services agreement to provide additional repair services and begin the initial phase of reconstruction of the electrical power system on Puerto Rico. PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contracts is largely dependent upon funding from the Federal Emergency Management Agency, or FEMA, or other sources. PREPA's contracting practices in connection with restoration and repair of PREPA's electrical grid on Puerto Rico, and the terms of certain of those contracts, have been subject to critical comment and are the subject of review and hearings by U.S. federal and Puerto Rican governmental entities. In 2017, a contract for restoration and repair services entered into by PREPA with an unrelated third party was terminated by PREPA. As of December 31, 2018, PREPA owed us approximately $225 million for services performed on or before December 31, 2018. As of March 8, 2019, the amount owed to us by PREPA had increased to approximately $281 million. In the event that PREPA (i) does not have or does not obtain the funds necessary to satisfy its current obligations to Cobra under the contracts, (ii) obtains the necessary funds but refuses to pay the amounts owed to us, (iii) terminates the contracts or curtails our services prior to the end of the contract terms or (iv) otherwise fails to pay amounts owed to us for services performed, our financial condition, results of operations and cash flows would be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.

~~166.~~173.    These purported risk disclosures failed to warn investors that Mammoth's ability to be reimbursed by PREPA for its work was at risk, and subject to recovery, because Cobra secured its contracts through a scheme whereby Ellison was bribing Tribble to steer the contracts and procure work for Cobra. These purported risk factors further failed to disclose that Cobra's own contracts with PREPA were among the

"certain of those contracts" entered into by PREPA that were subject to review by U.S. federal authorities. The omitted facts were necessary in order to make the statements made by Mammoth not materially misleading.

167.174.    The 2018 10-K contained an additional false and misleading risk disclosure that did not appear in the 2017 10-K. Specifically, the 2018 10-K stated:

> ***Opportunities associated with government contracts could lead to increased governmental regulation applicable to us.***
>
> Most government contracts are awarded through a regulated competitive bidding process. If we were to be successful in being awarded government contracts, significant costs could be incurred by us before any revenues were realized from these contracts. Government agencies may review a contractor's performance, cost structure and compliance with applicable laws, regulations and standards. If government agencies determine through these reviews that costs were improperly allocated to specific contracts, they will not reimburse the contractor for those costs or may require the contractor to refund previously reimbursed costs. **If government agencies determine that we engaged in improper activity, we may be subject to civil and criminal penalties**. Government contracts are also subject to renegotiation of profit and termination by the government prior to the expiration of the term.

168.175.    This statement was materially false and misleading because it omitted to disclose that: (1) the Second Cobra Contract was obtained through a corrupt bidding process, as described in paragraphs 153-55146-148 above; (2) that Mammoth's subsidiary was not in compliance with "applicable laws, regulations and standards" as described in paragraph 164 above; (3) that government agencies, including the FBI and Department of Homeland Security Office of Inspector General, were, at the time the above statement was made, actively investigating Ellison in relation to the contracts with PREPA, as described in paragraph 80 above; and (4) as a result of the investigations and Ellison's criminal

activity, Mammoth faced a substantial likelihood of being subjected to civil and criminal penalties. The omitted facts were necessary in order to make the statements made by Mammoth not materially misleading.

***The March 15, 2019 Earnings Call***

169.176.    On March 15, 2019, Mammoth held a call with investors and analysts to discuss its 4Q18 and fiscal 2018 financial results. Layton made the following false and misleading statement during the call:

> As of December 31, 2018, we had $68 million in cash and no borrowings under our $185 million credit facility, resulting in total liquidity of $243 million net of letters of credit. **On March 13, 2019, we borrowed $82 million under our credit facility for 2018 Puerto Rico taxes to be paid today. Pursuant to the terms of our original PREPA contract, once our 2018 Puerto Rico income taxes are paid and the applicable returns are filed, we are entitled to receive $45 million from PREPA related to a contractual income tax provision**.

170.177.    Layton's statement that Mammoth would "receive $45 million from PREPA related to a contractual income tax provision" was materially false and misleading because, as discussed in paragraph 171164 above, the Company was in violation of the conflict of interest and Anti-Corruption provisions contained in Articles 21 and 49 to the First and Second PREPA Contracts, rendering the prospects that PREPA would pay Mammoth the funds highly unlikely.

