# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE MAMMOTH ENERGY SERVICES, INC. SECURITIES LITIGATION | Case No.: CIV-19-522-J |

## LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS MAMMOTH ENERGY SERVICES, INC., ARTY STRAEHLA, AND MARK LAYTON'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

Table of Authorities ...........................................................................................................iii

Preliminary Statement ......................................................................................................... 1

Statement of Facts ............................................................................................................... 5

Argument .............................................................................................................................. 9

I.    Pleading Standards .................................................................................................. 9

II.   The SAC Pleads Facts Giving Rise To A Strong Inference That Defendants Acted With Scienter .......................................................................................................... 9

    A.    Ellison's Scienter ............................................................................................. 9

    B.    Ellison's Scienter Can Be Imputed To Mammoth .................................... 10

    C.    Straehla's Scienter ......................................................................................... 15

    D.    Layton's Scienter ........................................................................................... 19

III.  The Complaint Pleads Actionable Misstatements ................................................ 21

    A.    Statements Touting The Reasons for Mammoth's Success Are Actionable...... 22

    B.    Statements About the First PREPA Contract Are Actionable .............................. 23

    C.    Statements About the Adverse Impact of PREPA Terminating the Contracts or Not Making Payments Are Actionable ................................................................. 26

    D.    The Additional Statements Are Actionable ......................................................... 27

IV.   Plaintiffs Adequately Plead Loss Causation ........................................................ 28

Conclusion.......................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ................................................................................ passim

*Chill v. Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996) ............................................................................................ 14

*City of Monroe Emps.' Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ............................................................................................ 10

*City of Phila. v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ......................................................................................... 10

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
713 F. Supp. 2d 378 (D. Del. 2010) ................................................................................. 11

*City of Roseville Emps' Ret. Sys. v. Horizon Lines, Inc.*,
442 Fed.Appx. 672 (3d Cir. 2011) .................................................................................... 18

*Cohen v. Kitov Pharm. Holdings, Ltd.*,
2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) .................................................................. 29

*Constr. Laborers Pension Tr. For S. Cal. v. CBS Corp.*,
2020 WL 248729 (S.D.N.Y. Jan. 15, 2020) .................................................................... 22

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018) .............................................................................. 23

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) .......................................................................................................... 28

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ............................................................................................ 10

*Higginbotham v. Baxter Intern., Inc.*,
495 F.3d 753 (7th Cir. 2007) ............................................................................................ 15

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) ....................................................................... 16, 21

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005) .............................................................................. 13

*In re Braksem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017) .............................................................................. 23

*In re Chesapeake Energy Corp. 2012 ERISA Class Litig.*,
2013 WL 5596908 (W.D. Okla. Oct. 11, 2013) ........................................................... 26

*In re Cognizant Tech. Solutions Corp. Sec. Litig.*,
2018 WL 3772675 (D.N.J. Aug. 8, 2018) ..................................................... 11, 13

*In re Comshare Inc. Sec. Litig.*,
183 F.3d 542 (6th Cir. 1999) ......................................................................... 14

*In re Eletrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017) ............................................................ 16, 18

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) ............................................................ 19

*In re Galena BioPharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) .............................................................. 19

*In re Grupo Televisa Sec. Litig.*,
368 F. Supp. 3d 711 (S.D.N.Y. 2019) ............................................................ 13, 22

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ......................................................................... 19

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005) ............................................................ 13

*In re Marsh & McLennan Cos. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ............................................................ 11, 12, 19

*In re MF Glob. Holdings. Ltd., Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................ 21, 22

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................................ 19

*In re Nature's Sunshine Prods. Sec. Litig.*,
486 F. Supp. 2d 1301 (D. Utah 2007) ........................................................... 14

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) ......................................................................... 14

*In re Providian Fin. Corp. Sec. Litig.*,
152 F. Supp. 2d 814 (E.D. Pa. 2001) ............................................................ 23

*In re Prudential Secs. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) .................................................................. 27

*In re Sec. Cap. Assurance Ltd. Sec. Litig.*,
2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011) ............................................... 30

*In re SemGroup Energy Partners, L.P., Sec. Litig.*,
   729 F. Supp. 2d 1276 (N.D. Okla. 2010) ......................................................... 20

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005) ............................................................... 23

*In re Vivendi*, *S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ............................................................................. 29

*In re Williams Sec. Litig. - WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) .................................................................. 28, 29

*In re Williams Sec. Litig.*,
   339 F. Supp. 2d 1242 (N.D. Okla. 2003) ......................................................... 21

*In re Williams Sec. Litig.*,
   339 F. Supp. 2d 1206 (N.D. Okla. 2003) ......................................................... 19

*Makor v. Issues & Rights, Ltd. v. Tellabs, Inc.*,
   513 F.3d 702 (7th Cir. 2008) ........................................................................... 10

*Murphy v. Precision Castparts Corp.*,
   2017 WL 3084274 (D. Or. Jun. 27, 2017) ....................................................... 21

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012) ............................................................. 10

*Patel v. L-3 Commc'ns Holdings Inc.*,
   2016 WL 1629325 (S.D.N.Y. April 21, 2016) ............................................ 11, 12

*Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc.*,
   372 F. Supp. 3d 1139 (D. Colo. 2019) .................................................. 23, 28, 29

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Intern. N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015) ................................................................ 30

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ........................................................................... 29

*Schiro v. Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019) ............................................................. 12

*SEC v. GlobeTel Commc'ns Corp.*,
   2008 WL 11333153 (S.D. Fla. Nov. 12, 2008) ................................................ 13

*SEC v. Gold*,
   2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006) .................................................. 14

*Smith v. LifeVantage Corp.*,
   2019 WL 6616308 (D. Utah Dec. 5, 2019) ...................................................... 22

*Stat-Tech Liquidating Trust v. Fenster*,
981 F. Supp. 1325 (D. Colo. 1997) ............................................................................... 17

*Stephenson v. Deutsche Bank AG*,
282 F. Supp. 2d 1032 (D. Minn. 2003) ......................................................................... 22

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
531 F.3d 190 (2d Cir. 2008) ......................................................................................... 10

*Van Noppen v. InnerWorkings, Inc.*,
136 F. Supp. 3d 922 (N.D. Ill. 2015) ........................................................................... 21

*Wolfe v. AspenBio Pharma, Inc.*,
587 Fed.Appx. 493 (10th Cir. 2014) ......................................................................... 5, 18

# PRELIMINARY STATEMENT

Mammoth Energy Services, Inc., through its wholly owned subsidiary Cobra Acquisitions, LLC, secured over $1.8 billion in contracts from the Puerto Rico Energy Power Authority ("PREPA") to restore Puerto Rico's power grid after Hurricane Maria in the fall of 2017. These contracts, which transformed Mammoth from a money losing operation into a highly profitable company, were secured by bribing a Federal Emergency Management Authority ("FEMA") official in violation of law.

Donald Keith Ellison, Cobra's President, was indicted on eight counts of criminal misconduct including bribery to steer the PREPA contracts to Cobra and Mammoth. The United States seized millions of dollars of Ellison's assets. His criminal trial is presently set to commence in January 2021.

