# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE MAMMOTH ENERGY SERVICES, INC. SECURITIES LITIGATION | Case No.: CIV-19-522-J |

**LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANT DONALD KEITH ELLISON'S MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

Table of Authorities ..........................................................................................................iii

Preliminary Statement..................................................................................................... 1

Statement of Facts............................................................................................................ 1

Pleading Standards........................................................................................................... 2

Argument........................................................................................................................... 3

I.    Ellison's Misrepresentations On October 31, 2017 Are Actionable .......................... 4

    A.     Ellison's Denial of The Bribery Scheme Contradicts Plaintiffs' Well-Pled Allegations And Cannot Support a Motion to Dismiss ...................................................... 4

    B.    Ellison's October 31, 2017 Statements Are Actionable ......................................... 6

        1.    Timeline of events leading up to Ellison's October 31, 2017 misrepresentations. .........6

        2.    Plaintiffs' allegations do not suffer from "fraud by hindsight."....................................9

        3.    Ellison cannot insulate himself from liability with a disclaimer that he was speaking unofficially.................................................................................................................12

        4.    Ellison's October 31, 2017 statement speaks to specific, discrete facts that are objectively verifiable. ................................................................................................12

II.    Ellison's "Group Pleading" And "Shotgun Pleading" Arguments Provide No Support For His Motion To Dismiss.......................................................................................... 15

    A.     "Group Pleading" or "Group Published" ............................................................ 15

    B.    "Shotgun Pleading".............................................................................................. 17

III.    The SAC Adequately Alleges The Requisite Scienter By Ellison......................... 19

    A.     Ellison Knew That His Misrepresentations and Omissions About The PREPA Contracts Had a Substantial Likelihood of Misleading a Reasonable Investor ............ 19

    B.    The SAC Alleges That Ellison Knew He Needed to Disclose, or Was Reckless by Failing to Disclose, The Truth Behind The PREPA Contracts ..................................... 21

    C.    The SAC Adequately Alleges That Ellison's Conduct Constituted, at a Minimum, Actionable Recklessness ................................................................................................ 22

    D.     Plaintiffs' Additional Scienter Allegations Further Support a "Cogent and Compelling" Inference of Fraudulent Intent by Ellison .............................................. 23

Conclusion...................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
 340 F.3d 1083 (10th Cir. 2003) .................................................................................. 2

*Anderson v. Spirit Aerosytems Holdings, Inc.*,
 827 F.3d 1229 (10th Cir. 2016) ............................................................................ 10, 20

*City of Phila. v. Fleming Cos.*,
 264 F.3d 1245 (10th Cir. 2001) ................................................................... 2, 9, 19, 21

*Hart v. Salois,*
 605 Fed.Appx. 694 (10th Cir. 2015) ..................................................................... 17, 18

*In re Cognizant Technology Solutions Corp. Sec. Litig.,*
 2018 WL 3772675 (D.N.J. Aug. 8, 2018) .............................................................. passim

*In re Eletrobras Sec. Litig.,*
 245 F. Supp. 3d 450 (S.D.N.Y. 2017) .................................................................... 15, 24

*In re Level 3 Commc'ns, Inc. Sec. Litig.,*
 667 F.3d 1331 (10th Cir. 2012) ............................................................................ 10, 13

*In re Marsh & McLennan Cos. Sec. Litig.,*
 501 F. Supp. 2d 452 (S.D.N.Y. 2006) ......................................................................... 22

*In re Petrobras Sec. Litig.,*
 116 F. Supp. 3d 368 (S.D.N.Y. 2015) ......................................................................... 14

*In re Take-Two Interactive Sec. Litig.,*
 551 F. Supp. 2d 247 (S.D.N.Y. 2008) ......................................................................... 22

*In re Vivendi, S.A. Sec. Litig.*,
 838 F.3d 223 (2d Cir. 2016) ......................................................................................... 2

*In re Williams Sec. Litig.,*
 339 F. Supp. 2d 1206 (N.D. Okla. 2003) ............................................................... 16, 23

*In re Williams Sec. Litig.*,
 339 F. Supp. 2d 1242 (N.D. Okla. 2003) ............................................................... 16, 19

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011) ....................................................................................................... 2

*Meek v. Torossian,*
 2002 WL 32026156 (W.D. Okla. Dec. 17, 2002) ........................................................ 18

*Nibur v. SandRidge Mississippian Trust I*,
  2017 WL 3996421 (W.D. Okla. Sept. 11, 2017)............................................................ 2

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ....................................................................................... 9

*Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc.*,
  372 F. Supp. 3d 1139 (D. Colo. 2019) ....................................................................... 2

*Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*,
  365 F.3d 353 (5th Cir. 2004) ................................................................................... 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...................................................................................... 2, 3, 4, 8

## PRELIMINARY STATEMENT

Defendant Donald Keith Ellison ("Ellison"), the former President of Mammoth Energy Services, Inc.'s ("Mammoth") subsidiary, Cobra Acquisitions, LLC ("Cobra"), has been indicted on eight counts and had nearly all of his assets seized for conspiring to bribe a FEMA official to steer restoration and reconstruction work on Puerto Rico's power grid to Cobra from October 2017 to April 2019. The contracts at issue, entered into with the Puerto Rico Energy Power Authority ("PREPA"), totaled over $1.8 billion and constituted more than half of Mammoth's revenue in 2018 alone. As the centerpiece of this bribery scheme, Ellison was well aware of the truth regarding the PREPA contracts and associated work. Yet, Ellison misrepresented to investors that Cobra's relationship with PREPA was a "standard bidding process for a storm contract" resulting from a "really good package" and stood silent while Mammoth and senior executives Straehla and Layton touted the PREPA contract work in public statements and financial reports. Lead Plaintiffs' SAC[1] adequately alleges that Ellison made material misrepresentations and omissions with scienter and his motion to dismiss should be denied.

