**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| IN RE MAMMOTH ENERGY SERVICES, INC. SECURITIES LITIGATION, | ) ) ) | Case No. CIV-19-522-J |

# ORDER

Before the Court are Defendants Mammoth Energy Services, Inc. (Mammoth), Arty Straehla (Straehla), and Mark Layton's (Layton) Motion to Dismiss the Second Amended Complaint [Doc. No. 104] and Defendant Keith Ellison's (Ellison) Motion to Dismiss the Second Amended Complaint [Doc. No. 105]. Lead Plaintiffs Daniel, Vincent, and Sharon Furia have filed their responses, and Defendants have filed their replies.

## I. Introduction[1]

This case is a federal securities class action on behalf of all investors who purchased or otherwise acquired Mammoth common stock between October 19, 2017 and June 5, 2019, inclusive. Mammoth is an energy services and infrastructure company based in Oklahoma City, Oklahoma. Cobra Acquisitions, LLC (Cobra) is a subsidiary of Mammoth. Straehla has been the Chief Executive Officer and a Director of Mammoth since June 3, 2016, and the Chief Executive Officer of Cobra since its formation in 2017. Layton has been the Chief Financial Officer and Secretary of Mammoth since June 3, 2016. Ellison was President of Cobra from January 2017 until he was terminated on June 7, 2019.

Mammoth, through Cobra, secured over $1.8 billion in contracts from the Puerto Rico Energy Power Authority (PREPA) to restore Puerto Rico's power grid after Hurricane Maria in the fall of 2017. The PREPA contracts were the largest source of revenue for Mammoth during

---

[1] The information contained in the Introduction is based primarily on plaintiffs' Second Amended Complaint for Violation of the Federal Securities Laws (SAC) [Doc. No. 93].

the October 19, 2017 through June 5, 2019 class period. Mammoth's stock price increased from around $15 per share just before the first PREPA contract was awarded, to above $40 per share at the end of June 2018. Both Ellison and Straehla were involved in securing these contracts.

Based upon a September 3, 2019 Indictment (Indictment) filed against Ellison and others charging him with conspiracy to commit bribery against the United States, honest services wire fraud, disaster fraud, and false statements [Doc. No. 55-1], Plaintiffs allege the PREPA contracts were secured by bribing a Federal Emergency Management Authority (FEMA) official, Ahsha Nateef Tribble (Tribble)[2], in violation of law. After the *Wall Street Journal* published articles regarding the Federal Bureau of Investigation (FBI) and the Department of Homeland Security's investigation examining how Cobra came to dominate the power restoration efforts in Puerto Rico, Mammoth's stock price began to drop. By the time the Indictment was revealed, the stock price had dropped to under $4 per share.

On June 7, 2019, Plaintiffs filed this case, asserting claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. On March 9, 2020, Plaintiffs filed their SAC. In their SAC, Plaintiffs allege that statements made by Defendants between October 2017 and May 2019 concerning Cobra's work in Puerto Rico were false and misleading. Defendants have now moved to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (PSLRA).

---

[2] Tribble was FEMA's primary leader as to the restoration of electric power on Puerto Rico. She is also charged in the Indictment.

## II. Pleading Requirements of the PSLRA

"[T]o state a claim under Section 10(b) of the [Exchange] Act and Rule 10b-5 a plaintiff must allege: (1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages." *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1257-58 (10th Cir. 2001) (internal quotations and citation omitted). To curb abuse in private securities lawsuits, Congress enacted the PSLRA, which mandates a more stringent pleading standard for securities fraud actions.

Regarding the first element – a misleading statement or omission of a material fact, the PSLRA requires that a complaint asserting a violation of Section 10(b):

> Shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock. . . . Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1339 (10th Cir. 2012) (internal quotations and citations omitted).

The PSLRA also heightens the standard for pleading scienter with the following requirement:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2).