171.178.    Layton also made the following false and misleading statement in response to a question from an analyst concerning the work in Puerto Rico:

> Marshall, I think it**'s important to characterize Puerto Rico as a pause. It's not a shutdown, it's a pause while the engineering catches up**. So we fully expect that RFPs will be pushed out in Q3 or Q4 of this year. And the same amount of work that we anticipated all along still has to be done

in Puerto Rico. So while we work through this pause in Puerto Rico, we'll shift those assets back to North America and put them to work. But **it's certainly not a "stop" in Puerto Rico, it's just a pause on that work**.

~~172.~~179.    Layton's statement characterizing Puerto Rico as "a pause" and not a "stop" was materially false and misleading and omitted to disclose material facts. Layton attended the Mammoth Executive Leadership Meeting held before this call during which Straehla informed the attendees that Mammoth was leaving Puerto Rico because PREPA was not going to pay Mammoth approximately $280 million it owed Mammoth. Layton misrepresented that "it's certainly not a 'stop'" because it was a stop. He omitted to reveal the true reason why Mammoth was leaving: because PREPA would not pay Mammoth. Plus, by March 15, 2019 ~~as discussed in paragraphs 80-82 above,~~ the FBI and Department of Homeland Security were investigating how Cobra was awarded its PREPA contracts and Ellison was already interviewed as part of the investigation and Mammoth executives, including CW1, were being contacted by the FBI for questioning.~~.~~ Given that Cobra was under investigation for how its contracts were awarded would lead a reasonable investor to understand that Cobra's ability to obtain additional contracts was at risk. ~~Plus, Ellison was informed by Tribble, in June 2018, that a work stoppage was coming.~~

180.   During this call, in addition to announcing lower-than-expected earnings for the fiscal quarter, Straehla revealed that "Our staffing levels declined during the first quarter of 2019 and we are currently in the process of winding down our operations in Puerto Rico, with the expectation of leaving the island completely within the next 60 days."

181.   This statement by Straehla was false, materially misleading and omitted to disclose material facts. Straehla informed executives at a prior Leadership Meeting that

Mammoth/Cobra was "pulling out" of Puerto Rico because PREPA would not pay outstanding invoices owed to Mammoth/Cobra. It was therefore misleading to not reveal the true reason why Mammoth/Cobra was leaving Puerto Rico – that PREPA was not paying.

**The May 2, 2019 10-Q (the "1Q19 10-Q")**

182. On May 2, 2019, Mammoth filed Form 10-Q with the SEC, which contained the following false and misleading statements:

> In 2017, we expanded into the electric infrastructure business, offering both commercial and storm restoration services to government-funded utilities, private utilities, IOUs and Co-Ops. Since we commenced operations in this line of business, substantially all of our infrastructure revenues has been generated from storm restoration work, including revenue from PREPA due to the damage by Hurricane Maria. Our contract with PREPA, as amended during the first quarter of 2018, provides for 2018 revenue of approximately $745 million for services estimated to be performed through mid-2018. Cobra intends to seek additional repair and restoration work for PREPA's electric grid as well as work rebuilding and modernizing PREPA's electric grid once the repair and restoration phase is complete. However, there can be no assurance that Cobra will be successful in securing any additional work. Further, PREPA is currently subject to bankruptcy proceedings pending in the U.S. District Court for the District of Puerto Rico. As a result, PREPA's ability to meet its payment obligations under the contract will be largely dependent upon funding from the Federal Emergency Management Agency or other sources. In the event PREPA does not have or does not obtain the funds necessary to satisfy its obligations to Cobra under the contract, terminates the contract or curtails our services prior to the end of the contract term, our financial condition, results of operations and cash flows could be materially and adversely affected. In addition, government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made.

> The demand for our infrastructure services in the continental United States has steadily increased since we expanded in to the infrastructure business.

> Our infrastructure teams are working for multiple utilities across the northeastern, midwestern and southwestern portions of the United States. We believe we will be able to continue to grow our customer base in the continental United States and increase the backlog of work over the coming years.