Cobra is a wholly owned subsidiary of Mammoth. Defendant Arty Straehla served as both Mammoth *and* Cobra's chief executive. Ellison reported directly to Straehla. Cobra shares the same office space, telephone number, and website with Mammoth. SAC ¶ 32.[1] Cobra is not, as Defendants misleadingly claim, an "indirect" subsidiary of Mammoth. Def. Br.[2] at 5.

The PREPA contracts were the single largest source of revenues for Mammoth during the October 19, 2017 through June 5, 2019 Class Period. Mammoth's stock price

---

[1] "SAC" refers to Lead Plaintiffs' Second Amended Complaint, (ECF No. 93). "Indictment" refers to the criminal indictment in *United States v. Tribble*, Crim. No. 19-541 (D.P.R.) attached as Exhibit A to the SAC (ECF No. 55-1).

[2] "Def. Br." refers to The Motion to Dismiss the Second Amended Complaint, and Opening Memorandum in Support, filed by Defendants Mammoth Energy Services, Inc. Arty Straehla and Mark Layton, (ECF No. 104).

dramatically increased from around $15 per share just before the PREPA contracts were awarded in October 2017, to above $40 per share at the end of June 2018 (right when Wexford and Gulfport sold their $150+ million in common stock), and plummeted to under $4 per share after Ellison's indictment was revealed.

Defendant Straehla traveled with Ellison to Puerto Rico in October 2017 to secure the initial PREPA contracts; Straehla signed each of the contracts on behalf of Cobra. Both Straehla and Mark Layton, Mammoth's CFO, learned non-public information about PREPA's push back on, and ultimate refusal to pay, Mammoth's invoices, but concealed these material facts from investors.

Defendants suggest that because neither Mammoth, Straehla, nor Layton were indicted, the Court should presume their innocence. Def. Br. at 8. Not so. After Plaintiffs filed the SAC, Mammoth revealed that both the Department of Justice and the Securities and Exchange Commission are investigating Mammoth relating "to the same subjects as those at issue in the criminal matter."[3] While the existence of these investigations does not establish Defendants' guilt, they do negate Defendants' claims that they have been somehow exonerated.

Defendants' motion to dismiss lacks merit and should be denied. *First*, Ellison's scienter can be imputed to Mammoth under the corporate scienter theory. When a subsidiary that accounts for a material portion of a company's revenues engages in misconduct that creates those revenues, and where a senior officer of the subsidiary is

---

[3] *See* Declaration of Jeffrey C. Block ("Block Decl.") Ex. 1 (Excerpt from Mammoth Form 10-K dated February 28, 2020).

directly involved in that wrongful conduct, the scienter of the subsidiary's officer may be imputed to the corporation. *See* II B, *infra.* Accordingly, Mammoth acted with the requisite scienter.

*Second,* Defendants incorrectly argue that because there are no facts directly establishing that Straehla and Layton knew of the bribery scheme, a strong inference of their scienter cannot be established. Plaintiffs, however, need not plead direct evidence of scienter, only facts that support a strong inference thereof, in a pleading. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) ("The PSLRA did not, however, purport to move up the trial to the pleading stage. . . . 'Clearly, the Reform Act requires some precision in alleging facts, however, it does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim.'") (citation omitted).

*Third*, the SAC pleads specific facts supporting the strong inference that Straehla and Layton misled investors. On June 3, 2018 Ellison received an e-mail from Tribble (the FEMA official who conspired with Ellison) which warned that $200 million in payments from PREPA to Cobra were being delayed and another work stoppage was looming. Shortly thereafter, Straehla, Layton and CW1, among others, attended a Leadership meeting at which Straehla stated that PREPA was pushing back on paying and he was not sure if Mammoth/Cobra would get paid. SAC ¶ 81. This was non-public information and it is reasonable to infer that Straehla received this information from Tribble through Ellison, and that Straehla was aware of Ellison's "relationship" with Tribble. Even if Straehla and Layton did not receive the information from Tribble via Ellison, they knew of this information before Wexford and Gulfport carried out their $150 million sale of stock

in June 2018 but made no disclosure of this information to investors.

Additionally, prior to the March 15, 2019 earnings conference call, Straehla, Layton and CW1 attended another Leadership meeting at which Straehla said that Mammoth/Cobra was "pulling out" of Puerto Rico because PREPA would not pay its outstanding invoices. SAC ¶ 89. During a call with investors, however, while Straehla said that Mammoth was winding down its Puerto Rico work, he made no mention that it was because PREPA was not paying. Layton claimed that Puerto Rico was just "a pause" and "not a shutdown." These statements were false and misleading.

There are more than sufficient facts pled to support a strong inference that Mammoth, Straehla, and Layton either knowingly, or in reckless disregard for the truth, misled Mammoth investors.

Defendants' claim that there are no actionable misstatements also lacks merit. If a company's success is based, in part, on an illegal scheme, and the company then makes statements about the reasons for its success, it triggers a duty to reveal the true reasons for that success, *i.e.*, the illegal conduct. This is precisely what Defendants did here; they touted their success in Puerto Rico without revealing the true reasons behind their success—the bribery scheme. Plus, the SAC is not a "puzzle-pleading;" it provides the specific reasons why each of the identified statements are false or misleading.

Finally, Defendants' loss causation argument is also baseless, as each of the pled corrective disclosures revealed new information about the bribery scheme and "corrected" Mammoth's artificially inflated stock price. The motion to dismiss should be denied.

**STATEMENT OF FACTS**[4]

Mammoth and Cobra both operate out of the same office space, 14201 Caliber Drive, Suite 300, in Oklahoma City. Both share the same telephone number and website. SAC ¶ 32.

Cobra, after obtaining the PREPA contracts, transformed Mammoth from a money losing operation into a highly profitable company. Before the PREPA contracts, Mammoth lost money in its first, second, and third quarters of 2017. After PREPA awarded the contracts, however, Mammoth's earnings skyrocketed: in its 2017 fourth quarter alone it earned $65.9 million. SAC ¶ 108. In 2018, Mammoth admitted that "PREPA was our largest customer" and accounted "for approximately 60% of our revenue." *Id*. ¶ 111. In each conference call discussing quarterly and annual results during the Class Period, Straehla and Layton specifically discussed and noted the success of Cobra and its positive effect on Mammoth. *Id.* ¶ 110.[5]

---

[4] Under the PSLRA, a district court is to "accept as true 'all well-pleaded factual allegations in [the] complaint and view these allegations in the light most favorable to the plaintiff.'" *Wolfe v. AspenBio Pharma, Inc.*, 587 Fed.Appx. 493, 496-97 (10th Cir. 2014).

[5] In a 2018 press release announcing first quarter results, Straehla said that Mammoth's first quarter "was our third sequential record quarter" which was "underpinned by the hard work performed by our teams in Puerto Rico." On the conference call Straehla made a point of noting that Mammoth's contracts in Puerto Rico "made up approximately 65% of our overall revenue . . ." During the conference call discussing 2018 second quarter results, Straehla "wanted to point out a few key highlights" he was "particularly proud of" which was that Cobra "performed exceptionally well in Puerto Rico." In discussing third quarter 2018 results, Straehla again "wanted to point out" that "Cobra continues to perform exceptionally well." In discussing year-end 2018 results, Straehla touted that "2018 was a very good year for Mammoth. We saw year-over-year growth across all of our business clients but most notably" at Cobra. In fact, Cobra contributed $1.1 billion of Mammoth's $1.69 billion in 2018 revenues." SAC ¶ 110.