## STATEMENT OF FACTS

To avoid unnecessary duplication and repetition, Plaintiffs respectfully refer the Court to the recitation of facts set forth in Lead Plaintiffs' Opposition to Defendants

---

[1] "SAC" refers to Lead Plaintiffs' Second Amended Complaint, (ECF No. 93). "Indictment" refers to the criminal indictment in *United States v. Tribble*, Crim. No. 19-541 (D.P.R.) attached as Exhibit A to the SAC (ECF No. 55-1).

Mammoth Energy Services, Inc., Arty Straehla, and Mark Layton's Motion to Dismiss, filed concurrently herewith.

## PLEADING STANDARDS

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the SAC as true." *Nibur v. SandRidge Mississippian Trust I*, 2017 WL 3996421, at *3 (W.D. Okla. Sept. 11, 2017) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007). Like any motion to dismiss, the court views all well-pled factual allegations "in the light most favorable" to the plaintiff. *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1257 (10th Cir. 2001).

Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, the SAC shall state with particularity all facts on which that belief is formed." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003). While § 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), once a defendant chooses to speak, "it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim." *Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1152 (D. Colo. 2019) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (emphasis in original)).

**ARGUMENT**

Ellison's Motion to Dismiss the SAC for violations of the Securities Exchange Act (ECF no. 105) (the "Motion") lacks merit and should be denied for three reasons. *First*, a district court must "accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322. Yet, Ellison's argues at length that Plaintiffs' well-pled allegations are factually incorrect. *See e.g.*, Motion at 3 ("[t]here was no bribery here"). The Motion is therefore largely irrelevant, in addition to being unpersuasive. Ellison's related arguments – that Plaintiffs allege "fraud by hindsight" and that the alleged misrepresentations and omissions are too vague to be actionable – similarly ignore Plaintiffs' well-pled allegations.

*Second*, the SAC alleges in detail Ellison's role in bribing FEMA officials to obtain the lucrative PREPA contracts and specifies why each subsequent misrepresentation and omission was false and misleading. Thus, Ellison's argument that Plaintiffs' allegations suffer from "group pleading" and/or "shotgun pleading"[2] is meritless.

*Third*, Plaintiffs' allegations create a strong inference of scienter as to Ellison. *See In re Cognizant Tech. Solutions Corp. Sec. Litig.,* 2018 WL 3772675, at *30 (D.N.J. Aug. 8, 2018) (scienter as to company's president adequately alleged where complaint alleged that the company's president "was a participant in the bribery scheme and, consequently, that he had actual knowledge that statements touting [the] licenses, touting compliance procedures, and misrepresenting financial statements were false and misleading."). For these reasons, discussed further *infra*, the Motion should be denied.

---

[2] Motion at 10.

## I. Ellison's Misrepresentations On October 31, 2017 Are Actionable

Ellison acknowledges that he "must treat all factual allegations in the Complaint as true for purposes of this Motion to Dismiss,"[3] yet devotes the majority of his Motion to arguing the facts, specifically: (a) there was no bribery scheme; and (b) even if Ellison did engage in a conspiracy to bribe a federal official to get work for his company (and thus lucrative performance bonuses for himself), the timeline of events absolves him of liability for his October 31, 2017 misrepresentations. Ellison's assertions are quite plainly contradicted by the allegations in the SAC.

### A. Ellison's Denial of the Bribery Scheme Contradicts Plaintiffs' Well-Pled Allegations and Cannot Support a Motion to Dismiss

Ellison argues: there are "***no smoking gun emails or texts***"[4]; "[t]here was no money given, ***no credit card used***, and ultimately no evidence to support the inference"[5]; "[t]he ***so-called 'gifts'*** [from Ellison to FEMA official Ahsha Tribble] . . . do not support a 'cogent and compelling' inference of bribery . . ."[6]; and ***"[t]here was no bribery here***."[7] The Indictment tells a starkly different story.

---

[3] Motion at 4 n. 2 ("Ellison categorically denies all bribery allegations. But that is a question for another day, as Ellison must treat all factual allegations in the SAC as true for purposes of this Motion to Dismiss under Rule 12(b)(6).")

[4] Motion at 3. In addition to being wrong on the facts, as discussed further below, Ellison's implicit assertion that Plaintiffs must come forward with "smoking gun" evidence is also incorrect. *Cognizant*, 2018 WL 3772675, at *33 ("As the Supreme Court has directed, 'strong inference' of scienter does not require Plaintiffs to come forward with a 'smoking gun.'") (citing *Tellabs,* 551 U.S. at 324.)

[5] Motion at 18.

[6] *Id.*

[7] *Id.* at 3.

The Indictment is replete with emails and text messages between Tribble and Ellison regarding Tribble's covert efforts to steer PREPA restoration and reconstruction work to Cobra, including providing confidential information to Ellison.[8] For example, a June 3, 2018 email from Tribble to Ellison (routed through their personal email accounts) warned Ellison: "$200M behind in payment to Cobra – stop work looming again." SAC ¶ 78; Indictment ¶ 76. Straehla (CEO of Mammoth and Cobra) in turn reported this non-public information to a group of senior officers and division heads a short while later. SAC ¶¶ 80-81. Tribble was also found to have photographs of the front and back of Ellison's credit card in her iCloud Photo Library and both Ellison's personal and company credit cards were used to book travel for Tribble. Indictment ¶¶ 81, 94, 115. Tribble procured these gifts for both herself and at least one co-worker and friend, FEMA Deputy Chief of Staff in Puerto Rico Jovanda Patterson[9], who has since pled guilty to bribery under 18 U.S.C. §208.[10] In exchange, Tribble is alleged to have performed a number of official acts to benefit Cobra[11], including: causing a letter to be sent from FEMA's Federal Coordinating Officer to PREPA stating that FEMA had determine Cobra's costs under the PREPA contracts to be reasonable; pressuring PREPA executives to utilize Cobra for repair damage at a substation that PREPA was prepared to perform itself at a lower cost; pressuring

---

[8] *See e.g.,* Indictment, ¶¶ 48, 50-52, 54-56, 58-62, 64, 66-67, 69-77, 84, 87, 90, 92-95.