> The term "scienter" has been defined by the Supreme Court of the United States as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Supreme Court has further elaborated on the meaning of the term by stating: "The words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct." *Id.* at 197, 96 S.Ct. 1375. Recklessness, defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it," can also satisfy the scienter requirement for Section 10(b). *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996) (citations and quotations marks omitted). Simple negligence, however, does not satisfy the scienter requirement.

*City of Phila.*, 264 F.3d at 1258.

To establish scienter in a securities fraud case alleging nondisclosure of potentially material facts, a plaintiff must show that (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors. *See id.* at 1261. In pleading scienter, "the important issue [ ] is not whether Defendants knew the underlying facts, but whether Defendants knew that not disclosing the [underlying facts] posed substantial likelihood of misleading a reasonable investor." *Id.* at 1264. "The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Id.* at 1261.

The United States Supreme Court has established the following prescriptions for a court faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action:

> *First*, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. . . .

> *Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. . . . The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. . . .
>
> *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. . . .
>
> . . . To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the "most plausible of competing inferences," . . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible" – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Telltabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007).

## III. Analysis

### A. Claims against Ellison

In the SAC, Plaintiffs allege Ellison made one affirmative misstatement. On October 31, 2017, *E&E News* published an article titled "Echoes of Whitefish Surface in $200M Puerto Rico grid deal." *See* SAC at 56. In that article, Ellison, speaking in a personal, unofficial capacity, is quoted as follows: "We feel we had a really good package put together that would provide for the community without taking needed resources away from the island." *Id.* at 57. The article further states that Ellison characterized Cobra's relationship with PREPA as a "standard bidding process

for a storm contract." *Id.* Plaintiffs allege this statement was false and misleading because the PREPA contract was obtained as a result of Ellison bribing Tribble.

Having carefully reviewed the SAC, as well as the Indictment, and accepting all factual allegations in the SAC as true, the Court finds Plaintiffs have not pled any factual allegations showing that any alleged bribery started prior to October 31, 2017. Further, there are no allegations in the Indictment indicating that any alleged improper conduct occurred prior to October 31, 2017. The first purported "official act" committed by Tribble was on or about December 23, 2017, and the first alleged gift from Ellison to Tribble occurred on or about February 7, 2018. *See* Indictment at 13 and 15. Accordingly, the Court finds that Plaintiffs have not sufficiently alleged a material misrepresentation by Ellison. Additionally, even assuming this statement was false and misleading, the Court finds Plaintiffs have not sufficiently alleged facts showing that Ellison acted with scienter when he made the above statement. Taking all of the facts alleged, collectively, the Court concludes that a reasonable person would not deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Plaintiffs also assert that Ellison can be held liable for the statements and omissions made by Straehla, Layton, and Mammoth. Some courts have found that a subsidiary may be held responsible for statements of its parent company "that are uniquely within the subsidiary's knowledge and control." *In re Marsh & McClennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 480 (D.N.J. 2006); *see also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 268 (S.D.N.Y. 2008). Even assuming this case law would apply in the Tenth Circuit and/or that it would apply to an individual officer of a subsidiary, the SAC does not allege any facts tending to show that Ellison had any control over the information disclosed by Mammoth, Straehla, or Layton and/or that Ellison communicated misleading information to Mammoth, Straehla, or Layton

knowing that it would be incorporated in their public statements. This branch of subsidiary liability, therefore, is inapplicable.

Accordingly, the Court finds Plaintiffs' claims against Ellison should be dismissed.

**B. Claims against Straehla and Layton**

Plaintiffs allege in the SAC that Straehla and Layton made numerous misstatements and omissions. These misstatements and omissions fall into a number of categories: (1) statements that are false and misleading because Ellison was bribing Tribble; (2) statements and omissions regarding FEMA's review and approval of the first PREPA contract; (3) omissions regarding Cobra's first PREPA contract having the same contract provision as did an unrelated third party whose contract had been terminated by PREPA; (4) statements regarding Cobra's prior experience with infrastructure repairs; (5) omissions regarding PREPA being behind in payments to Cobra and a possible work stoppage as a result; (6) statements regarding the contractual income tax provision; and (7) statements regarding the ending of the work in Puerto Rico.