~~174.~~183.　　The above statements made in the 1Q19 10-Q were materially false and misleading when made because Defendants omitted to disclose material facts necessary to make the statements that were made not misleading. Defendants omitted to disclose that: (1) FEMA did not review or approve Cobra's contract with PREPA leaving Mammoth at heightened risk to not be reimbursed for the work it performed; (2) Mammoth knew PREPA was not going ~~was at risk of its payments being withheld or delayed, and the amounts already paid~~ to pay ~~it subject to being repaid because Ellison was bribing Tribble to steer the contracts and work to~~ Cobra for the outstanding invoices; (3) Cobra's ability to secure additional work was at risk because it obtained its existing work by bribing FEMA officials; (4) Cobra hired a FEMA employee who provided prior assistance with obtaining work from PREPA at a salary nearly three times what she earned at FEMA, thereby placing the Company in violation of the conflict of interest provision in Article 21 (¶¶ 45, 50 ~~(¶ 43, 48~~) and the Anti-Corruption provision in Article 49 of the Second PREPA Contract (¶¶ 47, 50 ~~(¶ 45, 48~~); (5)  the FBI had obtained multiple warrants to seize the vast majority of Ellison's assets, and had, by the time of the 1Q19 10-Q seized nearly $5 million worth of Ellison's assets (¶ 87 ~~82~~). Defendants either knew, or recklessly disregarded that the President of their most important business segment was in the midst of a far-reaching federal investigation into how Cobra obtained its PREPA contracts.

184. The 1Q19 10-Q was also false and misleading because under Item 1A Risk Factors, Defendants stated "There have been no material changes to the Risk Factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2018." Thus, the 1Q19 10-Q risk factors were false and misleading when made because they omitted to disclose the risks described in paragraphs 172-75165-68 above. The facts omitted from the 2018 10-K, omitted again in the 1Q19 10-Q, were necessary in order to make the statements made by Mammoth not materially misleading.

***The May 2, 2019 Earnings Call***

185. On May 2, 2019, Defendants held an earnings call with analysts and investors. In addition to reiterating the false and misleading statements contained in the 1Q19 10-Q, discussed in paragraphs 182-84173-75 above, Layton provided a financial update in which he made the following false and misleading statement:

> As of March 31, 2019, we had $21 million in cash and $82 million in borrowing under our $185 million credit facility, resulting in total liquidity of $115 million, net of letters of credit. **Pursuant to the terms of our original PREPA contract, once our 2018 Puerto Rico income tax returns are filed, which we currently expect to happen in mid-May, we're entitled to receive $45 million from PREPA related to a contractual income tax provision**.

186. Layton's statement that Mammoth would "receive $45 million from PREPA related to a contractual income tax provision" was materially false and misleading because, as discussed in paragraph 183174 above, the Company was in violation of the conflict of interest and Anti-Corruption provisions contained in Articles 21 and 49 of the First and Second PREPA Contracts, rendering the prospects that PREPA would pay Mammoth the funds highly unlikely. Making payment from PREPA even more unlikely,

and as discussed in paragraphs 84-8780-82 above, a far-reaching federal investigation into Cobra's procurement of the PREPA contracts was fully underway – with Ellison already having met with FBI and DHS OIG agents and having his assets seized and frozen. Informing investors that Mammoth would receive the $45 million from PREPA without also disclosing the omitted facts that made receipt of the payment highly unlikely, rendered Layton's statement materially false and misleading.

***Defendants False Certifications***

178.187.    The 3Q17 10-Q was signed by Defendants Straehla and Layton and included certifications signed by Straehla and Layton as exhibits, which stated in pertinent part:

> 1.    I have reviewed this Quarterly Report on Form 10-Q of Mammoth Energy Services, Inc. (the "registrant")
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

179.188.    Additionally, Defendants Straehla and Layton both signed Sarbanes-Oxley certifications, certifying in pertinent part, that "[t]he information contained in the Report fairly represents, in all material respects, the financial condition and results of operations of the Company."

180.189.    Certifications signed by Defendants Straehla and Layton, substantially similar to those described in paragraphs 187-88178-79 above, were also

attached to Mammoth's: 2017 10-K; 1Q18 10-Q; 2Q18 10-Q; 3Q18 10-Q; 2018 10-K; and 1Q19 10-Q.

## ADDITIONAL SCIENTER ALLEGATIONS

181.190. Defendant Ellison's scienter can be strongly inferred from the facts from the Indictment. Ellison engaged in activities such as providing Tribble with money, credit cards, helicopter rides, and trips to support the strong inference that he bribed Tribble to steer contracts and business to Cobra and Mammoth.

182.191. Additionally, Ellison was in regular communication with Tribble whereby she would send email communications from her FEMA email to her personal email and then forward those emails on to Ellison. Ellison either knew, or recklessly disregarded, that this communication with Tribble created a conflict of interest, or at least the appearance of a conflict of interest, in violation of the PREPA contracts entered into between PREPA and Cobra.

183.192. Moreover, Ellison arranged to have FEMA employee Patterson hired by Cobra at approximately more than 3 times her FEMA salary. Patterson was working directly on the PREPA contracts that were awarded to Cobra. Ellison caused Cobra to hire Patterson, in part, as a favor to Tribble.