Straehla and Ellison sought to deflect the scrutiny that the award of the first PREPA contract brought to Mammoth. At the time PREPA awarded Mammoth its contract, another company, Whitefish Energy, was also awarded a $300 million contract. Whitefish was a firm with only two full-time employees based in the hometown of then-Interior Secretary Ryan Zinke. SAC ¶ 55. The Whitefish and Mammoth contract awards immediately raised public scrutiny about the contract awards. Straehla defended Mammoth's contract award by falsely claiming that Cobra had "recently completed electrical work in Texas and Florida after the hurricanes" to create an appearance that Cobra was experienced and skilled in hurricane restoration. *Id.* ¶ 56. Straehla further falsely represented that the contract "was drafted in the room and every step of the way with FEMA, so it does comply with FEMA reimbursement."[6] *Id*.

Ellison falsely said that Cobra "had a really good package put together" and that Cobra won the contract through a "standard bidding process for a storm contract." SAC ¶ 57. Investors and stock market analysts subsequently questioned Straehla on a November 2, 2017 conference call about the contract award. He defended it claiming, "we did everything absolutely right" without revealing that the contract was amended to remove the provision that FEMA approved the contract or the funding thereunder, the same

---

[6] Defendants' assertion that the public scrutiny put investors on notice of the illegal conduct by Ellison misses the point. Even if Straehla did not know about Ellison's conspiracy with Tribble, the negative publicity should have raised red flags with him. That he then misrepresented Cobra's experience and that FEMA approved the contracts, demonstrates that he misled investors to justify the contract awards, supporting that he acted with scienter.

offensive provision that got Whitefish in hot water.[7] *Id.* ¶ 61.

To further quell scrutiny of the Cobra contract award, Ellison worked with Tribble to have her secure a letter attesting to the reasonableness of Cobra's costs. Indictment ¶¶ 50-51. Tribble "took official action to cause" FEMA to send a December 23, 2017 letter determining "the costs under the Cobra contract with PREPA to be reasonable." Indictment ¶ 47(a). Straehla and Mammoth championed this letter when revealing an increase in the contract size on January 29, 2018.

Next, Tribble, on June 3, 2018 emailed Ellison warning him of coming trouble: "$200M behind in payment to Cobra – stop work looming again," Indictment ¶ 76. Fifteen days later, at a Leadership meeting attended by Straehla, Layton, and CW1, Straehla informed the attendees that Cobra was getting "push[]back" from PREPA on paying and Straehla was not sure if Mammoth/Cobra would get paid. SAC ¶ 81. The import of this statement is telling: first, it establishes that Ellison was informing Straehla and Layton what Tribble was telling him—there is little other explanation for how this non-public information made it to Straehla and Layton. Second, even if this information did not come from Ellison, Straehla and Layton knew what investors did not: PREPA was beginning to push back on payments to Cobra and $200 million in payments were in doubt.

Despite this, Straehla and Layton signed the S-3 registration statement, which allowed Mammoth's two controlling shareholders to sell $150 million in stock in late June 2018. No disclosure of the "pushback" from PREPA on making payments was made.[8]

---

[7] Shortly after its award, PREPA rescinded the $300 million Whitefish contract. SAC ¶ 57.
[8] As part of the criminal conspiracy, Ellison agreed to hire Tribble's friend, Jovanda

By March 15, 2019 Mammoth and Straehla knew the government was investigating the contracts. On that date, Ellison—whose counsel was being paid for by Mammoth—was interviewed by FBI and DHS agents. SAC ¶ 200. During this interview, Ellison allegedly lied to the agents by denying any personal relationship with Tribble and denying that he had ever taken a helicopter trip with her. *Id.* ¶ 84. That same day, CW1 was contacted by an FBI agent to discuss Mammoth. CW1's superior contacted Straehla who relayed that CW1 should not talk to the FBI and should ignore the call. SAC ¶ 86. On April 26, 2019 the FBI obtained warrants issued by the United States District Court for the District of Puerto Rico which seized nearly all Ellison's assets. *Id.* ¶ 87.

The Wall Street Journal began to reveal the truth when, on May 24, 2019, it reported that Tribble was under investigation "by a government watchdog over allegations she steered work" to Cobra. *Id.* ¶ 95. About two weeks later, the Journal further reported that the FBI and DHS were investigating Cobra and "examining how the Oklahoma City-based company came to dominate the power restoration efforts [in Puerto Rico] since 2017." *Id.* ¶ 97. Mammoth's stock price fell 45% from June 5 to June 6, 2019. *Id.* ¶ 224.

Finally, Ellison, Tribble, and Patterson were indicted and charged with 15 counts of criminal conduct:

---

Patterson, who was FEMA's Deputy Chief of Staff in San Juan in June 2018. Cobra hired Patterson at a salary plus bonus of almost 3 times her FEMA salary. SAC ¶¶ 70-76; *see also* Indictment ¶ 74. Cobra's contracts with PREPA, signed by Straehla, said that Cobra "shall avoid even the appearance of the existence of conflicting interests." ("Article 21") SAC ¶¶ 45, 50. Cobra's hiring of Patterson—who played a role in FEMA's oversight of and reimbursement of Cobra's work for PREPA—violated Article 21 of the First and Second PREPA Contracts. Ellison, who was instrumental in the hiring, either knew or recklessly disregarded that Cobra was violating its contract with PREPA.

From in or about October 2017 to in or about April 2019 . . . [1] Ahsha Nateef Tribble, [2] Donald Keith Ellison, the defendants, and others known and unknown, willfully and knowingly, combined, conspired, confederated, and agreed together . . . to commit offenses against the United States . . .

Indictment ¶ 36. The Indictment charges that the "purpose of the conspiracy" was for Tribble to use her "official acts as a FEMA employee" "in connection to COBRA's contracts with PREPA." *Id.* ¶ 39. According to the Department of Justice "from October 2017 to April 2019, Tribble and Ellison developed a personal relationship . . . with the intent to influence Tribble's performance of official acts. . . . and exerting pressure on PREPA and FEMA officials, in order to award restoration work to COBRA and to accelerate payments to COBRA." SAC ¶ 4.

**ARGUMENT**

## I.    Pleading Standards

To avoid repetition, Plaintiffs respectfully refer the Court to their opposition to Defendant Ellison's motion to dismiss for the applicable pleading standards.

## II.    The SAC Pleads Facts Giving Rise To A Strong Inference That Defendants Acted With Scienter

### A.    Ellison's Scienter

Again, to avoid repetition, Plaintiffs respectfully refer the Court to their opposition to Ellison's motion to dismiss. In short, because Ellison was indicted on 8 counts of defrauding the United States for engaging in a scheme to bribe Tribble to steer business to Cobra and Mammoth and because the Court is to accept those facts as true for purposes of this motion, Ellison's scienter is readily inferred. "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior." *City of Phila. v. Fleming Cos.,*

9

264 F.3d 1245, 1260 (10th Cir. 2001).

**B.      Ellison's Scienter Can Be Imputed to Mammoth**

Ellison's scienter can be imputed to Cobra and Mammoth. "The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violation of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority." *Adams*, 340 F.3d at 1106-07 (collecting cases and authorities); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." "[I]t is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."); *Makor v. Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud."); *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) ("[T]here could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication."); *City of Monroe Emps.' Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 688 (6th Cir. 2005) (relying on *Adams* in holding that the "knowledge of a corporate officer or agent acting within the scope of [his] authority is attributable to the corporation."); *See also Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012) (collecting cases and rejecting argument

that the person with scienter and the person who issued the misstatement must be the same to impute scienter).[9]

Ellison was a senior controlling officer of Cobra and acted within the scope of his authority when he engaged in the bribery scheme with Tribble. He did so to steer business to Cobra and Mammoth. In similar circumstances courts have not hesitated to find scienter on the part of a corporate parent when its subsidiary, which accounts for a significant portion of its business, engaged in illegal conduct.