[9] Tribble arranged for Ellison to Ms. Patterson at nearly three times her prior salary. SAC ¶¶ 70-76.

[10] Patterson entered a guilty plea on March 10, 2020. *U.S. v. Patterson,* 19-cr-00541 (ECF No. 92); *see also* Motion to Dismiss the Second Amended Complaint, and Opening Memorandum of Law in Support, By Mammoth Energy Services, Inc., Arty Straehla, and Mark Layton at 8.

[11] SAC ¶ 4.

PREPA executives and FEMA officials to hire Cobra for repair work for a redevelopment project; and pressuring PREPA executives to adopt Cobra's design for the electric power distribution system for the island of Vieques and to hire Cobra to execute the redesign. Indictment ¶ 47. Plaintiffs allege that Ellison gave things of value to Tribble to influence her actions as a high ranking FEMA official to benefit Cobra (and in turn, himself). SAC ¶¶ 4, 195; Indictment ¶¶ 37, 98-99 (describing "Purposes of Scheme"). The SAC therefore adequately alleges that Ellison engaged in a bribery scheme to obtain the PREPA contracts and that his misrepresentations and omissions about those contracts are therefore actionable.[12]

**B.     Ellison's October 31, 2017 Statements Are Actionable**

     **1.     Timeline of events leading up to Ellison's October 31, 2017 misrepresentations.**

The SAC alleges that on October 13, 2017, Ellison, along with the CEO of Mammoth and Cobra, Straehla, flew to Puerto Rico to meet with PREPA and FEMA

---

[12] Citing a Wall Street Journal article, Ellison also argues that "[t]he Rand Corporation found that the contract was awarded in accord with standard contracting processes . . . ." Motion at 8. Not so. Rather, the article explains that the scope of the inquiry was limited to a review of "the initial contract's rates for laborers, equipment and security" and that the conclusion in the Rand report was that "the contract rates were reasonable considering the 'situational uncertainty that prevailed' after Hurricane Maria." Andrew Scurria, *Puerto Rico Grid Contractor Caught Up in Federal Probes*, The Wall Street Journal, June 5, 2019. Nowhere does the article state that the "contract was awarded in accord with standard contracting process." *Cf* Motion at 8. Ellison ignores that shortly after the Wall Street Journal article was published, the DHS Office of Inspector General released a report finding that "FEMA's eligibility determination was not sound[.]" SAC ¶ 133. Regardless, this is yet another fact dispute and as such cannot support a motion to dismiss.

officials[13]; the original PREPA contract was executed a short while later, on October 19, 2017. Cobra CEO Straehla began touting that contract immediately. For example, on October 20, 2017, Straehla stated to analysts in a conference call that the PREPA contract "was drafted and in the room every step of the way with FEMA," emphasizing that "we wouldn't have entered this contract if we didn't think we would – if we didn't think we'd get paid. And we feel very, very strongly about that." SAC ¶ 122. Straehla's comments were intended to assure investors that Mammoth/Cobra had done things the "right way," with FEMA "in the room every step of the way." SAC ¶ 127.

Not only did Ellison fail to correct these misrepresentations by Straehla, on October 31, 2017, he backed up those statements with his own false assurances, claiming that Cobra's relationship with PREPA was a "standard bidding process for a storm contract" and that Mammoth/Cobra had been awarded the contract simply because it "had a really good package put together for the community." SAC ¶¶ 57, 124.

Cherry picking among Plaintiffs' allegations, Ellison argues that "the earliest gift from Ellison to Tribble detailed in the indictment occurred on February 7, 2018" and that "the first purported 'official act' committed by Tribble was on or about December 23, 2017." Motion at 6. Therefore, Ellison concludes, his statements on October 31, 2017 are

---

[13] SAC ¶ 127, quoting Straehla's statements to investors on a November 2, 2017 earnings call: "So myself and my President [Ellison] flew down to Puerto Rico on the 13th of October. We met with people, started meeting on Saturday at the convention center where everybody was there, that's the command and control center. We went from meeting to meeting, talking with FEMA officials, talking with the governors, officials, talking with officials from PREPA, that resulted in a meeting that evening . . . with PREPA."

"not actionable." *Id*. Ellison's argument is flatly contradicted by Plaintiffs' well-pled allegations, which must be viewed "holistically." *Tellabs*, 551 U.S. at 326.[14]

In addition to the specific facts about the events of October 2017 detailed above, the SAC (and criminal Indictment appended thereto) further allege that:

> "***From October 2017*** to April 2019, Tribble and Ellison developed a personal relationship wherein Ellison provided Tribble with things of value with the intent to influence Tribble's performance of official acts" (SAC ¶ 4);

> "***From in or about October 2017*** to in about September 2018, defendant [1] Ahsha Nateef Tribble was Sector Lead for Power and Infrastructure in Puerto Rico (Sector Lead) as part of FEMA's response to Hurricane Maria. She was also designated as Recovery Office Deputy Director – Infrastructure Directorate/Disaster Recovery Manager (Recovery Manager) in the Office of the FEMA Federal Coordinating Officer in Puerto Rico.") (Indictment ¶ 21);

> "***From in or about October 2017*** to in or about April 2019, within the District of Puerto Rico, and elsewhere within the jurisdiction of this Court, defendants[1] Ahsha Nateef Tribble, [2] Donald Keith Ellison, and others known and unknown to the Grand Jury did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and deprive the United States and the citizens of Puerto Rico, through bribery, of the honest services of [1] Ahsha Nateef Tribble, a public official. . . . ." (Indictment ¶ 96).