**1. Alleged false and misleading statements as a result of alleged bribery**

Having carefully reviewed the SAC, and accepting all factual allegations in the SAC as true, the Court finds Plaintiffs have not pled sufficient factual allegations to show that either Straehla or Layton was aware, or should have been aware, of any alleged bribery by Ellison prior to the FBI interviewing him. The Court, therefore, finds Plaintiffs have not sufficiently alleged facts showing that either Straehla or Layton acted with scienter when they made any statements or omissions that Plaintiffs allege are actionable based upon Ellison bribing Tribble prior to March 15, 2019. Taking all of the facts alleged, collectively, the Court concludes that a reasonable person would not deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged as to these statements and omissions. However,

for those statements or omissions made on or after March 15, 2019, the Court finds that Plaintiffs have sufficiently alleged that these statements and omissions are actionable and that Straehla and/or Layton acted with scienter when they made these statements or omissions. Taking all of the facts alleged, collectively, the Court concludes that a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged as to these statements and omissions. The existence of the FBI investigation, the likely discovery of misconduct on the part of Ellison, and Ellison's termination on June 7, 2019 all constitute circumstantial evidence that Straehla and Layton either knew or were reckless in not learning of the alleged bribery. *See In re Marsh*, 501 F. Supp. 2d at 486 (finding strong inference of scienter after officer's awareness of investigation).

**2. Statements and omissions regarding FEMA's review and approval of the first PREPA contract**

On October 20, 2017, Mammoth held a conference call with analysts, and during that call, Straehla stated that the first PREPA contract was drafted "in the room every step of the way with FEMA" and that it "does comply with FEMA reimbursement requirements." SAC at 55. This statement was also included in the October 31, 2017 *E&E News* article. *See* SAC at 56-58. Article 68 of the first PREPA contract provided, in part: "PREPA hereby represents and warrants that FEMA has reviewed and approved of this Contract, and confirmed that this Contract is an acceptable form to qualify for funding from FEMA or other U.S. Government agencies." SAC at 33. On November 1, 2017, Straehla signed an amendment to the first PREPA contract that removed the above language.

Plaintiffs allege that Straehla's October 20, 2017 statement is a false and misleading statement and that he had the requisite scienter when he made it. However, a plausible, nonculpable explanation for this statement is that Straehla relied on the original language contained

in Article 68 of the first PREPA contract when he made the statement. Taking all of the facts alleged, collectively, the Court concludes that a reasonable person would not deem the inference of scienter cogent and at least as compelling as the opposing inference one could draw from the facts alleged. The Court, thus, finds Plaintiffs have not sufficiently alleged scienter as to Straehla in relation to this statement.

Plaintiffs also allege that various statements that were made after November 1, 2017 were false and misleading because they did not state that FEMA did not review or approve the first PREPA contract. Attached to Mammoth's Form 10-Q dated November 13, 2017 is a copy of the amendment to the First PREPA contract that removed the language about FEMA reviewing and approving the contract. Further, Plaintiffs do not allege that any further statements were made after November 1, 2017 about FEMA reviewing and approving the contract. In light of the public disclosure of the November 1, 2017 amendment and the lack of any statements regarding FEMA's review and approval of the first PREPA contract after November 1, 2017, the Court finds the alleged statements made after November 1, 2017 were not false and misleading because they did not state that FEMA did not review or approve the first PREPA contract and, thus, are not actionable.

**3. Omissions regarding Cobra's first PREPA contract having the same contract provision as did an unrelated third party whose contract had been terminated by PREPA**

Plaintiffs allege that various statements that were made after November 1, 2017 were false and misleading because Mammoth did not disclose that Cobra entered into the same contract provision as did an unrelated third party whose contract was terminated by PREPA. The contract provision at issue is the language contained in Article 68 that was removed on November 1, 2017. Because all of the alleged statements at issue were made after the similar language had been

removed, the Court concludes these statements were not false and misleading and, therefore, are not actionable.