184.193. Ellison's scienter can also be inferred from the fact that he lied to federal law enforcement officials by stating that he had no personal relationship with Tribble, had never taken her on a helicopter ride, and was found to have a copy of a competing contractor's RFP bid on his computer. Indictment ¶¶ 95, 119-20.

185.194.	Ellison filed a declaration in a case related to the government's seizure of his assets in which he stated that his compensation was $300,000 for 2017 and $600,000 for 2018. Ellison also stated that he received "a substantial bonus in 2018," though he did not disclose the amount.

186.195.	The government seized cash totaling nearly $4.9 million from Ellison, as well as a $660,640 catamaran, a $30,000 pickup truck, and two tractors, which sell, used, for over $100,000 each. Additionally, the government is seeking forfeiture of more than $2 million worth of real property purchased by Ellison in 2018, which, according to the government, "constitutes or is derived from proceeds traceable to" Ellison's criminal violations. It is more than a reasonable inference that Ellison engaged in bribing Tribble to obtain large contracts for Cobra to enrich himself with a "substantial" 2018 bonus.

187.196.	Ellison's scienter can be imputed to Mammoth. Ellison knew, or recklessly disregarded, that Mammoth was reporting to its investors that it obtained contracts from PREPA, that those contracts were the largest driver of Mammoth's revenue in the Class Period accounting for 60% of overall 2018 revenues. Ellison knew, or recklessly disregarded that Mammoth regularly discussed Cobra and the PREPA contracts in its SEC filings. Mammoth also informed investors that it intended to focus more on its infrastructure segment, Cobra, going forward underscoring the importance of Cobra to Mammoth.

188.197.	Ellison as President of Cobra also acted within the scope of his employment at Cobra and Mammoth and he knew, or recklessly disregarded, that the illegal actions he was undertaking was designed for and to benefit Mammoth.

189.198.    Mammoth, as an entity, can be charged with knowing that the First PREPA contract was amended to remove the provision that FEMA reviewed and approved the contracts, such that Mammoth knew, or recklessly disregarded, that the removal of this provision subjected Cobra to higher than normal risk of non-payment and PREPA was in bankruptcy, was depending on FEMA to fund the reconstruction of the power grid, and if FEMA did not approve the contracts, FEMA could ultimately determine to not reimburse PREPA.

190.199.    In the *E&E News* article published on October 31, 2017, reported that "[a] Cobra spokesman said the contract 'imposes extensive disclosure obligations on Cobra in favor of all appropriate governmental authorities' and said there had been no requests to change the language in the documentation." Yet, the next day, Cobra signed an amendment to the First PREPA contract removing certain contract language. Cobra and Mammoth were attempting to downplay and divert attention from the objectionable contract provisions in the contract.

191.200.    Mammoth as an entity also paid for Ellison's criminal defense lawyers at the law firm of Norton Rose Fulbright. Ellison met with agents from the FBI and DHS OIG on March 15, 2019 in connection with the federal investigation (¶ 8480), that same day, Mammoth's general counsel abruptly resigned without any other employment lined up     (¶ 85(¶81) and the same day Straehla informed investors that they were "in the process of winding down our operations in Puerto Rico." Ellison had nearly all of his assets seized or frozen in late-April of 2019. (¶ 8782).  Mammoth did not disclose the criminal investigation, nor did it disclose that Ellison was terminated from his position with the

Company on June 7, 2019, supporting the inference that Mammoth was attempting to cover up the investigation and allegations of wrongdoing.

192.201.    Mammoth conducted a secondary public offering, which was set in motion just days after Ellison received non-public information from Tribble "that $200 million in payments were being delayed and another work stoppage looming." ¶¶ 77-8375-79.

193.202.    Straehla's scienter can be inferred from the following facts: Straehla is the CEO of Cobra where the bribery scheme was carried out.

194.203.    Straehla accompanied Ellison to Puerto Rico in October 2017 which is when and where Cobra was awarded its first PREPA contract and the Indictment charges that the improper relationship between Ellison and Tribble began in October 2017.

195.204.    To assure investors that even though PREPA was in bankruptcy, FEMA would make the payments to Cobra, Straehla publicly stated that "the contract is with PREPA, but it was drafted and – in the room every step of the way with FEMA. So . . . it does comply with FEMA reimbursement requirements" and "we wouldn't have entered this contract if we didn't think . . . we'd get paid. And we feel very, very strongly about that." ¶ 5452.