The district courts' decisions in *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006), *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325 (S.D.N.Y. April 21, 2016) and *In re Cognizant Tech. Solutions Corp. Sec. Litig.*, 2018 WL 3772675 (D.N.J. Aug. 8, 2018) are on point. In each case the court found the corporate parent's scienter would be inferred from an executive at a subsidiary, *Marsh* and *L-3*, or where an executive who made no statements orchestrated the fraudulent scheme and was aware the company made misstatements, *Cognizant.*

In *Marsh*, even though senior officers at the parent company were not found to know of the fraud at the subsidiary, the corporate parent's scienter was "easily inferred from the conscious misbehavior and recklessness of particular management-level employees [at the subsidiary] identified in the Complaint as it is from the collective knowledge of the

---

[9] Defendants rely on a Delaware district court decision, *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378 (D. Del. 2010), for the assertion that unless an "individual officer . . . made, or participated in the making of, a false or misleading statement" the corporation itself will not be held liable. Def. Br. at 15. *Horizon Lines* represents the extreme minority view on this issue. Indeed, circuit courts that considered this question (the Second, Sixth, Seventh, and Ninth) hold the opposite.

corporate entities." 501 F. Supp. 2d at 481-82. The court found it significant that "Marsh is the largest and most prominent of MMC's businesses, generating approximately sixty percent of the Company's revenues, [which] undermines MMC's attempt to detach itself from its subsidiary." *Id.* at 483. The court further found there were "sufficient allegations regarding the pervasiveness of the fraud, the conscious misbehavior of particular corporate employees, and the complicity of the corporate entities to find that MMC was aware of or recklessly disregarded the intentional misconduct at Marsh." *Id.*

In *L-3*, the court imputed the scienter of the CFO of one of the company's four business segments to the parent where the CFO at the subsidiary engaged in accounting irregularities:

> The Aerospace Systems CFO, as the CFO of one of L-3's four business segments, was situated one management level down from the CEO and CFO of L-3 and was responsible for a business segment comprising 36[] percent of L-3's total business, qualifying him as "sufficiently senior" to serve as a proxy for L-3's scienter. Because Lead Plaintiffs have adequately pled that the Aerospace Systems CFO is someone whose scienter can be imputed to L-3 and that the Aerospace Systems CFO engaged in intentional misconduct with respect to the accounting misstatements, Lead Plaintiffs have succeeded in alleging L-3's scienter.

2016 WL 1629325 at \*14-15.[10] *See also SEC v. GlobeTel Commc'ns Corp.*, 2008 WL

---

[10] *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283 (S.D.N.Y. 2019), relied on by Defendants, illustrates why corporate scienter here is properly pled. *Cemex*, decided by Judge Caproni, who also decided *L-3,* found that corporate scienter was not adequately pled in *Cemex* when the fraud occurred at a subsidiary that made up a mere 4% of the total assets and 13% of the total sales of the Defendant parent corporation. *Id*. at 302 & n.10. Because Cobra was such a significant part of Mammoth, *Cemex* is inapt (as illustrated by *Cemex*'s contrast with *L-3* and *Marsh*.) What is more, the resignation allegations in *Cemex* were weaker than they are here: in *Cemex*, those alleged to have resigned at the subsidiary did not report to executives at the Defendant parent. *Id*. at 302. Here, Ellison directly reported to Straehla.

11333153, at *4 (S.D. Fla. Nov. 12, 2008) (imputing scienter of president of subsidiary who devised fraudulent scheme and who "reported directly to" CEO of parent corporation).

In *Cognizant*, the court attributed the scienter of the company's president, Coburn, to the corporate entity even though the president himself made no false statements. "Defendant Coburn's scienter may be imputed to the corporation because he is a 'high managerial agent . . . who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." 2018 WL 3772675 at *33. "Cognizant touted its SEZ licenses in SEC filings" and the "misstatements were repeated over the course of multiple years in various public filings" and while that "was occurring" Coburn "was facilitating an ongoing bribery scheme in India. . . [so t]here is a strong inference that [Coburn even] if he did not actually participate in [the false statement's] preparation, he became aware that they misstated earnings and touted SEZ licenses" and he "nevertheless tolerated the misrepresentation." *Id*.[11]

Here, Cobra accounted for 60% of Mammoth's 2018 revenue and was, without

---

[11] *See also In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 722 (S.D.N.Y. 2019) ("a subsidiary's [] scienter may be imputed to the parent company [], particularly where the subsidiary is at the center of the alleged fraud" and scienter "is also corroborated by the criminal information [filed against another company], which refers to [parent's subsidiary] as 'Broadcasting Affiliate A' and alleges that it paid millions of dollars in bribes and kickbacks to a high-ranking FIFA official."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (citing Tenth Circuit's opinion in *Adams* in stating "nothing in Rule 9(b) or the PSLRA requires a plaintiff to allege that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter" and attributing knowledge of vice chairman, vice president, and managing director to the corporate defendant); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 442-43 (S.D.N.Y. 2005) (imputing scienter to corporate defendant based on intentional misconduct of regional vice president and vice president of corporate finance).

question, the driver of Mammoth's profits throughout the Class Period. SAC ¶¶ 108-11. Cobra and Mammoth shared the same office space, and Straehla served as CEO to both Cobra and Mammoth. *Id.* ¶¶ 27, 32. Ellison, Cobra's President, was one level below Straehla, reported to him, and this made Ellison "sufficiently senior" to serve as a proxy for Mammoth's scienter.[12] Intense media and government scrutiny put Mammoth on notice of questions surrounding Cobra's first PREPA contract. And, Ellison knew of or recklessly disregarded that Mammoth was issuing the false and misleading statements. *Id.* ¶ 196.

The Court can also infer Mammoth's scienter because of its cover up of the FBI and DHS's investigation of Ellison, and its refusal to acknowledge Ellison's termination.[13] Mammoth was concealing material facts about Ellison's role in the bribery scheme. *See, e.g.*, *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter"); *SEC v. Gold*, 2006 WL 3462103, at *5 (E.D.N.Y. Aug. 18, 2006) ("[C]ommon sense dictates that actions taken after the fraud occurred can be circumstantial evidence

---

[12] *Chill v. Gen. Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) is of no help to Defendants. There, the Second Circuit affirmed dismissal of a securities class action against GE where misconduct by one employee at one of the 24 subsidiaries of a GE division, GE Capital, was not imputed to the parent corporation. Here, Plaintiffs are not charging a "failure to investigate" because of the success of Cobra, Def. Br. at 16; instead, given the significant questions and scrutiny about how Cobra came to obtain the lucrative Puerto Rico contracts with no prior direct experience, this should have raised red flags for just how all that business was really secured.