The foregoing allegations are sufficient to state a claim for an actionable misstatement by Ellison on October 31, 2017, as well as for material omissions in connection with Straehla's comments on October 20, 2017.

---

[14] *See also Id.* at 322-323 ("The inquiry . . . is whether ***all of the facts alleged, taken collectively***, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.") (emphasis added).

### 2. Plaintiffs' allegations do not suffer from "fraud by hindsight."

Ellison cites three cases for the argument that Plaintiffs' allegations amount to "fraud by hindsight" and that Tenth Circuit precedent therefore "mandates dismissal." Motion at 6-7. Each is readily distinguishable.

With respect to *City of Philadelphia v. Fleming Cos.,* 264 F.3d 1245 (10th Cir. 2001), Ellison summarizes the decision as affirming the dismissal of a securities fraud claim "where the plaintiffs did not plead sufficient facts giving rise to a 'strong inference' that the defendants intentionally or recklessly failed to disclose a pending litigation that sought damages of approximately $250 million." Motion at 5. However, for the vast majority of the class period at issue in the *Fleming* case, the damages amount sought in the underlying litigation was *not* $250 million; rather, it was a substantially lower figure representing a mere 2.45% to 3.5% of the company's total assets. *Fleming*, 264 F.3d at 1250. In fact, it was not until 22 months into the 26-month class period that the damages figure ballooned to the $250 million figure referenced by Ellison.[15] The *Fleming* court understandably reasoned that "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id*. at 1260 (quoting *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) (quotations omitted)). Here, there is no "anticipated future event[]" at issue. Rather, Plaintiffs allege that "***From October 2017*** to April 2019, Tribble and Ellison developed a personal relationship wherein Ellison provided Tribble with things of value

---

[15] *Id*. at 1251 (class period was November 15, 1993 to March 14, 1996, but it was not until September 19, 1995 that the damages figure was revised upward to $250 million).

with the intent to influence Tribble's performance of official acts" and that Ellison's misrepresentations and omissions about the PREPA contract on October 31, 2017 are therefore actionable.

Ellison also cites *In re Level 3 Communications, Inc. Securities Litig.,* 667 F.3d 1331, 1342 (10th Cir. 2012), describing the case as holding that "an April financial statement was not evidence of the falsity of a February financial statement." Motion at 7. However, the portion of the *Level 3* decision referenced by Ellison does not turn on any temporal issue. Rather, the question was one of vocabulary, *i.e.,* whether an April statement about "route integration" in fact contradicted a February statement about "physical network interconnections." *Level 3*, 667 F.3d at 1342 ("But according to our definitions above, 'route integration' and 'physical network interconnections' were two distinct components . . . . Thus, for all we know, Level 3 could have completed a 'majority of physical network interconnections' in April despite having been done with less than twenty percent of route integration."). Thus, the case is inapposite and provides no support for Ellison's "timeline" argument.

In the third case relied upon by Ellison, *Anderson v. Spirit Aerosytems Holdings, Inc.,* 827 F.3d 1229 (10th Cir. 2016), plaintiffs alleged that there was a "disconnect" between the CEO's August statements (that the company "anticipates that it will continue to make efficiency gains on the . . . project") and the company's October statement announcing a "forward-loss charge"[16] on the project (at which time the CEO also

---

[16] A "forward-loss charge" is described as "an accounting term meaning that past production costs plus estimated future production costs will exceed the total revenues

10

announced that the company could no longer meet its cost estimates and that it had recently fallen behind on production). *Id*. at 1247-49. The court concluded that the CEO's statements "suggest an ***honest mistake in predicting [the company's] future production and costs***, not an inference of scienter." *Id*. at 1249 (emphasis added).

Here, there is no "honest mistake" about a "future" "predict[ion]." The SAC (and Indictment) allege a conspiracy to bribe a FEMA official to steer work to Cobra and that the conspiracy began in "October 2017," resulting in the first PREPA contract, executed October 19, 2017. Moreover, Plaintiffs allege that the purpose of the conspiracy was for "Tribble [to] perform[] official acts including influencing, advising and exerting pressure on PREPA and FEMA officials, *in order to award restoration work to Cobra.*" SAC ¶ 4. Thus, Plaintiffs adequately allege that Ellison's October 31, 2017 statements were false and misleading when made.

Straehla's comments at the time are also telling. On an analyst call the day after the first PREPA contract was executed, Straehla was asked about payment terms. In response, Straehla stressed that FEMA "was in the room every step of the way" and that Mammoth/Cobra "wouldn't have entered this contract if we didn't think we would – if we didn't think we'd get paid. And we feel very, very strongly about that." SAC ¶ 122. Subsequent events indicate that the October 19, 2017 PREPA contract was *not*, in fact, negotiated through the normal FEMA process[17], begging the question – why *did* Straehla

estimated on a given contract." *Id.* at 1237 n.5.