**4. Statements regarding Cobra's prior experience with infrastructure repairs**

Plaintiffs' allegations of false statements regarding Cobra's prior experience with infrastructure repairs is based on the October 31, 2017 *E&E News* article. The article stated, in pertinent part:

> Arty Straehla, the CEO of Mammoth (the parent company of Cobra), said in a conference call on Friday that Cobra does infrastructure repairs for utility companies across the Midwest. The company, founded in 2017 according to SEC filings, has 275 full-time employees, he said, and recently completed electrical work in Texas and Florida after the hurricanes.
>
> In a follow-up conversation with Vox, a spokesperson for the company was unable to give further details about Cobra's contracts in Texas and Florida, or any of the clients they have served. The company has not won any federal contracts in the past or handled contracts for the state of Texas, based on a search of government procurement databases.

SAC at 57-58.

Having carefully reviewed the SAC, and accepting all factual allegations in the SAC as true, the Court finds Plaintiffs have not pled sufficient factual allegations to show that the statements made by Straehla regarding Cobra's prior experience were false or misleading. A news article's suspicions are not sufficient factual allegations showing that Straehla's statements were false or misleading. In his statement, Straehla did not say that the electrical work that Cobra recently completed in Texas and Florida was for the federal or state government; so, the lack of results from a search of government procurement databases does not show that Straehla's statement was not true. Work performed for non-government clients presumably would not be included in these databases. Further, the statement that a spokesperson from Cobra was unable to

give further details about Cobra's contracts in Texas and Florida, even in combination with the statement about the government databases, does not show the falsity of Straehla's statements. These statements, therefore, are not actionable.

**5. Omissions regarding PREPA being behind in payments to Cobra and a possible work stoppage as a result**

Plaintiffs allege that statements made in the June 6, 2018 S-3/A; the August 7, 2018 10-Q; and the August 7, 2018 earnings call concerning the possibility of delayed payments were materially false and misleading because Ellison was informed by Tribble about a possible work stoppage due to PREPA being $200 million behind in payments to Cobra and Ellison shared this information with Straehla. Plaintiffs further allege that Straehla repeated that PREPA was "pushing back" on payments at a meeting, attended by Layton, on June 18, 2018. Having carefully reviewed the SAC, and accepting all factual allegations in the SAC as true, the Court finds these statements are not materially false and misleading. Any failure to pay and work stoppage was only a possibility, not a definite occurrence, at the time. Considering the filings as a whole, the Court concludes that the risk of delayed or no payments was adequately stated in the above-referenced filings and that the failure to include the specific information Straehla had received about a possible work stoppage did not make the statements materially false and misleading. These statements, accordingly, are not actionable.

**6. Statements regarding the contractual income tax provision**

In both the March 15, 2019 earnings call and the May 2, 2019 earnings call, Layton made the following statement: "Pursuant to the terms of our original PREPA contract, once our 2018 Puerto Rico income taxes are paid and the appliable returns are filed, we are entitled to receive $45 million from PREPA related to a contractual income tax provision." SAC at 93 and 97. Plaintiffs allege these statements were materially false and misleading because Cobra was in

violation of the conflict of interest and anti-corruption provision of the first and second PREPA contracts as a result of the alleged bribery that Ellison had engaged in.

Having carefully reviewed the SAC, and accepting all factual allegations in the SAC as true, the Court finds Plaintiffs have sufficiently alleged that these statements are misleading. Additionally, because Layton likely would have been aware of the investigation into the alleged bribery at the time he made these statements, the Court finds Plaintiffs have sufficiently alleged that Layton acted with scienter when he made these statements. Taking all of the facts alleged, collectively, the Court concludes that a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged as to these statements.