196.205.    Twelve days after executing the First PREPA contract, on November 1, 2017, Straehla executed Amendment No. 1 to the contract, which removed the sentence "By executing this Contract, PREPA hereby represents and warrants that FEMA has reviewed and approved of this Contract, and confirmed that this Contract is an acceptable form to qualify for funding from FEMA or other U.S. Governmental agencies." ¶ 6563.

All of this supports an inference that it was Tribble who Straehla was referring to when he said that FEMA was "in the room every step of the way" in drafting the First PREPA Contract – the procurement of which he stated occurred through his and Ellison's joint effort. Straehla also knew, or recklessly disregarded, that by deleting the provision in the First PREPA contract that FEMA reviewed and approved the contracts that Cobra's risk of non-payment heightened considerably.

197.206.     Almost immediately after the First PREPA contract was executed, Congress and news reporters began to raise questions about the legitimacy of the contract award. Straehla defended Cobra and its conduct despite knowing that (1) the Cobra contract contained the same questionable provision – no audits of profits and costs – that caused Whitefish to have its contract terminated within days of signing and (2) FEMA did not review or approve the contracts. Straehla therefore knew, or recklessly disregarded, that there were irregularities in the PREPA contracts being awarded to Cobra similar to the irregularities that were in the Whitefish contracts.

198.207.     Straehla falsely tried to distinguish Cobra from Whitefish by falsely assuring investors that Cobra had prior experience in utility restoration and that Cobra's contracts were different from the contract entered into between Whitefish as Cobra's contracts did not contain the objectionable provisions and that FEMA was "in the room" when the contracts were agreed upon.

199.208.     Plus, Straehla was on personal notice after receiving the McCaskill Letter on December 1, 2017, that the United States Senate Committee on Homeland Security and Governmental Affairs had concerns about Cobra's procurement of the PREPA

contracts. ¶ 6462. Then-Senator McCaskill emphasized that "it is imperative that any taxpayer dollars used in this effort are spent effectively and are not subject to waste, fraud, or abuse." The McCaskill Letter further requested a multitude of information and documents, including "[a]ll communications between Cobra and any employee or representative of the federal government related to Cobra's contract with PREPA."

200.209. Straehla, as CEO of Cobra, either knew, or recklessly disregarded, that Cobra hired Patterson in July 2018 which was either a conflict of interest with FEMA or created the appearance of a conflict of interest with FEMA, yet neither Mammoth nor Cobra disclosed this conflict to FEMA.

201.210. Straehla had a direct line of communication with Ellison regarding events at PREPA. Three days after Tribble sent Ellison an email on June 3, 2018 warning him that $200 million in payments were being delayed, and another work stoppage was looming, Straehla and Layton resurrected the secondary offering to permit Wexford and Gulfport to sell four million shares of common stock. Straehla also informed Mammoth subsidiary executives, at a meeting on June 18, 2018 which was attended by Layton, that PREPA was "pushing back" on making payments to Mammoth. ¶ 81. This was the very information Tribble shared with Ellison just a few weeks earlier. ¶ 82.

202.211. On June 29, 2018 Mammoth's two controlling shareholders, Wexford and Gulfport, sold $105 million and $50 million, respectively, of Mammoth common stock.

203.212. Layton's scienter can be inferred from the following facts: Layton signed the Form S-3/A to effectuate the sale of four million shares by Wexford and Gulfport on June 6, 2018, just three days after Ellison had received an email from Tribble

warning him that $200 million in payments were being delayed and another work stoppage was looming. Layton sent a letter to the SEC on June 15, 2019 asking that the SEC accelerate the effective date of the S-3/A to June 19, 2019 or as soon thereafter as possible. Layton attended the June 18, 2018 meeting where Straehla informed attendees that PREPA was "pushing back" on making payment to Mammoth. ¶ 81. As CFO of Mammoth, Layton was responsible for paying close attention to the financials of Mammoth's most important subsidiary, Cobra. Layton therefore either knew, or recklessly disregarded that Cobra was having difficulties getting paid from PREPA when he took immediate and swift action to enable Wexford and Gulfport to sell more than $150 million worth of Mammoth shares.

## CLASS ACTION ALLEGATIONS

204.213. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Mammoth Energy common stock between October 17, 2017, and June 5, 2019, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

205.214. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. More than 34.8 million Mammoth Energy shares trade on the NASDAQ.