[13] *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553-54 (6th Cir. 1999) stands for the unremarkable proposition that, without more, accounting errors at a subsidiary will not automatically be imputed to the parent. The Sixth Circuit, however, does endorse the concept of corporate scienter. *i.e.*, imputing scienter to the corporation where a "high managerial agent" "recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014).

that the defendant had acted with the requisite state of mind.").[14]

### C.     Straehla's Scienter

There are more than enough facts to support Straehla's scienter.

*First*, Straehla went to Puerto Rico with Ellison in October 2017, the bribery scheme began in October 2017, and its purpose was "to award restoration work to COBRA and to accelerate payments to COBRA." SAC ¶ 5.[15] Upon announcing the contract award, newspaper stories and stock market analysts challenged the legitimacy of the award, and Straehla lied to deflect the criticism. *Id.* ¶ 126.

Straehla also falsely proclaimed, on October 20, 2017, that Mammoth's contract with PREPA "was drafted [] in the room and every step of the way with FEMA. So [] it does comply with FEMA reimbursement requirements." *Id.* ¶ 122. But Article 68 of the

---

[14] Defendants misplace their reliance on *Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) for the proposition that Mammoth did not have to disclose uncharged criminal activity. To the contrary, Plaintiffs charge that Mammoth had to disclose material *facts* so as to make what it did say not misleading. Issuing a press release defending its work in Puerto Rico in response to news stories of a criminal investigation, without revealing that the President of the subsidiary that secured the business was questioned by government agents, had his assets frozen and was terminated, are all facts that undercut the veracity of Mammoth's June 7 press release and evidence a mind set to cover up the fraud. Defendants did not have to admit to engaging in fraud but did have to reveal the facts that the President of its subsidiary was terminated and his assets were frozen by the Government. Plus, in *Higginbotham*, the court found the act of instituting an internal investigation upon learning of the potential wrongful conduct negated an inference of scienter; here, in stark contrast, Mammoth has never publicly acknowledged any steps to "investigate" Ellison's alleged criminal conduct.

[15] Defendants' contention that "Plaintiffs plead no facts suggesting the award of either PREPA Contract was obtained through the alleged misconduct" is incorrect and belied by the facts. *See* SAC ¶ 4. Defendants misplace their reliance on *Higginbotham*. While the news stories questioned the legitimacy of the awards, Straehla disputed the stories and misrepresented facts to discount any suggestion of wrongdoing by Mammoth or Cobra.

first PREPA Contract did not provide that FEMA approved the contract, only that PREPA *represented* that FEMA approved it. Straehla's suggestion that FEMA itself approved the contract and agreed to fund the payments was false. Given that PREPA was in bankruptcy, claiming that FEMA approved everything improperly legitimized the contract and the award.

Straehla's material misrepresentations that FEMA approved the contract and funding, both support a strong inference that Straehla knew, or recklessly disregarded, that there were irregularities in how Cobra was awarded the contract.[16] *Id.* ¶ 126. After all, if Straehla did not know of or recklessly disregard wrongdoing related to the contract awards, he would not have misrepresented facts to justify and support the award to Cobra. *See In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 718 (W.D. Tex. 2010) ("Even if [defendants] did somehow manage to remain unaware of any improprieties at ArthroCare before December 2007, the red flags in the media should have led them to investigate discrepancies between the media reports and their own knowledge, and thus are strong indicia that they acted with scienter"); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017) ("These red flags [including news reports] highlighted significant problems with Eletrobras's internal controls . . . that were ultimately subject to write-offs

---

[16] Defendants argue that Long's testimony alerted investors to the fact that FEMA did not approve the contracts but, this does not alter the analysis of Straehla's state of mind when he made the false statements on October 20, 2017. Plus, even after Long's testimony, Straehla and Mammoth continued to claim that FEMA approved the first contract and funding under it. *See* SAC ¶ 131 (Mammoth January 29, 2018 press release, Straehla stated that "at the request of PREPA, FEMA reviewed our *original* contract with PREPA and our rates of service.")

due to illicit payments—and therefore support a strong inference that [the individual defendants] acted with scienter.")

*Second*, Ellison was providing Straehla with information from Tribble. Tribble told Ellison on June 3 that there was push back on $200 million in payments and Straehla repeated this non-public information fifteen days later at a Leadership meeting. It is a fair inference that this information came from Tribble through Ellison. Plus, Straehla knew material facts—that PREPA was pushing back on $200 million in payments and a work stoppage was looming—without causing Mammoth to disclose these material facts before Wexford and Gulfport sold over $150 million of their Mammoth common stock in late June 2018 regardless of the source of this information.

*Third*, given that Straehla was CEO of Cobra, it is reasonable to infer that he knew that Cobra hired Patterson away from FEMA at a high annual salary—the same salary amount as Ellison's 2017 salary and one-half of his 2018 salary. Plus, given that Cobra and Mammoth shared the same office space, it is reasonable to presume that Straehla met the "new" employee in the office. *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1341 (D. Colo. 1997) (scienter may be inferred from circumstantial evidence because "direct evidence of fraudulent intent is rarely available.")

*Fourth*, while Straehla's status as CEO of both Mammoth and Cobra alone cannot support a strong inference of scienter, it is a relevant fact. *Adams*, 340 F.3d at 1106 ("standing alone, the fact that a defendant was a senior executive in a company cannot give rise to a strong inference of scienter. However, that [CEO] was the most senior executive of the Company is a fact relevant in our weighing the totality of the allegations.") (citation

omitted); *Wolfe*, 587 Fed.Appx. at 498 (same). The inference of scienter is strengthened because Straehla was also CEO of Cobra and signed the contracts on its behalf. *See In re Eletrobras*, 245 F. Supp. 3d at 468-69 (that CEO of parent company also served as chairman of subsidiary where bribery scheme was carried out "further bolster[ed] the circumstantial evidence supporting an inference of scienter.")[17]

*Fifth*, Straehla's scienter is supported by his false statements on the March 15, 2019 investor call. Prior to that call, Straehla attended a Leadership meeting at which he stated that Mammoth/Cobra was "pulling out" of Puerto Rico because PREPA was not paying Cobra's invoices. Although Straehla revealed to investors that Mammoth was "winding down our operations in Puerto Rico" and would leave "within the next 60 days" he omitted to reveal the true reason: PREPA was no longer paying. That PREPA indicated it would not pay the $280 million in outstanding invoices was undoubtedly a material fact. Defendants disingenuously suggest that Mammoth fully disclosed that PREPA would not be paying the $280 million, citing to its generic risk disclosure in its 2018 10-K that *if* PREPA does not pay the $280 million, Mammoth's "operations" and "cash flow" could be

---

[17] Straehla mistakenly claims that because the Indictment alleges no wrongdoing by him, the Court should infer that he is exonerated and that a strong inference of scienter is therefore negated. Def. Br. at 12. The SAC, however, alleges that Straehla is "Individual A" referred to throughout the Indictment. SAC ¶ 106. And both the SEC and DOJ are now investigating Mammoth's conduct regarding the bribery scheme. This falls well short of an exoneration. Defendants therefore misplace their reliance on *City of Roseville Emps' Ret. Sys. v. Horizon Lines, Inc.*, 442 Fed.Appx. 672, 675 n.5 (3d Cir. 2011) as there the Court of Appeals confirmed that where one executive "provided evidence against 'his superiors'" including "presently uncharged coconspirators" that did not support a strong inference of scienter against the unindicted executives. It does not stand for Straehla's proposition that if an executive is not named in an indictment it means he is exonerated.