[17] For example, the first PREPA contract was amended shortly after it was executed to remove (a) a statement that "FEMA has reviewed and approved this Contract" and (b) a prohibition on PREPA, FEMA and other governmental officials' ability to audit or review

feel so confident that his company would be paid? The reasonable inference is that the bribery conspiracy was in place at the time of (and resulted in) the first PREPA contract, further bolstering Plaintiffs' allegations (and the allegations set forth in the Indictment) that the conspiracy, which Plaintiffs alleged to have begun in October 2017, was in place when Ellison made his misrepresentations and omissions on October 31, 2017.

### 3. Ellison cannot insulate himself from liability with a disclaimer that he was speaking unofficially.

Ellison asserts that his October 31, 2017 statements are also not actionable because he said that he could only speak in a "personal, unofficial capacity." Motion at 8. Not surprisingly, Ellison offers no authority to support this argument, which in any event is deeply undercut by the context of his statements: "Reached by phone for comment, ***Cobra Energy President Keith Ellison defended his company's contract*** while noting that he could only speak in a personal, unofficial capacity." SAC ¶ 57. Senior executives cannot insulate themselves from liability under the securities laws by tacking on feeble disclaimers to false and misleading statements made to investors about the company's affairs.

### 4. Ellison's October 31, 2017 statement speaks to specific, discrete facts that are objectively verifiable.

Plaintiffs allege that Ellison's October 31, 2017 statement that the PREPA contract

---

cost and profit elements related to the contract. SAC ¶¶ 65-69. In addition, when Brock Long, head of FEMA, was asked whether he or anyone at FEMA had approved the original Cobra contract, Long responded that "[t]here is not a lawyer within FEMA that would have approved that contract." SAC ¶ 63. Additionally, Senator Claire McCaskill sent a letter to Straehla stating, "I am concerned about the company's apparent attempt to circumvent federal oversight" and inquiring "If officials from FEMA . . . . were involved in the contracting process between PREPA and Cobra, please explain their roles." SAC ¶ 64.

was the result of a "standard bidding process for a storm contract" was false and misleading because the contract was not, as Ellison claimed, obtained through the normal bidding process, but rather through a conspiracy to bribe FEMA officials. SAC ¶ 10. Ellison counters that the statement is not actionable because it is "too vague and lacks specificity." Motion at 8. The touchstone of the "vagueness" inquiry is whether the defendant's statements "could have, and should have had, some basis in **objective and verifiable fact**." *Level 3,* 667 F.3d at 1340-41 (emphasis added) (finding that the following four misrepresentations alleged by plaintiffs *were* materially false and misleading statements: project was "ahead of plan" and "under budget"; the "majority of the physical network interconnections are completed"; "on WilTel, we have generally done, substantially done, by that I mean 85%, 90% done with those efforts"; and "[m]ost of the physical integration of WilTel is now complete.")

Whether Ellison bribed a FEMA official to obtain the PREPA contracts is simply not a subjective inquiry. It either happened or it didn't. Although Ellison will have ample opportunity to debate the facts, he cannot seriously contest that the question is an objective one, which will turn on "verifiable fact."

The context of Ellison's October 31, 2017 statement is also important. Ellison made the comment (*i.e.,* that the PREPA contract resulted from a "standard bidding process for a storm contract") in response to being questioned by a reporter for an article entitled, *Echoes of Whitefish Surface in $200M Puerto Rico grid deal.* The article explains:

> Two days [prior to the Cobra contract], PREPA had approved a separate $300 million grid repair deal with Whitefish Energy, a small contracting firm that hails from Interior Secretary Ryan Zinke's hometown of Whitefish, Mont.

The costly terms of PREPA's deal with Whitefish came under intense scrutiny after they were made public, and Ramos [PREPA's executive director] ultimately announced he would move to cancel the contract Sunday after calls from Puerto Rico's governor to end the deal.

Several U.S. lawmakers, including Rep. Raja Krishnamoorthi (D-Ill.), a former official in Illinois' anti-corruption unit, voiced concerns about language in the Whitefish contract that appeared aimed at avoiding government oversight. . . .

The same language appears word for word in PREPA's arrangement with Cobra . . . .

PREPA's deal with Cobra also states that FEMA officials had the chance to review the arrangement, finding it "an acceptable form to qualify for funding from FEMA or other U.S. Governmental agencies."

That same line landed Whitefish Energy and PREPA in hot water after FEMA representatives claimed they had not reviewed the contract and that FEMA also had "significant concerns" with its contents. . . .

**Reached by phone for comment, Cobra Energy President Keith Ellison defended his company's contract** while noting that he could only speak in a personal, unofficial capacity. "We feel we had a really good package put together that would provide for the community without taking needed resources away from the island," he said, **characterizing his company's relationship with PREPA as a "standard bidding process for a storm contract**.

SAC ¶ 57 (emphasis added).

Ellison's October 31, 2017 statements were targeted misrepresentations about specific, "objectively verifiable" facts made in defense of the process by which Cobra secured the PREPA contract, and are therefore actionable. *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (in case stemming from bribery/kickback scheme, where certain statements "were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of

the true state of affairs at the Company."); *see also In re Eletrobras Sec. Litig.,* 245 F. Supp. 3d 450, 463-464 (S.D.N.Y. 2017) ("The repeated references made specifically in response to damaging media reports about bribery and bid-rigging at Eletrobras were made to 'emphasize its reputation for integrity or ethical conduct as central to its financial condition' and 'clearly designed to distinguish [Eletrobras] from [Petrobras]'. . . . Accordingly, there was a substantial likelihood that these statements, made to reassure investors, would be important to a reasonable person in considering whether to buy or sell shares of Eletrobras securities.").