**7. Statements regarding the ending of the work in Puerto Rico**

Finally, Plaintiffs allege Layton made a false and misleading statement in response to a question from an analyst during the March 15, 2019 earnings call. Specifically, Layton stated: "I think it's important to characterize Puerto Rico as a pause. It's not a shutdown, it's a pause while the engineering catches up. . . . it's certainly not a 'stop' in Puerto Rico, it's just a pause on that work." SAC at 93-94. Plaintiffs allege that Layton omitted to reveal the true reason why Mammoth was leaving: because PREPA would not pay Mammoth. Additionally, Plaintiffs allege that Cobra's ability to obtain additional contracts was at risk because of the investigation into the alleged bribery. Having carefully reviewed the SAC, and accepting all factual allegations in the SAC as true, the Court finds Plaintiffs have sufficiently alleged that this statement is materially false and misleading.

In the SAC, Plaintiffs also allege that prior to the March 15, 2019 earnings call, Layton attended a leadership meeting during which Straehla stated that Mammoth/Cobra was leaving

Puerto Rico because PREPA was not going to pay Mammoth/Cobra on approximately $280 million in outstanding invoices. Because Layton likely would have been aware of the investigation into the alleged bribery at the time he made the statements regarding ending the work and had attended the leadership meeting, the Court finds Plaintiffs have sufficiently alleged that Layton acted with scienter when he made these statements. Taking all of the facts alleged, collectively, the Court concludes that a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged as to these statements.

**C. Claims against Mammoth**

"The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003). Thus, the factual allegations of the SAC establishing a strong inference of scienter against Straehla and Layton suffice to state a claim against Mammoth.

Plaintiffs also assert that Ellison's scienter can be imputed to Mammoth. The authority cited by Plaintiffs, however, involve cases where the parent company had some knowledge of, or participated in, the alleged misconduct. *See In re March*, 501 F. Supp. 2d at 482-83 (S.D.N.Y. 2006) ("Plaintiffs allege that both [parent] and [subsidiary] actively oversaw a 'business model based on unsustainable and improper business practices.'"); *Patel v. L-3 Commc'n Holdings*, 14-CV-6038 (VEC), 2016 WL 1629325, at *14 (S.D.N.Y. Apr. 21, 2016) (imputing to company the scienter of senior managers at company, not subsidiary); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 2:16-cv-06509 WHW-CLW, 2018 WL 3772675, at *33 (D.N.J. Aug. 8, 2018) (same).

As set forth above, Plaintiffs have not pled sufficient factual allegations to show that either Straehla or Layton was aware, or should have been aware, of any bribery by Ellison prior to the FBI interviewing him. Further, Plaintiffs have not pled sufficient factual allegations to show that any other member of the senior management of Mammoth was aware, or should have been aware, of any bribery of Ellison prior to the FBI interviewing him. Accordingly, the Court concludes that Ellison's scienter cannot be imputed to Mammoth.

**D. Loss causation**

A "plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005). Loss causation requires simply a "short and plain statement [that] must provide the defendants with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 346. Having carefully reviewed the SAC, the Court finds Plaintiffs have sufficiently alleged loss causation. Paragraphs 222 through 226 of the SAC, in conjunction with the other allegations in the SAC, provide Defendants with fair notice of the grounds upon which Plaintiffs' claims regarding loss causation rest. The allegations sufficiently plead a causal connection between the misstatements and omissions that the Court have found actionable and the declines in Mammoth's stock price.

**IV. Conclusion**

Accordingly, the Court GRANTS Ellison's Motion to Dismiss the Second Amended Complaint [Doc. No. 105] and DISMISSES all claims against Ellison, and the Court GRANTS IN PART and DENIES IN PART Mammoth, Straehla, and Layton's Motion to Dismiss the Second Amended Complaint [Doc. No. 104] as follows: the Court DENIES the motion to dismiss as to any claims against Straehla, Layton, and/or Mammoth regarding (1) statements or omissions made on or after March 15, 2019 that are alleged to be false or misleading based upon the bribery Ellison

is alleged to have engaged in, (2) the statements regarding the contractual income tax provision, and (3) the statements regarding the ending of the work in Puerto Rico and GRANTS the motion to dismiss in all other respects.

IT IS SO ORDERED this 26th day of January, 2021.

BERNARD M. JONES
UNITED STATES DISTRICT JUDGE