206.215. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the

Class which predominate over questions which may affect individual Class members include:

   a. Whether the Exchange Act was violated by Defendants;

   b. Whether Defendants made false or misleading statements and/or misrepresented material facts;

   c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

   d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

   e. Whether the price of the Company's stock was artificially inflated; and

   f. The extent of damage sustained by Class members and the appropriate measure of damages.

~~207.~~216.     Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

~~208.~~217.     Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

~~209.~~218.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FRAUD ON THE MARKET**

~~210.~~219.      Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

   a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b. The omissions and misrepresentations were material;

   c. The Company's common stock traded in efficient markets;

   d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

   e. Lead Plaintiffs and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

~~211.~~220.      At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Lead Plaintiffs and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

221. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION

222. On March 15, 2019 Straehla surprised investors by stating that Mammoth was "in the process of winding down our operations in Puerto Rico, with the expectation of leaving the island completely within the next 60 days." Mammoth's stock price fell 12%, or $2.50 per share on March 15, 2019, in response to this news.

223. On May 24, 2019, investors began to learn of the illegal conduct which allowed Cobra to obtain the PREPA contracts. That day *The Wall Street Journal* published an article titled "*FEMA Official Probed Over Puerto Rico Power Restoration*," in which it reported that the FEMA Deputy Regional Administrator who oversaw FEMA's response to the damage caused by Hurricane Maria, Ahsha Nateef Tribble, was under investigation by the Department of Homeland Security and had been placed on administrative leave over allegations that she improperly steered work to Mammoth's subsidiary, Cobra. The Wall Street Journal's story was published in the middle of the day on May 24, 2019 and Mammoth's stock price fell from its intra-day high of $12.40 per

share to close at $11.74 per share, a 5% drop. Mammoths' stock price had closed at $12.24 on May 23, 2019.

215.224.    On June 5, 2019, at 3:44 pm *The Wall Street Journal* published another article, titled "*Puerto Rico Grid Contractor Caught Up in Federal Probes*" in which it reported that the "The Federal Bureau of Investigation and the Department of Homeland Security's Inspector General are looking into the work of a Mammoth Energy Services Inc. subsidiary in Puerto Rico, examining how the Oklahoma City-based company came to dominate the power restoration efforts there since 2017". The article also reported that the FBI had "opened a related criminal inquiry". Mammoth's stock price fell from its closing price on the prior day, $11.20 per share, to close at $9.53 per share on June 5 and continued to fall to close at $6.11 per share on June 6, 2019, a 45% drop.

216.225.    In the afternoon of September 10, 2019, the Department of Justice announced that it arrested and charged Ellison, Tribble and Patterson in the PREPA Cobra bribery scheme. Mammoth's stock price traded at a high of $4.25 per share on September 10, 2019 and closed at $3.68 per share that day. On September 11, 2019 stock market analysts downgraded Mammoth's stock price and the stock closed at $3.55 that day and continued to fall to $3.19 per share on September 13, 2019, for a total drop of $1.06 per share, or 25%.

217.226.    All totaled, Mammoth's common stock price fell by $9.31 per share, wiping out almost $325 million in market capitalization.

## CAUSES OF ACTION

### Count I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

~~218.~~227. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

~~219.~~228. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

~~220.~~229. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

~~221.~~230. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Lead Plaintiffs and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

<u>**Count II**</u>
**Violation of § 20(a) of the Exchange Act**
**(Against The Individual Defendants)**

~~222.~~231.    Lead Plaintiffs repeats and re-alleges each and every allegation contained above as if fully set forth herein.

~~223.~~232.    The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where the false or misleading statements were made and other statements alleged by Lead Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(a)    determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Lead Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Lead Plaintiffs' counsel as Lead Counsel;

(b)    awarding compensatory and punitive damages in favor of Lead Plaintiffs and the other class members against all Defendants, jointly and severally, for all

112

damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(c)     awarding Lead Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)     awarding Lead Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Lead Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

February 24, 2020~~November 12, 2019~~                Respectfully submitted,

/s/ Jeffrey C. Block
Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
**Block & Leviton LLP**
260 Franklin Street, Suite 1860
Boston, Massachusetts 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockesq.com
jake@blockesq.com

*Lead Counsel for*
*Lead Plaintiffs and the Class*

C. Michael Copeland OBA No. 13261
**Jones, Gotcher & Bogan P.C.**
3800 First Place Tower
15 East 5th Street
Tulsa, Oklahoma 74103
(918) 581-8200 phone
(918) 583-1189 fax
mcopeland@jonesgotcher.com

*Local Counsel for*
*Lead Plaintiffs and the Class*