harmed. Def. Br. at 28, citing to SAC ¶ 172. A generic risk disclosure is insufficient in the face of known facts to the contrary. *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1232 (N.D. Okla. 2003) (company's warnings "insufficient because Defendants failed to disclose that these problems had already manifested themselves").[18]

Plus, in defending Mammoth's work in Puerto Rico on June 7, 2019, Straehla omitted to reveal that Ellison had been terminated that day, was under federal investigation and nearly all of his assets had been seized. SAC ¶ 99. Straehla's concealment of these facts also supports a strong inference of scienter. *See Marsh*, 501 F. Supp. 2d at 486 (strong inference of scienter upheld against defendants who made statements publicly supporting company's business practices after learning of investigation); *In re Galena BioPharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (CEO's "attempts to cover up the specifics of the paid promotional campaign . . . support a strong inference of scienter."); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 641 (E.D. Va. 2000) ("[A]ttempts at covering-up the truth are probative of a culpable state of mind").

### D.    Layton's Scienter

Layton attended the June 18, 2018 Leadership meeting at which Straehla informed attendees that Cobra was getting "push[]back" from PREPA on paying and that Straehla

---

[18] *See also In re Harman Int'l Indus., Inc. Sec. Litig.,* 791 F.3d 90, 106, 108 (D.C. Cir. 2015) (holding cautionary language insufficient because it "fail[ed] to account for the materialization, rather than abstract possibility, of [an] important risk" and explaining "[t]o conclude otherwise, that even where a risk has materialized a company need only warn that it is a 'risk,' would render misleading cautionary language sufficient, a result neither the statutory text, nor legislative history, nor precedent supports."); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) (risk disclosure misleading where risk was presented as "merely possible when, in fact, it had already materialized.")

was not sure if Mammoth would get paid. SAC ¶ 81. Despite this, Layton signed the registration statement which allowed Wexford and Gulfport to sell more than $150 million worth of Mammoth stock. The S-3 does not mention the pushback from PREPA on paying $200 million or of a potential work stoppage. Straehla and Layton concealed this material information from investors.[19]

Plus, Layton falsely stated on March 15, 2019 that Puerto Rico was just "a pause" and "not a shutdown" despite attending a prior Leadership meeting where Straehla reported that PREPA was not paying so Mammoth was "pulling out." This is "classic" evidence of scienter. *See In re SemGroup Energy Partners, L.P.*, *Sec. Litig.*, 729 F. Supp. 2d 1276, 1297 (N.D. Okla. 2010) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting their public statements were materially inaccurate.").

Defendants wrongly argue that Layton's statement that the work stoppage was just a "pause" is not actionable because Plaintiffs fail to plead that that "Cobra would *never* again perform work for PREPA." Def. Br. at 28. As charged, *Mammoth* decided to stop work and pull out because PREPA indicated it would not pay the outstanding invoices

---

[19] Defendants' contention that as soon as the SEC's comments were resolved Layton tried to have the S-3 declared effective so there is no inference of wrongdoing is a red herring. Def. Br. at 7. *First*, the fact that Wexford and Gulfport wanted to sell stock just after PREPA awarded Mammoth the first contract—as a result of an alleged criminal conspiracy—supports a strong inference of scienter. *Second*, even if the SEC comments were the source of the delay, Layton and Straehla withheld material information from investors in the S-3: that PREPA was pushing back on $200 million in payments and a work stoppage was looming. Any delay caused by comments from the SEC does not alter that Defendants withheld these material facts from investors.

rendering what Layton said materially misleading, *i.e.*, this was not a "pause" but a pull out because PREPA was no longer paying.

## III.    The Complaint Pleads Actionable Misstatements

Defendants erroneously claim that the SAC is a defective form of "puzzle pleading," "quoting lengthy passages, then offering general reasons for falsity – [which] leaves the Court to the task of teasing out which specific statements are at issue." Def. Br. at 17.

Beginning at ¶ 120 and continuing and concluding at ¶ 189, the SAC specifies each statement alleged to be false and misleading, with each identified statement followed by a paragraph about what portion of the statement is false, what facts are omitted and why the statement is false or misleading. "Because the Complaint provides notice to each Defendant regarding the statements and omissions that Plaintiffs allege are misleading and the reasons why those statements and omissions are misleading, the Court denies the Williams Defendants' motion to dismiss based on the argument that the Complaint is a 'puzzle-style' pleading." *In re Williams Sec. Litig.,* 339 F. Supp. 2d 1242, 1261 (N.D. Okla. 2003).[20]

Plus, where a central allegation is that Defendants omitted material information— that Mammoth's success was due to the bribery scheme— it is necessary to quote passages of what was said to show what was omitted. *See In re ArthroCare*, 726 F. Supp. 2d at 710

---

[20] *See also Murphy v. Precision Castparts Corp.*, 2017 WL 3084274 at \*7 (D. Or. Jun. 27, 2017) (rejecting "puzzle pleading" argument where complaint identifies "misstatements and omissions made within a particular fiscal quarter or at a particular event, along with the reasons each statement is false or misleading" as the court "can match the alleged misstatements and omissions with Plaintiffs' explanations of why each statement is misleading."); *Van Noppen v. InnerWorkings*, *Inc.*, 136 F. Supp. 3d 922, 930 (N.D. Ill. 2015) (same); *In re MF Glob. Holdings. Ltd., Sec. Litig.*, 982 F. Supp. 2d 277, 309 (S.D.N.Y. 2013) (same).

("Plaintiff set[s] forth the relevant portions of a press release or investor call *in toto*, in order to give an idea of what was said and, just as importantly, what was omitted. Plaintiff does not appear to be hiding behind lengthy block quotes to avoid making itself abundantly clear on the issue of falsity (which would be improper); instead, it uses the block quotes to put its allegations of material omissions in context.").

Defendants' argument also is belied by their specific eleven-page attack on why the misstatements alleged are not actionable. Def. Br. at 18-28. *See Constr. Laborers Pension Tr. For S. Cal. v. CBS Corp.*, 2020 WL 248729, at *5, n.3 (S.D.N.Y. Jan. 15, 2020) (rejecting puzzle pleading argument where "CBS's own detailed and targeted motion to dismiss betrays this point."); *In re MF Glob.*, 982 F. Supp. 2d at 310 (same); *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1075 (D. Minn. 2003) (same).[21]

### A. Statements Touting the Reasons for Mammoth's Success Are Actionable

Mammoth, Straehla and Layton made a series of statements attributing Mammoth's financial success to its work in Puerto Rico. SAC ¶¶ 107-18. Courts uniformly find that where a company is engaged in illegal or wrongful conduct to obtain business, touting the financial success creates a duty to reveal the true reasons for that success. *See, e.g.*, *In re Grupo Televisa*, 368 F. Supp. 3d at 721 ("If the revenue generated by the World Cup broadcasting rights was partly attributable to bribery, Televisa's statements about its World

---

[21] In any event, Defendants' puzzle pleading argument is not a basis for dismissal. *See Smith v. LifeVantage Corp.*, 2019 WL 6616308, at *4 (D. Utah Dec. 5, 2019) (declining to dismiss complaint because "[a]lthough the Tenth Circuit has expressed disapproval of puzzle pleading, . . . the Tenth Circuit also recognize[s] the preference for deciding cases on the merits.") (citations and quotations omitted).