## II. Ellison's "Group Pleading" And "Shotgun Pleading" Arguments Provide No Support For His Motion To Dismiss

### A. "Group Pleading" or "Group Published"

*Southland Securities Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353 (5th Cir. 2004), upon which Ellison bases his argument that Plaintiffs' allegations suffer from impermissible "group pleading," explains that the doctrine "allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *Id.* at 363 (quotations omitted).

First, although *Southland* may have rejected the group pleading doctrine[18], "courts in the Tenth Circuit recognize the applicability of the group-published information doctrine

---

[18] "Significantly, this court has never adopted the 'group pleading' doctrine, even before the PSLRA." *Id.* at 364.

whereby group-published documents such as annual reports, press releases, and SEC filings are presumed to involve the collective actions of corporate directors or officers." *In re Williams Securities Litig.,* 339 F. Supp. 2d 1206, 1221 n.2 (N.D. Okla. 2003) ("*Williams – WCG Subclass*") (collecting cases). In a related decision, the court explained:

> The majority view recognizes that the doctrine is merely a rebuttable presumption that the contents of group-published documents are attributable to corporate insiders with knowledge of, and involvement in, the day-to-day affairs of a company . . . . Courts rejecting the group published doctrine do not address the convincing reason for adopting the doctrine in the first place – that it is almost impossible, without some discovery, for a plaintiff to dissect a group-published document, like an annual report, and attribute each of the statements therein to a particular corporate manager . . . . the Court finds that the group pleading doctrine survived the enactment of the PSLRA and applies in this case.

*In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1260 (N.D. Okla. 2003) ("*Williams – WMB Subclass*").

Second, unlike the allegations in *Southland,* the SAC alleges Ellison's specific communications and actions in furtherance of the underlying fraud, including: the dates; means of communication; content of communications; identity of the other individual(s) involved in the communication; as well as the "quid pro quo." For example, in support of Plaintiffs' allegations that Ellison procured a job for Tribble's friend and FEMA colleague Jovanda Patterson at Tribble's behest, in return for actions benefitting Cobra, Plaintiffs state the following:

- On March 22, 2018, Tribble emailed Ellison inquiring about Ellison's intent to help Tribble's friend and FEMA's Deputy Chief of Staff in San Juan, Puerto Rico, Jovanda R. Patterson ("JoJo"), secure a position with Cobra.

- Ellison responded to Tribble: "I ran into JoJo last night . . . . I asked her directly if she was serious. She said yes, I told her to get with Michelle to start the paperwork. I was dead serious and sincere when I said I would take care of her. . . ."

- On March 24, 2018, Tribble sent an email with the subject line "Connecting you by gmail" to Patterson and Ellison, stating "Jo – Per our convo." On the same day, Patterson emailed Ellison asking for information "before I text Michelle."

- On April 7, 2018, Tribble and Ellison received emails to their personal emails from Patterson's personal email, stating in part "Thank you both for everything!!!"

- On May 8, 2018, while engaged in employment negotiations with Cobra, Patterson, in her capacity as a FEMA employee, completed a customer Past Performance Evaluation for Cobra Logistics as part of a vendor bid process.

- On June 1, 2018, Cobra's Director of Human Resources emailed an "Offer Letter" to Patterson at her personal account. Her annual salary would be $160,000 with a bonus up to 30% of her annual salary, plus per diem, bringing potential compensation to $274,000, far exceeding her FEMA salary of less than $100,000.

SAC ¶¶ 70-76 (all emails described transpired solely through personal accounts).

The same level of detail accompanies each of Plaintiffs' allegations regarding Ellison's active role in the bribery scheme. Thus, there can be no doubt that Ellison, who has been indicted on eight counts of defrauding the United States for engaging in a scheme to bribe Tribble to steer business to Cobra and Mammoth, has been "enlighten[ed] . . . as to his . . . particular part in the alleged fraud." Motion at 9.

### B. "Shotgun Pleading"

The two cases on which Ellison relies for his "shotgun pleading" argument illustrate why that doctrine has no application to the present case. In *Hart v. Salois,* 605 Fed.Appx. 694 (10th Cir. 2015), the plaintiff named more than 30 defendants (including a non-profit entity and several municipalities) and asserted 60 claims for relief in connection with the discharge of a debt through bankruptcy that was owed by an individual (Sherry Salois) to

the plaintiff. *Id.* at 696-97. The court affirmed the dismissal on a number of grounds, including the plaintiff's "failure to connect his 60 separate claims to the [complaint's] hundreds of factual allegations." *Id*. at 701.[19] In contrast, the SAC alleges ***two*** counts against a total of ***three*** Individual Defendants (Ellison, the President of Cobra; Straehla, the CEO of Cobra and Mammoth; and Layton, the CFO of Mammoth) and the corporate entity Mammoth Energy. In short, Ellison's "shotgun pleading" argument is inaccurate and provides no support for his motion to dismiss.