Cup broadcasting rights were plausibly materially misleading. Because those statements put its source of revenue at issue, they gave rise to Section 10(b) liability because the company failed to disclose the illegal conduct that generated the revenue.").[22]

The omission of a key reason for Cobra's success—the bribery engaged in by one of its senior officers —is an actionable half-truth. *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 444 (S.D.N.Y. 2018) ("[I]n addition to the bribes, CNO's selectivity could have also contributed to successes . . . Nonetheless, CNO's omission of the bribes underlying the bidding process was a class[ic] half-truth.") (quotations omitted).

### B. Statements About the First PREPA Contract Are Actionable

Straehla sought to deflect criticism of the first PREPA contract award by (1) misrepresenting Cobra's past experience and (2) claiming that FEMA "was in the room every step of the way," assuring investors "we wouldn't have entered this contract if we

---

[22] *Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1151-52 (D. Colo. 2019) (finding statements attributing success to various factors rather than DaVita's "allegedly illegitimate" patient-steering scheme were false and misleading); *In re Braksem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 759-60 (S.D.N.Y. 2017) (finding statements concerning undisclosed bribery scheme "would have called into question whether Braksem's ability to secure favorable pricing in the future was durable and due to a legitimate competitive advantage, or whether—like all illegal arrangements—it was legally unenforceable and subject to abrupt termination. The market, too, might have questioned whether Braksem's business practice of securing better pricing through bribery left Braksem open to the risk of exposure, scandal, and instability."); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (statements about financial performance that failed to disclose that "revenue had been generated, at least in part, by trading practices that violated NYSE rules" false and misleading because such statements "put the sources of [defendants'] revenue at issue."); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) ("Having put the issue in play, Providian is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.").

didn't think . . . we'd get paid. And we feel very, very strongly about that" and that Cobra "did everything absolutely right," and put forth a "very legitimate effort." SAC ¶¶ 122, 124, 127.

Defendants improperly dispute the well-pled facts in arguing that these statements were not false or misleading when made. As to Cobra's experience, the well-pled newspaper reports document that there were no records of any of the work Straehla claimed Cobra performed. Plus, Cobra's spokesperson could provide no information to support Straehla's claims. These facts are to be accepted as true on a 12(b)(6) motion.

Next, Defendants erroneously contend that "the Indictment nowhere connects Tribble to Cobra's bids for the PREPA Contracts, nor attributes to Tribble specific acts until after the first PREPA Contract was signed." Def. Br. at 18. Not so. The Indictment alleges that the conspiracy began in "October 2017"—which is before Straehla signed the first PREPA Contract. Further, the DOJ said that the purpose of the conspiracy was for "Tribble [to] perform[] official acts including influencing, advising and exerting pressure on PREPA and FEMA officials, *in order to award restoration work to Cobra*" SAC ¶ 4.

Defendants further assert that Straehla's representations that the contract "was drafted . . . in the room every step of the way with FEMA" was truthful because Article 68 of the contract contained a provision that "FEMA has reviewed and approved of this Contract." Def. Br. at 19. *Not so*. Article 68 provided that "*PREPA hereby represents and warrants* that FEMA has reviewed and approved this Contract, and confirmed that this Contract is an acceptable form to qualify for funding from FEMA . . ." At best Article 68 was a representation by PREPA that FEMA had reviewed the contracts; it is not evidence

that FEMA itself reviewed or approved them.

Given that PREPA was in bankruptcy, a material fact was whether FEMA would reimburse PREPA, *i.e.*, fund the payments. So Straehla's representations that "we wouldn't have entered this contract if we didn't think . . . we'd get paid" were misleading because the original Article 68 did not provide that FEMA approved the contract and its funding.[23]

Plus, on November 1, 2017, Article 68 was deleted from the first PREPA Contract and Straehla signed the revised contract on behalf of Cobra. Straehla, when asked about the contract, Puerto Rico, and Whitefish in a conference call with stock market analysts the next day, never mentioned that the contract was amended to delete the reference to FEMA approving the contract, which was a reason why Whitefish lost its contract.

Defendants hang their hats on Long's testimony that "FEMA" would not have approved Cobra's contract claiming this corrected any misinformation put into the market by Straehla. Def. Br. at 19. Not so. First, FEMA never approved the contract to begin with so Straehla's statement was false. Second, Mammoth's stock price rose while Long testified[24] and after CNN reported about it. It is hard to imagine that the effects of the fraud

---

[23] Even if "FEMA" was "in the room," in all likelihood the FEMA official in the room was Tribble with whom Ellison had already entered into the criminal conspiracy. Given the illegal conduct Ellison and Tribble were engaging in, assuring investors that FEMA would pay was misleading under the circumstances.

[24] Mammoth's stock price rose from a closing price of $18.48 per share on Friday October 27, 2017 to close at $20.08 per share on November 6, 2017—the day the CNN article was published. *See* Block Decl. Ex. 2 (Mammoth's closing stock prices between October 27 and November 6, 2017). Defendants' claim that Long's testimony alerted investors to the fraud is disabused by the upward movement of Mammoth's stock price. Indeed, if investors knew the contract was procured through fraud and that Mammoth would not get paid under the contract, it is reasonable to presume the stock would have declined to its pre-contract announcement level of below $15 per share, and not continue to increase. The Court can

were revealed with the stock price going up, not down. Plus, Straehla and Mammoth repeated the misrepresentation in January 2018 that FEMA reviewed the "*original* contract award" when claiming that FEMA purportedly approved Mammoth's rates as reasonable. SAC ¶ 131.

### C. Statements About the Adverse Impact of PREPA Terminating the Contracts or Not Making Payments Are Actionable

Mammoth represented that "we are in substantial compliance with applicable regulatory requirements," and that "government contracts are subject to various uncertainties, restrictions and regulations, including oversight audits by government representatives and profit and cost controls, which could result in withholding or delayed payments to us or efforts to recover payments already made." SAC ¶¶ 141, 144, 146, 156, 159, 166, 168, 172, 182.

Defendants assert that these statements are not actionable because "disclosure is not a rite of confession" and they did not have to disclose "uncharged, unadjudicated wrongdoing." Def. Br. at 21. This misses the point. By putting their "compliance with regulatory requirements" at issue, Defendants had to tell the truth—they could not be engaged in the bribery scheme, hire Patterson away from FEMA (creating a conflict of interest in violation of the contract), and simultaneously proclaim regulatory compliance. By choosing to speak, they obligated themselves to speak truthfully. While Defendants do not have to accuse themselves of wrongdoing, they cannot publicly proclaim they are in

---

take judicial notice of Mammoth's stock prices. *See In re Chesapeake Energy Corp. 2012 ERISA Class Litig.*, 2013 WL 5596908, at *5 (W.D. Okla. Oct. 11, 2013) ("a district court may take judicial notice of well-publicized stock prices").

full regulatory compliance when they are not.