Ellison further argues that Plaintiffs "improperly attempt to impute and stretch additional misstatements and omissions to Ellison beyond the one statement made by him" on October 31, 2017. Motion at 11. The argument overlooks Plaintiffs' well-pled allegations regarding Ellison's senior position at the company, his hands-on role in the bribery scheme, and his resulting liability for the material misrepresentations and omissions alleged in the SAC. In the recent, similar case *Cognizant*, the plaintiffs alleged that the company president was involved in a scheme to bribe governmental officials to obtain Special Economic Zone ("SEZ") licenses. 2018 WL 3772675, at *2. The court found that, "[t]here is a strong inference that as President of the company, [the defendant] either

---

[19] The *Meek* decision cited by Ellison is also inapposite. *See Meek v. Torossian,* 2002 WL 32026156, at *5 (W.D. Okla. Dec. 17, 2002) (sanctioning plaintiffs' counsel for alleging multiple claims against three sisters for (non-existent) contamination at a property that the sisters never owned and where there was "no factual basis for asserting a claim against the sisters."). In contrast to the clear, well-supported allegations Plaintiffs have made against Ellison, the *Meek* Court concluded that the complaint was, "as against the sisters, devoid of any factual or legal foundation from its very inception. . . . The very filing of this action, as against the sisters, amounted to an inexcusable abuse of our civil justice system." *Id.* at *9.

had a role in preparing the statements at issue or that, if he did not actually participate in their preparation, he became aware that they misstated earnings and touted SEZ licenses and internal compliance measures, but nevertheless 'tolerated the misrepresentation.'" *Id*. at *33 (citation omitted). Here, Plaintiffs have alleged that the representations about the PREPA contracts that were made to investors by Mammoth, Straehla, and Layton misrepresented the truth and omitted to disclose material information. Ellison "tolerated the misrepresentation[s]," and can thus be charged with them.

## III.  The SAC Adequately Alleges The Requisite Scienter By Ellison

### A.  Ellison Knew That His Misrepresentations and Omissions About the PREPA Contracts Had a Substantial Likelihood of Misleading a Reasonable Investor

To establish scienter in a securities fraud case alleging actionable omissions, the plaintiff must demonstrate that the defendant "knew of the potentially material fact . . . and knew that failure to reveal the potentially material fact *would likely mislead investors*." *Fleming,* 264 F.3d at 1261 (emphasis added).[20]

Plaintiffs allege that Ellison knew that his misrepresentations and omissions created a danger of misleading investors into believing that Cobra had obtained the highly lucrative restoration and reconstruction work in Puerto Rico through a "standard bidding process for a storm contract" and as a result of the company's own merits, rather than as a result of a

---

[20] *See also Williams – WMB Subclass,* 339 F. Supp. 2d at 1258. Ellison's argument that the "SAC fails to adequately plead Ellison's scienter that he *intended* to mislead investors" (Motion at 14) (emphasis added) suggests a heightened burden beyond what is required under the law.

bribery scheme.[21] A "bribery scheme involving [] senior management affecting [core operations] would 'significantly alter the total mix of information made available' to investors." *Cognizant,* 2018 WL 3772675, at *16.[22] Moreover, by "highlighting the benefits" of the contract work that was obtained through bribery, the defendant "put the underlying bribery at play." *Id*. Ellison also knew that the real reason Cobra pulled out of Puerto Rico when it did was because PREPA refused to pay $280 million in invoices, yet failed to disclose this material information to investors, standing silent while Mammoth CFO Layton claimed that it was just "a pause" and "not a shutdown." SAC ¶¶ 90-91.

The *Anderson* case relied upon by Ellison (Motion at 15) is readily distinguishable. There, the court dismissed the claims against the executive defendants for failure to adequately allege scienter on the basis that the executives had simply been "optimistic" that certain projects "would meet the original cost forecasts." *Anderson*, 827 F.3d at 1249 (CEO's statements "suggest an honest mistake in predicting Spirit's future production and costs.") Ellison's alleged misconduct, for which he faces criminal charges and the loss of nearly all his assets, sits in stark contrast to overly-optimistic expectations about meeting forecasts.[23]

---

[21] SAC ¶ 10 ("Ellison knew, or recklessly disregarded, that his statements about how Cobra obtained the PREPA contracts were false and that all statements made by Mammoth concerning how Mammoth obtained the PREPA contracts were false and misleading as they omitted to disclose the material facts that the contracts were secured through Ellison's bribing Tribble and hiring Patterson at Cobra which subjected Mammoth to forfeitures, fines, and penalties.")
[22] The PREPA contract work was obtained through a bribery scheme involving "senior management" and was central to Cobra's "core operations" and contributed more than half Mammoth's revenues in 2018 alone. SAC ¶ 111.
[23] Tellingly, Ellison asserts that the Court "must consider plausible opposing inferences"

**B.** **The SAC Alleges That Ellison Knew He Needed to Disclose, or Was Reckless by Failing to Disclose, the Truth Behind the PREPA Contracts**

Ellison argues that the SAC fails to allege that he "had any intent to mislead investors." Motion at 16. First, Ellison's argument suggests a heightened pleading standard (*i.e.,* intent to mislead") beyond what Plaintiffs are required to show. Rather, scienter is adequately pled where the complaint alleges that the defendant knew, or was reckless in not knowing, that the omitted information was material and that non-disclosure would likely mislead investors.[24] For the reasons discussed in Section III.A., *supra,* Plaintiffs' well-pled allegations readily satisfy this standard. Moreover, Plaintiffs allege that Ellison was indicted on eight counts of defrauding the United States for engaging in a scheme to bribe Tribble to steer business to Cobra and Mammoth; because the Court is to accept those facts as true for purposes of this motion, Ellison's scienter is readily inferred. *Fleming*, 264 F.3d at 1260 ("Intentional misconduct is easily identified since it encompasses deliberate illegal behavior.")