Similarly, when Straehla and Layton knew there were concerns as to whether PREPA would pay the approximately $200 million in outstanding invoices (in June 2018) and that PREPA would stop paying (March 15, 2019) it was materially misleading to represent that it was possible PREPA could "withhold[] or delay[] payments to us." Casting as a possibility that Mammoth might not get paid when, in fact, Straehla and Layton knew that payments were not being made, is fraud. SAC ¶¶ 81, 89. *See In re Prudential Secs. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot way.")

### D. The Additional Statements Are Actionable

Defendants' attacks on the remaining false statements rest on their taking innocuous portions of the challenged statement, claiming there is nothing false or misleading about them, and then ignoring the parts of the statement that the SAC alleges is false or misleading.

For example, Defendants claim that statements alleged to omit violations of the PREPA Contracts' conflict of interest provisions (Article 21) are neither false nor misleading because "Plaintiffs fail to plead that Cobra breached these provisions." Def. Br. at 24-25. Not so. SAC ¶ 171 expressly alleges that "the Company was in violation of: the conflict of interest provisions under Article 21 . . . by hiring Patterson from FEMA . . ." Defendants simply ignore what is actually pled.

Similarly, Defendants assert that they did not breach any contract with PREPA by violating the duty of complete loyalty when they hired Patterson. According to Defendants, because the SAC does not allege that "PREPA was unaware" that Patterson was hired by Cobra, the statement is not actionable. Def. Br. at 25. This assertion is disingenuous as the question is what Defendants' knew, not what PREPA know.[25]

Each of the challenged statements plead actionable misstatements and omissions.

## IV. Plaintiffs Adequately Plead Loss Causation

Plaintiffs need only demonstrate that losses are "attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price" to plead loss causation. *In re Williams Sec. Litig. - WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009). Nothing more than a "short and plain statement of loss causation" is required. *DaVita*, 372 F. Supp. 3d at 1155 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Plaintiffs can show loss causation through a "leakage theory that posits a gradual exposure of the fraud rather than a full and immediate disclosure." *In re Williams*, 558 F.3d at 1138.

Plaintiffs adequately plead loss causation for the five partial corrective disclosures that gradually revealed the truth about the bribery scheme.

The March 15, 2019 announcement that Mammoth was winding down operations in Puerto Rico resulted from Straehla and Layton learning that PREPA would not pay the remaining invoices which was due to the criminal scheme beginning to unravel rather than

---

[25] Of course, on the merits Defendants can claim that FEMA and PREPA knew of and approved the hiring of Patterson—which seems highly unlikely given that Patterson was indicted and pled guilty for her role in the conspiracy—but cannot do so on a Rule 12 motion.

a "pause" in the work. SAC ¶¶ 170, 179. Defendants' assertion, that "the risk of wind-down was not a concealed risk," is off base. Def. Br. at 29. Mammoth pulled out because PREPA was no longer paying – because the bribery scheme was unraveling – not because the work was winding down. *See In re Williams*, 558 F.3d at 1138 ("the truth [can] be revealed by the actual materialization of the concealed risk rather than by a public disclosure that the risk exists"). This was a partial corrective disclosure—that the work in Puerto Rico was coming to an abrupt unexpected end—without disclosing the true reasons why: PREPA would not pay the remaining $280 million owed.

The four remaining loss causation events exposed the bribery scheme. Courts routinely hold that disclosures of investigations into wrongdoing satisfy the loss causation pleading requirements. *See DaVita*, 372 F. Supp. 3d at 1155 (finding that "announcement of an investigation into DaVita's practices, a press report concerning DaVita's practice of steering patients to private insurance, and an investor report revealing the extent of DaVita's profits attributable to private insurance and the AKF CPA" which led to stock price declines sufficiently pleads loss causation).[26]

The corrective disclosures here each revealed previously undisclosed information

---

[26] *Cohen v. Kitov Pharm. Holdings, Ltd.*, 2018 WL 1406619, at \*7 (S.D.N.Y. Mar. 20, 2018) (loss causation satisfied where plaintiffs linked stock drop to "news article describing an Israeli regulatory investigation"); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262-63 (2d Cir. 2016) (series of events about concealment of liquidity risk including news reports of regulatory investigation and analyst downgrades sufficient to establish loss causation); *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322-24 (5th Cir. 2014) (holding that loss causation sufficiently alleged after analyzing five partial disclosures—including a research report, news article, and announcement of SEC and DOJ investigations—"collectively in determining whether a corrective disclosure has occurred.")

with a causal connection between the corresponding declines in Mammoth's stock price and the alleged misrepresentations and omissions—that an illegal bribery scheme was at the core of Mammoth's most important source of revenue.[27] SAC ¶¶ 222-26. *See Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602, 620-21 (S.D.N.Y. 2015) (loss causation met based on disclosure of investigation that "revealed to the market a potential problem with the defendants' revenue recognition practices that had been previously concealed" and "the dispositive question is . . . whether the plaintiff has alleged a 'causal connection' between the loss and the alleged misrepresentations.").[28]

## CONCLUSION

For the reasons set forth herein, the motion to dismiss should be denied. Plaintiffs respectfully request leave to amend if the Court finds the false statements or loss causation is not properly pled.

---

[27] *In re Sec. Cap. Assurance Ltd. Sec. Litig.*, 2011 WL 4444206, at *5-6 (S.D.N.Y. Sept. 23, 2011) is off the mark. There, the court found loss causation was not pled because the alleged corrective disclosures—statements made by ratings agencies in the midst of the subprime debt crisis about the quality of subprime assets—did not tie to the alleged misstatements, which involved Defendant's specific use of risk modeling scores and FICO scores. *Id.* at *6 ("Because none of the alleged 'partial corrective disclosures' Plaintiff identifies relate to the use of FICO scores to calculate subprime exposure or relate to the independence of internal modeling, those 'disclosures' cannot plausibly be interpreted as 'reveal[ing] some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint.'") Here, the corrective disclosures tie directly to the alleged misstatements, they were not part of a broader story untethered to the specific alleged misstatements.

[28] The SAC pleads valid control person claims. First, Straehla and Layton are both primarily liable. Second, Straehla, as CEO, "possessed the ultimate management authority of the corporation on a daily basis. There were no managers higher than [Straehla]" so he has the power to control and direct Mammoth. *Adams*, 340 F.3d at 1108. As to Layton, he "had at least indirect control over the [company's] financial reporting" which established the power to control and direct. *Id.* at 1109.

April 20, 2020

Respectfully submitted,

/s/ Jeffrey C. Block
Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
**Block & Leviton LLP**
260 Franklin Street, Suite 1860
Boston, Massachusetts 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockesq.com
jake@blockesq.com

*Lead Counsel for*
*Lead Plaintiffs and the Class*

C. Michael Copeland OBA No. 13261
**Jones, Gotcher & Bogan P.C.**
3800 First Place Tower
15 East 5th Street
Tulsa, Oklahoma 74103
(918) 581-8200 phone
(918) 583-1189 fax
mcopeland@jonesgotcher.com

*Local Counsel for*
*Lead Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I certify that on April 20, 2020, I electronically transmitted the above document to the Clerk of the Court using the Electronic Case Filing System for filing. Based on the records currently on file in this case, the Clerk of the Court will transmit a Notice of Electronic Filing to those registered participants of the ECF System.

s/ Jeffrey C. Block
Jeffrey C. Block