Ellison further argues that "none of these omissions in Mammoth's corporate disclosures or earnings calls are actionable or properly pled against Ellison." Motion at 17. To the contrary, Ellison's own authority provides that a "subsidiary and its senior officers

and "nonculpable explanations" for his conduct (Motion at 14), yet offers neither.
[24] *Fleming,* 264 F.3d at 1261 (to establish scienter in a securities fraud case alleging actionable omissions, the plaintiff must demonstrate that the defendant "knew of the potentially material fact . . . and knew that failure to reveal the potentially material fact would likely mislead investors. The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware of both its materiality and that its non-disclosure would likely mislead investors.")

may be held liable for misstatements appearing in the parent company's public disclosures" where (as here) "the relevant statements by the parent company are 'uniquely within the subsidiaries' knowledge or control'" or where the "'subsidiary provides false or misleading financial information to a parent, knowing that the information will be communicated to investors.'" *In re Take-Two Interactive Sec. Litig.,* 551 F. Supp. 2d 247, 268 (S.D.N.Y. 2008) (citation omitted). Plaintiffs allege that Ellison was at the center of the bribery scheme to steer work to Cobra and thus he was knowledgeable about, and in control of, that misconduct. SAC ¶ 68. Plaintiffs further allege that Ellison was well aware that Cobra's lucrative PREPA contracts (which accounted for approximately 60% of Mammoth's 2018 revenues and which moved Mammoth into the black) were being touted in earnings calls and in Mammoth's corporate disclosures. SAC ¶¶ 101, 103-04, 111, 196. Plaintiffs have therefore adequately alleged actionable misrepresentations and omissions against Ellison. *See In re Marsh & McLennan Cos. Sec. Litig.,* 501 F. Supp. 2d 452, 480 (S.D.N.Y. 2006) (plaintiffs adequately alleged President and CEO of subsidiary made false and misleading statements, even though he did not sign the parent company's SEC filings, noting "subsidiaries may be held responsible for the statements of their parent companies that are uniquely within the subsidiary's knowledge and control.").

### C. The SAC Adequately Alleges That Ellison's Conduct Constituted, at a Minimum, Actionable Recklessness

Ellison argues that "Plaintiffs' allegations amount to, at most, negligence, but certainly nothing more than gross negligence." Motion at 20. Again, Ellison's argument ignores Plaintiffs' well pled allegations, to wit:

Ellison knew, or recklessly disregarded, that Mammoth was reporting to its investors that it obtained contracts from PREPA, that those contracts were the largest driver of Mammoth's revenue in the Class Period accounting for 60% of overall 2018 revenues. Ellison knew, or recklessly disregarded that Mammoth regularly discussed Cobra and the PREPA contracts in its SEC filings. Mammoth also informed investors that it intended to focus more on its infrastructure segment, Cobra, going forward underscoring the importance of Cobra to Mammoth.

SAC ¶ 196.

Thus, there is no merit to Ellison's disingenuous claims that his alleged misconduct amounts to "nothing more than gross negligence."

### D. Plaintiffs' Additional Scienter Allegations Further Support a "Cogent and Compelling" Inference of Fraudulent Intent by Ellison

The SAC alleges that "Ellison engaged in bribing Tribble to obtain large contracts for Cobra to enrich himself with a 'substantial' 2018 bonus,"[25] thus bolstering Plaintiffs' scienter allegations against Ellison. *Williams – WCG Subclass,* 339 F. Supp. 2d at 1233 ("allegations that Defendants could (and would) have reaped material benefits as a result of their fraud are probative of scienter").

The SAC further alleges that Ellison was interviewed by agents from the FBI and Department of Homeland Securities Office of the Inspector General regarding his activities related to Puerto Rico on March 15, 2019 (SAC ¶ 84), had nearly all of his assets seized in

---

[25] SAC ¶ 195 ("The government seized cash totaling nearly $4.9 million from Ellison, as well as a $660,640 catamaran, a $30,000 pickup truck, and two tractors, which sell, used, for over $100,000 each. Additionally, the government is seeking forfeiture of more than $2 million worth of real property purchased by Ellison in 2018, which, according to the government, "constitutes or is derived from proceeds traceable to" Ellison's criminal violations. It is more than a reasonable inference that Ellison engaged in bribing Tribble to obtain large contracts for Cobra to enrich himself with a "substantial" 2018 bonus.")

April 2019 (SAC ¶ 200), and was terminated from his position as President of Cobra on June 7, 2019 (SAC ¶ 99 & n.16). It is well established that "resignation of a member of senior management in the midst of an internal investigation can be indicative of scienter." *See Cognizant*, 2018 WL 3772675, at *30-31 (inference that company president was a participant in the bribery was "'cogent and at least as compelling' as the nonculpable inference that he resigned because of poor performance or unfortunately serendipitous timing"); *Eletrobras,* 245 F. Supp. 3d at 469 ("the timing and circumstances of individual defendants' resignations may add some further weight to an overall inference of scienter.") (quotations omitted).

Plaintiffs adequately allege that Ellison had the requisite scienter and his motion to dismiss on this basis should therefore be denied.

### CONCLUSION

For the reasons set forth herein, Ellison's motion to dismiss should be denied. Plaintiffs respectfully request leave to amend if the Court finds their claims against Ellison are not properly pled.

April 20, 2020

Respectfully submitted,

/s/ Jeffrey C. Block
Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
**Block & Leviton LLP**
260 Franklin Street, Suite 1860
Boston, Massachusetts 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockesq.com
jake@blockesq.com

*Lead Counsel for*
*Lead Plaintiffs and the Class*

C. Michael Copeland OBA No. 13261
**Jones, Gotcher & Bogan P.C.**
3800 First Place Tower
15 East 5th Street
Tulsa, Oklahoma 74103
(918) 581-8200 phone
(918) 583-1189 fax
mcopeland@jonesgotcher.com

*Local Counsel for*
*Lead Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I certify that on April 20, 2020, I electronically transmitted the above document to the Clerk of the Court using the Electronic Case Filing System for filing. Based on the records currently on file in this case, the Clerk of the Court will transmit a Notice of Electronic Filing to those registered participants of the ECF System.

s/ Jeffrey C. Block
Jeffrey C. Block