**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| IN RE MAMMOTH ENERGY SERVICES, INC. SECURITIES LITIGATION | Case No. CIV-19-522-J<br><br>CLASS ACTION |

**LEAD PLAINTIFFS' UNOPPOSED MOTION FOR (I) PRELIMINARY
APPROVAL OF THE SETTLEMENT AND (II) APPROVAL
<u>OF NOTICE TO THE SETTLEMENT CLASS</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................................1

II.   PROCEDURAL HISTORY AND CLAIMS ...................................................................4

III.    ARGUMENT..................................................................................................................7

   A.   THE SETTLEMENT MEETS THE CRITERIA FOR PRELIMINARY  APPROVAL ....7

     1.   Lead Plaintiff And Lead Counsel Have Adequately Represented The Class................10

     2.   The Settlement Is The Product Of Arm's Length Negotiations Between Experienced Counsel ...............................................................................................................13

     3.   The Relief Provided For The Class Is Adequate ...........................................................15

     4.   All Settlement Class Members Are Treated Equitably ....................................................23

   B.   THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED .........................24

     1.   Numerosity ......................................................................................................................26

     2.   Commonality ...................................................................................................................27

     3.   Typicality.........................................................................................................................28

     4.   Adequacy .........................................................................................................................29

     5.   Common Questions of Law Predominate And A Class Action Is The Superior Method of Adjudication ..............................................................................................................31

   C.   THE PROPOSED FORM AND METHOD OF NOTICE TO THE  CLASS IS APPROPRIATE .................................................................................................................32

   D.   PROPOSED SCHEDULE.................................................................................................34

IV.   CONCLUSION ................................................................................................................35

**Cases**

*Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540 (D. Colo. 1989) ............................ 13

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................ 25, 28, 31

*Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998) ......... 9

*D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188 (10th Cir. 2010) ............................... 28

*Ehrheart v. Verizon Wireless,* 609 F.3d 590, 595 (3d Cir. 2010) ..................................... 7

*Eisen v. Carlisle & Jacqueline*, 417 U.S. 156 (1974) ...................................................... 34

*Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752 (10th Cir.), *cert. denied sub nom. Gonzalez v. Elna Sefcovic, LLC*, 141 S. Ct. 851 (2020) ............... 10, 16

*Erica P. John Fund, Inc. v. Haliburton Co.*, 563 U.S. 804 (2011) ................................... 31

*Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) ...................... 20

*Goldstein v. MCI WorldCom*, 340 F.3d 238 (5th Cir. 2003) ............................................ 20

*Gradie v. C.R. England, Inc.*, No. 2:16-CV-00768-DN, 2020 WL 6827783 (D. Utah Nov. 20, 2020) ................................................................................................................. 10, 12

*Harris v. Chevron U.S.A., Inc.*, No. CIV-15-0094-PRW, 2019 WL 5846917 (W.D. Okla. July 29, 2019) ..............................................................................................................passim

*Horton v. Molina Healthcare, Inc.*, No. 17-CV-0266-CVE-JFJ, 2019 WL 2207676 (N.D. Okla. May 22, 2019) .............................................................................................. 8

*Hsu v. Puma Biotech., Inc.*, No. 8:15-cv-00865-AG-ASK (C.D. Cal.) (Dkt. 734-2) ....... 21

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ........................................................................................................................ 18

*In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) ............... 21

*In re Automotive Refinishing Paint Antitrust Litig.*, 2004 WL 6248154 (E.D. Pa. Sept. 27, 2004) .......................................................................................................................... 8

*In re Baldwin-United Corp.*, 105 F.R.D. 475 (S.D.N.Y. 1984) ......................................... 9

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) ...................................................................................................................................... 21

*In re Carrier IQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366 (N.D. Cal. Aug. 25, 2016) ........................................................................................................................ 23

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ................................................. 20

*In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672 (D. Colo. 2014) ..................................passim

*In re Crocs, Inc. Sec. Litig.*, No. 07-CV-02351-PAB-KLM, 2013 WL 4547404 (D. Colo. Aug. 28, 2013) ........................................................................................................passim

*In re Integra Realty Res., Inc.*, 262 F.3d 1089 (10th Cir. 2001) ........................................ 33

*In re Intelcom Grp. Sec. Litig.*, 169 F.R.D. 142 (D. Colo. 1996) ..................................... 32

*In re Molycorp, Inc. Sec. Litig.*, No. 12-CV-00292-RM-KMT, 2017 WL 4333997 (D. Colo. Feb. 15, 2017), *report and recommendation adopted,* No. 12-CV-00292-RM-KMT, 2017 WL 4333998 (D. Colo. Mar. 6, 2017) ...................................................... 33

*In re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. 488 (D. Kan. 2012) ..... 9

*In re Nat'l Football League Players' Concussion Injury Litig.,* 821 F.3d 410, 436 (3d Cir. 2016) ..................................................................................................................... 12, 25

*In re Par Pharm. Sec. Litig.*, 2013 WL 3930091 (D.N.J. July 29, 2013) ................... 18, 23

*In re Polaroid ERISA Litig.*, 240 F.R.D. 65 (S.D.N.Y. 2006) ......................................... 11

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) .............................................................................................................................. 16

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1143 (D. Colo. 2009) 18, 27

*In re Ribozyme Pharms., Inc. Sec. Litig.*, 205 F.R.D. 572 (D. Colo. 2001) ...................... 32

*In re Samsung Top-load Washing Mach. Mktg., Sales Practices & Prod. Liab. Litig.*, No. 17-ML-2792-D, 2020 WL 2616711 (W.D. Okla. May 22, 2020) .......................... 13, 15

*In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178 (D.N.M. 2012) ....... passim

*In re Viropharma Inc. Sec. Litig.*, No. CV 12-2714, 2016 WL 312108 (E.D. Pa. Jan. 25, 2016) .............................................................................................................................. 17

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002) .......................... 32

*Krimes v. JPMorgan Chase Bank, N.A.*, 2016 WL 6276440 (E.D. Pa. Oct. 26 2016) ....... 9

*Lachance v. Harrington*, 965 F. Supp. 630 (E.D. Pa. 1997) ............................................. 34

*Lane v. Page*, 272 F.R.D. 558 (D.N.M. 2011) ........................................................... 26, 27

*Lerner v. Haimsohn*, 126 F.R.D. 64 (D. Colo. 1989) ....................................................... 26

*Lopez v. City of Santa Fe*, 206 F.R.D. 285 (D.N.M. 2002) ............................................... 27

*M.B. v. Howard*, No. 18-2617-DDC-GEB, 2021 WL 295882 (D. Kan. Jan. 28, 2021) .. 10, 12, 30

*Martinez v. Reams*, No. 20-CV-00977-PAB-SKC, 2020 WL 7319081 (D. Colo. Dec. 11, 2020) .......................................................................................................................... 8, 11

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) ..................................... 33

*n re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65 (S.D.N.Y. 2004) ............................. 27

*Nakkhumpun v. Taylor*, No. 12-CV-01038-CMA-CBS, 2015 WL 6689399 (D. Colo. Nov. 3, 2015) .................................................................................................................. 13

*Neiberger v. Hawkins*, 208 F.R.D. 301 (D. Colo. 2002) .................................................. 27

*New Eng. Health Care Emps. Pen. Fund v. Woodruff*, 512 F.3d 1283 (10th Cir. 2008) .... 8

*O'Dowd v. Anthem, Inc.*, No. 14-CV-02787-KLM-NYW, 2019 WL 4279123 (D. Colo. Sept. 9, 2019) .......................................................................................... 24

*Rex v. Owens*, 585 F.2d 532 (10th Cir. 1978) ................................................... 26

*Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) ....................... 21

*Robidoux v. Celani*, 987 F.2d 931 (2nd Cir. 1993) ........................................... 26

*Rose v. Travelers Home and Marine Ins. Co.*, No. CV 19-977, 2020 WL 4059613 (E.D. Pa. July 20, 2020) ........................................................................... 19

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180 (10th Cir. 2002) ........... 7, 10, 29

*Shook v. El Paso Cty.*, 386 F.3d 963 (10th Cir. 2004) ...................................... 25

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001) ........................................... 26

*Strougo v. Bassini*, 258 F. Supp. 2d 254 (S.D.N.Y. 2003) ............................... 18

*T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth.*, 717 F.2d 1330 (10th Cir. 1983) ................................................................................... 26

*Tennille v. Western Union Co.*, 785 F.3d 422 (10th Cir. 2015) ......................... 7

*Trevizo v. Adams*, 455 F.3d 1155 (10th Cir. 2006) .......................................... 26

*Tumpa v. IOC-PA, LLC*, 2021 WL 62144 (W.D. Pa. Jan. 7, 2021) .................... 18

*Tuten v. United Airlines, Inc.*, 41 F. Supp. 3d 1003, 1007 (D. Colo. 2014) ....... 7

*Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207 (D.N.J. 2005) .............. 32

**Statutes**

15 U.S.C. §78u-4(a)(4) ............................................................................. 24, 34

Fed. R. Civ. P. 23 ...................................................................................... passim

Lead Plaintiffs Daniel Furia, Vincent Furia, and Sharon Furia ("Lead Plaintiffs"), on behalf of themselves and all others similarly situated, submit this memorandum of law in support of their unopposed motion seeking: (i) preliminary approval for the proposed Settlement set forth in the Stipulation and Agreement of Settlement dated April 30, 2021 (the "Stipulation")[1]; (ii) approval of the Notice to the Settlement Class[2]; and (iii) the scheduling of a hearing date ("Final Approval Hearing" or "Settlement Hearing") at which the Court will consider (a) final approval of the settlement and entry of the proposed Final Judgment, (b) the Plan of Allocation, and (c) Lead Counsel's application for an award of attorneys' fees and expenses.[3]

## I. INTRODUCTION

Lead Plaintiffs have reached an agreement with Defendants to settle the above-captioned action for $11,000,000 in cash (the "Settlement"). The terms of the Settlement are set forth in the Stipulation.

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings as set forth in the Stipulation, which is attached hereto as Exhibit 1.

[2] The "Settlement Class" or "Class" is defined as all persons and entities that purchased or otherwise acquired Mammoth Energy Services, Inc. common stock between October 19, 2017 and June 5, 2019, inclusive, and were damaged thereby. Excluded from the Settlement Class are Defendants; the officers and directors of the Company during the Settlement Class Period (the "Excluded Officers and Directors"); members of the Immediate Families of the Individual Defendants and of the Excluded Officers and Directors; any entity in which any Defendant, any Excluded Officer or Director, or any of their respective Immediate Family members had during the Settlement Class Period and/or has a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person or entity, in their respective capacity as such. For avoidance of doubt, Wexford Capital LP and its affiliates and Gulfport Energy Corporation and its affiliates are Excluded from the Settlement Class. Also excluded from the Settlement Class are the persons and entities who or which timely and validly seek exclusion from the Settlement Class or whose request for exclusion is accepted by the Court.

[3] On March 18, 2021, the Court entered an Order "administratively terminat[ing]" the action without prejudice to "reopen the proceeding for any other purpose necessary to

This is a securities class action against Mammoth Energy Services, Inc., its executives Arty Straehla, Mark Layton, and former executive Donald Keith Ellison.[4] Lead Plaintiffs alleged that Mammoth's stock price was artificially inflated throughout the Class Period because Defendants concealed a scheme to use Mammoth's wholly-owned subsidiary, Cobra Acquisitions, LLC, to bribe Federal Emergency Management Agency officials to steer $1.8 billion in business to Cobra and Mammoth to rebuild Puerto Rico's power grid in the aftermath of Hurricane Maria. Members of the class lost money in their Mammoth investments as the bribery scheme was revealed to the public, culminating with the indictment of Defendant Keith Ellison.

On January 26, 2021, the Court granted Defendants' motions to dismiss a significant part of Lead Plaintiffs' case. Although Plaintiffs had alleged that Defendants began making false statements or omitted to disclose material facts beginning as early as October 19, 2017, the Court found that only statements made by Defendants beginning on March 15, 2019 were actionable misstatements. (ECF No. 121.) This seriously curtailed both the size of the class and the total available recoverable damages. Nonetheless, when the Court denied part of Defendants' motion to dismiss, Lead Plaintiffs were, for the first time, allowed to use discovery originally obtained for purposes of mediation. At the time this

---

obtain a final determination of the action." (ECF No. 127.) Under Fed. R. Civ. P. 23(e)(2), the Court may approve this class action settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate." In this motion, Plaintiffs ask the Court to schedule a final approval hearing, after which the Court can enter judgment. Until such a hearing is held, the parties ask the Court to keep this case open to facilitate the settlement.

[4] Ellison was dismissed from the case by Court's January 26, 2021 Order. (ECF No. 121.)

Settlement was reached, Lead Plaintiffs were preparing to move the Court to file a Third Amended Complaint, which would have added allegations based on that discovery, and which Lead Plaintiffs believed would have brought the class period back to an earlier date.

Of course, the result of any attempt by Lead Plaintiffs to extend the case was uncertain. Given these uncertainties and the risks to both sides inherent in proceeding, the parties agreed to an arm's-length Settlement of $11 million. As explained below, Lead Plaintiffs contend that this is an excellent result, representing a significant portion of available damages under any scenario.

The Settlement follows eighteen months of hard-fought litigation. By the time the Settlement was reached, Lead Plaintiffs and Lead Counsel were well informed about the strengths and weaknesses of the claims and Defendants' defenses. Lead Counsel had (i) conducted a comprehensive investigation into the allegedly wrongful acts, which included, among other things, a review and analysis of Mammoth Energy Services, Inc.'s ("Mammoth") filings with the U.S. Securities and Exchange Commission ("SEC"), public reports and news articles concerning Mammoth, documents filed in the case of *United States of America v. Ahsha Nateef Tribble, Donald Keith Ellison and Jovanda R. Patterson*, Crim. No. 19-541 (D.P.R.) and transcripts of Mammoth's investor calls, and consultation with accounting, damages and market efficiency experts; (ii) drafted the First Amended Complaint for Violation of the Federal Securities Laws (the "FAC") and the Second Amended Complaint for Violation of the Federal Securities Laws (the "SAC"), based on the investigation; (iii) engaged in voluminous briefing related to Defendants' motions to dismiss the SAC; (iv) drafted and exchanged extensive mediation statements;

(v) participated in protracted mediation efforts, including a full-day mediation session before the Honorable Michael Burrage, Esq., of Whitten Burrage LLP; extensively reviewed nearly 90,000 internal Mammoth documents (including emails, internal accounting and billing summaries, invoices, and contracts) produced by Mammoth as part of mediation; (vi) prepared a draft Third Amended Complaint, based on review of those documents; and (vii) engaged in negotiations regarding the terms of the proposed Settlement.

The Settlement is, therefore, the result of arm's-length negotiations, conducted by informed and experienced counsel, in conjunction with a well-respected mediator. As discussed in greater detail below, Lead Plaintiffs and Lead Counsel believe that the proposed Settlement meets the standards for preliminary approval and is in the best interests of the putative Class. Accordingly, Lead Plaintiffs respectfully request that the Court grant preliminary approval.

## II.     PROCEDURAL HISTORY AND CLAIMS

By Order dated September 13, 2019, Judge Palk ordered that three related cases be consolidated into *In re Mammoth Energy Services, Inc.*, Case No. 5:19-cv-00522-SLP, appointed Daniel Furia, Vincent Furia, and Sharon Furia as Lead Plaintiffs and approved Lead Plaintiffs' selection of Block & Leviton LLP as Lead Counsel. By Order Dated September 25, 2019, Judge Palk appointed Jones, Gotcher & Bogan, P.C. as Local Counsel. (ECF No. 45.)

On March 9, 2020, Plaintiffs filed their Second Amended Complaint for Violation of the Federal Securities Laws (the "SAC"), again asserting claims against all Defendants

under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against Defendants Arty Straehla, Mark Layton, and Keith Ellison under Section 20(a) of the Exchange Act. (ECF No. 93.) Specifically, Plaintiffs alleged that Mammoth's wholly-owned subsidiary, Cobra Acquisitions, LLC ("Cobra"), bribed Federal Emergency Management Agency ("FEMA") officials to steer over $1.8 billion of business to Cobra/Mammoth to re-build Puerto Rico's power grid in the aftermath of Hurricane Maria. Plaintiffs also alleged that the contracts were with the Puerto Rico Electric Power Authority ("PREPA"), whose ability to meet its payment obligations under the contracts was dependent on obtaining funding from FEMA because PREPA was in bankruptcy. Plaintiffs alleged that this scheme violated the conflict-of-interest provision of the PREPA contracts, jeopardizing Cobra/Mammoth's ability to be paid and retain payments already made, Ellison carried out the scheme with Straehla's knowledge, and Layton eventually learned of the scheme. But, Plaintiffs alleged, Straehla, Layton, and Ellison publicly hyped the PREPA contracts and assured analysts and investors that the contracts were entirely above board.

On September 29, 2020, while Defendants' Motion to Dismiss the SAC was pending, Lead Counsel and Defendants' Counsel participated in a full-day mediation session before the Honorable Michael Burrage, Esq. of Whitten Burrage LLP. In advance of that session, the Parties prepared and exchanged detailed mediation statements. Additionally, Mammoth provided Lead Plaintiffs with considerable discovery under certain restrictive conditions, which limited use of the documents to mediation unless and until the PSLRA stay of discovery was lifted. This discovery consisted of nearly 90,000

documents. The mediation session ended without any agreement being reached. However, the parties continued to discuss grounds for resolving the case following the conclusion of the mediation session.

By Order dated January 26, 2021, this Court granted Ellison's motion to dismiss and granted in part and denied in part the motion to dismiss filed by Mammoth, Straehla, and Layton. (ECF No. 123.) The Order – which dismissed all claims against Mammoth, Straehla, and Layton except for those based on statements and omissions made on or after March 15, 2019 – ended the PSLRA stay and allowed Lead Counsel to thoroughly review and use the discovery materials produced for mediation.

Counsel for Lead Plaintiff and for Defendants Mammoth, Straehla, and Layton continued to hold numerous discussions over resolution of the case following the Court's January 26, 2021 Order. Those discussions ultimately resulted in an agreement, on March 12, 2021, to settle and release all claims arising out of, based upon, or related to their purchase or acquisition of Mammoth common stock during the Class Period and the allegations, representations, or omissions set forth in the SAC in return for a cash payment by or on behalf of Defendants of $11,000,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of an agreement of settlement and related papers.

At the time of the agreement to settle, Lead Counsel had reviewed nearly 90,000 documents produced by Defendants and was prepared to file a third amended complaint, based on the review of those documents, which would have included additional allegations that Plaintiffs believe would have allowed the Court to reinstate claims against Defendants

related to earlier alleged false and misleading statements. Based upon their investigation, prosecution and mediation of the case, Lead Plaintiffs and Lead Counsel have concluded that the terms and conditions set forth in the Stipulation are fair, reasonable and adequate to Lead Plaintiffs and the other members of the Settlement Class, and in their best interests.

## III.  ARGUMENT

### A.  THE SETTLEMENT MEETS THE CRITERIA FOR PRELIMINARY APPROVAL

Rule 23(e) of the Federal Rules of Civil Procedure provides that before a class action may be dismissed or compromised, notice of the proposed dismissal or compromise must be given in the manner directed by the court, and judicial approval must be obtained. The issue of whether a proposed settlement should be granted preliminary approval is a matter within the sound discretion of the district court, which should be exercised in the context of public policy strongly favoring the pretrial settlement of class action lawsuits. *See, e.g.*, *Tuten v. United Airlines, Inc.*, 41 F. Supp. 3d 1003, 1007 (D. Colo. 2014) (quoting *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 595 (3d Cir. 2010)) ("Settlement agreements are to be encouraged because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts."); *Tennille v. Western Union Co.*, 785 F.3d 422, 434 (10th Cir. 2015) ("We review the district court's decision to approve a class settlement for an abuse of discretion."); *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1186 (10th Cir. 2002) ("[W]e review the court's approval of the settlement agreement for an abuse of discretion.").[5] In determining whether a class action settlement

---

[5] Unless otherwise indicated, all internal citations are omitted and emphasis is added.

is fair, "it is appropriate to give substantial weight to the recommendations of experienced attorneys, who have engaged in arms-length settlement negotiations[.]" *In re Automotive Refinishing Paint Antitrust Litig.*, 2004 WL 6248154, at *2 (E.D. Pa. Sept. 27, 2004); *see also Horton v. Molina Healthcare, Inc.*, No. 17-CV-0266-CVE-JFJ, 2019 WL 2207676, at *1 (N.D. Okla. May 22, 2019) (approving class action settlement because, *inter alia*, it "has been negotiated in good faith at arms' length between experienced attorneys familiar with the legal and factual issues of this case.")

Preliminary approval of a proposed settlement is the first step in a two-step process required before a class action may be settled. *See New Eng. Health Care Emps. Pen. Fund v. Woodruff*, 512 F.3d 1283, 1287 (10th Cir. 2008) (noting that the district court "preliminarily approved the partial settlement" before subsequently holding "a hearing on final approval of the settlement"); *Harris v. Chevron U.S.A., Inc.*, No. CIV-15-0094-PRW, 2019 WL 5846917, at *1 (W.D. Okla. July 29, 2019) ("Approval of a class action settlement takes place in two stages."). "The standards for preliminary approval of a settlement class are not as stringent as those applied for final approval." *Horton*, 2019 WL 2207676, at *2; *see also Martinez v. Reams*, No. 20-CV-00977-PAB-SKC, 2020 WL 7319081, at *1 (D. Colo. Dec. 11, 2020) ("Preliminary approval of a class action settlement, in contrast to final approval, is at most a determination that there is … 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness."). "The Court will ordinarily grant preliminary approval where the proposed settlement 'appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class

representatives or segments of the class and falls within the range of possible approval.'" *In re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. 488, 492 (D. Kan. 2012). A settlement falls within the range of possible approval if there is a "conceivable basis for presuming that the standard applied for final approval – fairness, adequacy, and reasonableness – will be satisfied." *Krimes v. JPMorgan Chase Bank, N.A.*, 2016 WL 6276440, at *6 (E.D. Pa. Oct. 26 2016); *see also Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998) (noting that a proposed settlement is "within the range of possible approval" if "there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing"); *In re Baldwin-United Corp.*, 105 F.R.D. 475, 482 (S.D.N.Y. 1984) (finding a proposed settlement to be within the range of possible approval because "it is at least sufficiently fair, reasonable and adequate to justify notice to those affected and an opportunity to be heard').

Rule 23(e)(1) provides that preliminary approval should be granted where "the parties show[] that the Court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." With respect to Rule 23(e)(2)—which governs final approval—courts are required to consider the following factors in determining whether a proposed settlement is fair, reasonable and adequate:

(A)     have the class representatives and Lead Counsel adequately represented the class;

(B)     was the proposal negotiated at arm's length;

(C)     is the relief provided for the class adequate, taking into account:

<blockquote>

(i)      the costs, risks, and delay of trial and appeal;

(ii)      the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)      the terms of any proposed award of attorneys' fees, including timing of payment; and

(iv)      any agreement required to be identified under Rule 23(e)(3); and

(D)      does the proposal treat class members equitable relative to each other.

</blockquote>

Fed. R. Civ. P. 23(e)(2). As set forth below, the proposed Settlement satisfies the criteria for preliminary approval.[6]

### 1.      Lead Plaintiff And Lead Counsel Have Adequately Represented The Class

Here, Lead Plaintiffs and Lead Counsel adequately represented the Settlement Class during both the litigation of this Action and its settlement. Lead Plaintiffs' claims are

---

[6] Since the amendments to Rule 23(e), courts in this district have evaluated proposed settlements under the Rule 23(e)(2) factors, rather than the Tenth Circuit's traditional "*Rutter*" factors. *See Harris*, 2019 WL 5846917, at *3 ("If the proposed settlement class satisfies the requirements of Rules 23(a) and (b), then the Court must separately evaluate whether the settlement agreement is 'fair, reasonable, and adequate' under Rule 23(e)."); *see also Gradie v. C.R. England, Inc.*, No. 2:16-CV-00768-DN, 2020 WL 6827783, at *9 (D. Utah Nov. 20, 2020) (applying Rule 23(e)(2) factors to determine whether a settlement agreement is fair, reasonable, and adequate); *but see Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752, 757 (10th Cir.), *cert. denied sub nom. Gonzalez v. Elna Sefcovic, LLC*, 141 S. Ct. 851 (2020) (identifying Rule 23(e)(2) as the standard but applying the four factors outlined in *Rutter v. Wilbanks*, 314 F.2d 1180, 1188 (10th Cir. 2002) to evaluate a settlement without acknowledging the amendments to Rule 23); *M.B. v. Howard*, No. 18-2617-DDC-GEB, 2021 WL 295882, at *4 (D. Kan. Jan. 28, 2021) (noting that *Elna Sefcovic* "appl[ied] Rutter factors following the 2018 amendments to Fed. R. Civ. P. 23(e)"). Regardless, the Advisory Committee notes to the 2018 amendments explain that the changes to Rule 23(e) did not "displace any factor" generated by each circuit, "but rather [sought] to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e) advisory committee's note to 2018 amendment. The *Rutter* factors closely parallel the new Rule 23(e)(2) factors:

> (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable.

*Rutter*, 314 F.3d at 1188.

typical of and coextensive with the claims of the Settlement Class, and they have no antagonistic interests; rather, Lead Plaintiffs' interests in obtaining the largest possible recovery are aligned with the other Settlement Class Members. *See Martinez v. Reams*, No. 20-CV-00977-PAB-SKC, 2020 WL 7319081, at \*6 (D. Colo. Dec. 11, 2020) (representation found adequate where "there is nothing in the record or proposed settlement agreement that raises obvious concerns regarding interclass conflicts"); *Harris*, 2019 WL 5846917, at \*6 (same); *In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Lead Plaintiffs also retained counsel who are highly experienced in securities litigation, and who have a long and successful track record of representing investors in such cases. Lead Counsel and Liaison Counsel have successfully prosecuted securities class actions and complex litigation in federal and state courts throughout the country. *See* Block Decl.*,* Ex. A-B. Lead Counsel pursued this Action vigorously as well. By the time the Settlement was reached, Lead Counsel had, among other things: (i) reviewed and analyzed Mammoth's SEC filings, press releases, investor conference call transcripts, and other public statements, as well as (a) publicly available documents, reports, announcements, and news articles concerning Mammoth, and (b) research reports prepared by securities and financial analysts regarding Mammoth; (ii) worked with a damages and loss causation expert to analyze Mammoth's stock price movement; (iii) drafted the comprehensive, factually-detailed SAC against the Defendants; (iv) thoroughly briefed oppositions to Defendants' motions to dismiss; (v) reviewed nearly 90,000 documents

internal to Mammoth, including voluminous emails, billing summaries, invoices, and third party contracts related to Cobra's contracts in Puerto Rico[7]; (vi) drafted and exchanged detailed mediation statements that set forth the facts of the case and analyzed the strengths of the Action and potential damages; (vii) engaged in a full day mediation session overseen by Hon. Michael Burrage, a former federal district judge and experienced securities litigator; (viii) conducted protracted and time-intensive negotiations regarding the terms of the proposed Settlement; and (ix) drafted the initial versions of the Stipulation and exhibits.

Lead Plaintiffs and Lead Counsel have, therefore, adequately represented the Settlement Class. *See In re Nat'l Football League Players' Concussion Injury Litig.,* 821 F.3d 410, 436, 439 (3d Cir. 2016) (affirming approval where decision to settle informed by informal discovery and explaining that "requiring parties to conduct formal discovery before reaching a proposed class settlement would take a valuable bargaining chip—the costs of formal discovery itself—off the table during negotiations."); *Howard*, 2021 WL 295882, at *4 (finding settlement agreement fairly and honestly negotiated where "the parties reached this settlement following meaningful exchange of information[,] Lead Counsel's investigation" and mediation drawn out over months); *Gradie*, 2020 WL 6827783, at *9 (finding representation adequate, even though the parties did not engage in formal discovery, where "[i]n preparation for the mediation that preceded this Settlement, Lead Counsel reviewed, among other things, many thousands of pages of documents and other information amounting to multiple gigabytes of data"); *In re Samsung Top-load*

---

[7] These documents were obtained from Defendants in connection with the Parties' mediation efforts.

*Washing Mach. Mktg., Sales Practices & Prod. Liab. Litig.*, No. 17-ML-2792-D, 2020 WL 2616711, at \*13 (W.D. Okla. May 22, 2020) (finding representation adequate where the pre-class certification settlement agreement "was reached after three months of negotiations" and plaintiffs' claims had been vigorously litigated before settlement discussions); *Nakkhumpun v. Taylor*, No. 12-CV-01038-CMA-CBS, 2015 WL 6689399, at \*6 (D. Colo. Nov. 3, 2015) (finding settlement fairly and honestly negotiated where the parties had "conducted extensive factual investigations and thorough legal analysis," had "fully briefed Defendants' motion to dismiss," and "consulted with experts and engaged in mediation early in the case with a retired United States district judge"). Additionally, Lead Counsel has thoroughly evaluated the strengths and weaknesses of this Action and firmly believes that the Settlement represents an excellent result for the Settlement Class. *See Samsung*, 2020 WL 2616711 ("The parties' view of a settlement as fair and reasonable is to be given considerable weight."); *Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 548 (D. Colo. 1989) ("Courts have consistently refused to substitute their business judgment for that of counsel and the parties.").

### 2. The Settlement Is The Product Of Arm's Length Negotiations Between Experienced Counsel

Rule 23(e)(2)(B) evaluates whether the proposed settlement "was negotiated at arm's length." As noted above, the proposed Settlement was achieved only after a full-day mediation session overseen by a former United States District Judge, Mr. Burrage, followed by extensive arm's length negotiations drawn out over the course of five months. *Harris*, 2019 WL 5846917, at \*3 (finding settlement agreement fair, adequate, and

reasonable where "[t]h[e] matter was not settled on the first mediation attempt but was only settled after months of additional negotiations following the same"). As part of those discussions, Lead Counsel and Defendants' Counsel prepared submissions concerning, among other things, their respective views of the Action's merits and damages on a class-wide basis. The negotiations focused on heavily disputed issues. Specifically, the parties disputed: (1) whether Lead Plaintiffs adequately alleged materially false and misleading statements, scienter and loss causation; (2) whether Lead Plaintiffs would be able to certify a class; (3) whether Lead Plaintiffs' claims would survive summary judgment or at trial; and (4) whether the Settlement Class suffered damages and, if so, the amount of damages. These, as well as many other issues, were explored in-depth and with substantial input from Judge Burrage.

The Court's January 26, 2021 Order altered the negotiation landscape. The truncated class period beginning March 15, 2019 severely reduced the class's recoverable damages but also lifted the stay of discovery, giving Lead Plaintiffs license to use the nearly 90,000 documents produced by Mammoth in connection with the mediation. Review of these documents left Lead Counsel with a strong belief that evidence supported extending the class period back to at least June 18, 2016, the date of the secondary public offering, if not to the original October 19, 2017 start date. This would have restored the initially alleged class's damages, but only if the Court allowed the filing of an amended complaint and if the new allegations survived additional motions to dismiss. Many uncertainties remained.

The negotiations leading up to the settlement agreement were conducted at arm's length by experienced counsel who were well-aware of the strengths and weaknesses of

the case. Lead Counsel have many years of experience litigating securities fraud class actions and have negotiated score of class settlements, which have been approved in courts throughout the country. *See* Block Decl. Exs. A-B. Defendants are represented by Quinn Emanuel Urquhart & Sullivan, LLP, a highly respected firm with a strong reputation for tenacious litigation of all complex matters, including the defense of class actions. Accordingly, this factor weighs in favor of preliminary approval. *See Samsung*, 2020 WL 2616711, at *13 ("The presence of the mediator weighs heavily in favor of" the arm's-length negotiation "requirement being met."); *Harris*, 2019 WL 5846917, at *3 ("Utilization of an experienced mediator during the settlement negotiations supports a finding that the settlement is reasonable, was reached without collusion and should therefore be approved.").

### 3. The Relief Provided For The Class Is Adequate

Under Rule 23(e)(2)(C), when evaluating the fairness, reasonableness, and adequacy of a settlement, the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" along with other relevant factors. Fed. R. Civ. P. 23(e)(2)(C). This factor is satisfied where the settlement provides significant immediate relief for the Class and where the "value of immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation." *In re Crocs, Inc. Sec. Litig.*, No. 07-CV-02351-PAB-KLM, 2013 WL 4547404, at *12 (D. Colo. Aug. 28, 2013). That is certainly the case here, where the Parties face not only significant merits and damages discovery, extensive motion practice concerning further amendments to the complaint, class certification and summary

judgment, but a potential trial and subsequent appeal, which would significantly add to the length and resources required to resolve the Action on the merits. *See generally In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998) (settlement was favored where "the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both parties and the court"). The "time and costs inherent in complex securities litigation" such as this are significant, and here – where there is "the prospect of some recovery versus no recovery," *Crocs*, 2013 WL 4547404, at *12, the substantial immediate recovery outweighs the possibility of future relief after lengthy, expensive, and uncertain litigation. *See Elna Sefcovic,* 807 F. App'x at 759 (finding class settlement fair, in part, because "the immediate recovery was more valuable than the mere possibility of a more favorable outcome after further litigation" due to the uncertain outcome of the litigation and immediate partial recovery of losses).

The $11 million cash Settlement Amount is well within the range of reasonableness under the circumstances, warranting preliminary approval and the issuance of notice to the Settlement Class. Here, using the class period for the period upheld by the Court, from March 15, 2019 through June 5, 2019, Lead Plaintiffs' damages expert estimated that total recoverable damages were $14.9 million. Thus, based on the sustained class period, this settlement represents almost 75% of total recoverable damages.

Lead Plaintiffs, however, would have attempted to amend their complaint to bring back claims setting out a class period beginning October 20, 2017. If Lead Plaintiffs were successful in doing so—and of course there is no assurance that the Court would permit

another amendment or that the new allegations would not be dismissed yet again—and if a class were certified, if Defendants' likely summary judgment motion were denied, and if, after a jury trial, the Court and jury accepted Lead Plaintiffs' damages theory (including proof of loss causation, which was hotly contested at mediation)—*i.e.*, Lead Plaintiffs' **best case scenario**—the total **maximum** damages would be approximately $90.7 million. Thus, the Settlement Amount represents approximately 12.1% of the total **maximum** damages **potentially** available in this Action.

In comparison, the median recovery in securities class actions in 2020 was approximately 1.7% of estimated damages. *See* Block Decl., Ex. C (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review*, NERA (Jan. 25, 2021), at 20, Fig. 16.). This settlement far exceeds comparable securities class action settlements. As such, the "proposed Settlement is reasonable considering the best possible recovery for the Settlement Class and the risks of further litigation." *See In re Viropharma Inc. Sec. Litig.*, No. CV 12-2714, 2016 WL 312108, at *13-14 (E.D. Pa. Jan. 25, 2016) (citing historical median settlements as a percentage of recovery and finding that settlement reflecting approximately 9-10% of maximum estimated losses weighed in favor of approval).

Moreover, had Defendants prevailed on any motion(s) for class certification or at summary judgment—or had the Court or a jury later accepted Defendants' loss causation arguments—recoverable damages would have been substantially diminished or completely eliminated. Consequently, the amount recovered, when balanced against the risks of continued litigation, weighs strongly in favor of preliminary approval. *See In re Par*

*Pharm. Sec. Litig.*, 2013 WL 3930091, at *7 (D.N.J. July 29, 2013) ("[In assessing reasonableness,] the Court compares the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, with the amount of the proposed settlement.").

### a) The Cost, Risk, and Delay of Trial and Appeal

"The greater the inherent complexity and likely expense associated with litigating a case to its conclusion, the more likely it is that the court will find a proposed settlement to be fair[.]" *Tumpa v. IOC-PA, LLC*, 2021 WL 62144, at *8 (W.D. Pa. Jan. 7, 2021). Securities fraud cases are inherently complex and frequently take an exceptionally long time to litigate, in part because they often involve significant post-trial motions and appeals. *See, e.g.*, *Crocs*, 2013 WL 4547404, at *12 (quoting *Strougo v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003)) ("It is 'beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members.'"); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1143, 1149 (D. Colo. 2009) ("There are few simple class action cases involving securities law. This area of law may not be novel, but it generally is complex and difficult."). Given the "notorious complexity" of securities class actions, settlement is often appropriate because it "circumvents the difficulty and uncertainty inherent in long, costly trials." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006).

Here, there is no question that continued litigation would have been costly, risky, and drawn out. Although Lead Plaintiffs succeeded in defeating Defendants' motions to

dismiss, in part, the Court severely curtailed the class period by dismissing all claims premised upon Defendants' actions prior to March 15, 2019. Thus, Lead Plaintiffs' first obstacle was to file and defend a third amended complaint restoring the original class period. Lead Plaintiffs then faced the inevitable challenge of overcoming Defendants' summary judgment argument that the false statements and omissions sustained by the Court would not withstand scrutiny once the record included the actual communications and accounting records referenced and witness testimony. While Lead Plaintiffs have reviewed these documents and believe in the merits of their case, there is no question that the retention of expensive expert witnesses would be necessary to overcome Defendants' challenges. The Settlement avoids the substantial risks, costs, and delays that would necessarily follow Lead Plaintiffs' continued litigation of this Action, which would entail class certification, intensive discovery, summary judgment, trial, and likely appeals of any class certification order or judgment after trial. *See In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1242 (D.N.M. 2012) ("Pursuing the litigation further would require significant judicial and party resources to complete motions for summary judgment, [*Daubert* motions], and motions in limine. Any of those decisions could then be appealed to the Tenth Circuit along with any jury verdict that might be returned…. Additionally, without the Settlement, there is no guarantee that there will be funds available to satisfy any jury verdict that might be returned in the class' favor."); *see also Rose v. Travelers Home and Marine Ins. Co.*, No. CV 19-977, 2020 WL 4059613, at \*7 (E.D. Pa. July 20, 2020) (settlement provided "substantial relief" because "[t]here is no guarantee that the

Court would have certified a litigation class[,]" and the settlement "ensures" relief for settlement class members with valid claims).

Even if Lead Plaintiffs were successful in establishing liability at trial, they would still face substantial risks in proving loss causation and damages. Defendants made clear that they intended to challenge the alleged corrective disclosures. Issues relating to loss causation and damages would also have likely come down to a contested and unpredictable "battle of the experts." *Thornburg*, 912 F. Supp. 2d at 1242; *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) ("[E]stablishing damages at trial would lead to a 'battle of the experts' with each side presenting its figures to the jury and with no guarantee whom the jury would believe."). Accordingly, in the absence of a settlement, there was a very real risk that the Class would have recovered an amount significantly less than the total settlement amount – or even nothing at all.

While Lead Plaintiffs are confident in the merits of their case, success is never guaranteed. *See Goldstein v. MCI WorldCom*, 340 F.3d 238 (5th Cir. 2003) (affirming dismissal with prejudice of securities fraud class action against Bernard Ebbers and WorldCom arising out of a massive securities fraud that resulted in a $685 million write-off of accounts receivable, for which Ebbers was later convicted). Lead Plaintiffs and Lead Counsel recognize the significant risk, time and expense involved in prosecuting the claims against Defendants through class certification, completion of fact and expert discovery, summary judgment, trial, and subsequent appeals, as well as the inherent difficulties and delays complex litigation like this entails. *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion

after 13 years of litigation on loss causation grounds and error in jury instruction).[8] Even success at trial carries the substantial risk of reduced recovery. *See e.g., Hsu v. Puma Biotech., Inc.*, No. 8:15-cv-00865-AG-ASK (C.D. Cal.) (Dkt. 734-2) (press release highlighting that in first federal securities class action to reach a verdict in nearly ten years, jury returned a verdict resulting in total damages of $9 to $18 million in a case where "Plaintiffs' estimated potential class-wide damages exceeded $1.1 billion.").

There was, therefore, a very significant risk that continued litigation might yield a smaller recovery—or indeed no recovery at all—several years in the future. The substantial payment of $11,000,000 by the Defendants, particularly when viewed in the context of the risks and the uncertainties involved in this litigation, clearly weighs heavily in favor of approving the Settlement.

### b) Other Factors Established By Rule 23(e)(2)(C) Support Final Approval

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," "the terms of any proposed award of attorneys' fees, including timing of payment," and "any agreement required to be identified under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors supports the Settlement's approval.

---

[8] *See also Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing jury verdict of $81 million for plaintiffs); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict); *In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (overturning jury verdict for plaintiffs after extended trial).

First, the method for processing Settlement Class Members' claims and distributing relief to eligible claimants includes well-established, effective procedures for processing claims and efficiently distributing the Net Settlement Fund. Here, Angeion Group ("Angeion"), the Claims Administrator selected by Lead Counsel (subject to Court approval), will process claims under the guidance of Lead Counsel, allow claimants an opportunity to cure any deficiencies in their claims or request the Court to review a denial of their claims, and, lastly, mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund (per the Plan of Allocation), after Court-approval. Claims processing like the method proposed here is standard in securities class action settlements as it has been long found to be effective, as well as necessary insofar as neither Lead Plaintiffs nor Defendants possess the individual investor trading data required for a claims-free process to distribute the Net Settlement Fund.[9]

Second, as disclosed in the Notice, Lead Counsel will be applying for a percentage of the common fund fee award in an amount not to exceed 30% to compensate them for the services they have rendered on behalf of the Settlement Class. Such a request is reasonable in light of the work performed and the results obtained. It is also consistent with awards in similar complex class action cases. *See Thornburg*, 912 F. Supp. 2d at 1257 (recognizing that "[f]ees in the range of 30-40% of any amount recovered are common in complex and other cases taken on a contingency fee basis" and citing cases). More

---

[9] This is not a claims-made settlement. If the Settlement is approved, Defendants will not have any right to the return of a portion of the Settlement based on the number or value of the claims submitted. *See* Stipulation ¶13.

22

importantly, approval of the requested attorneys' fees is separate from approval of the Settlement, and the Settlement may not be terminated based on any ruling with respect to attorneys' fees. *See* Stipulation ¶16.

Third, with respect to Rule 23(e)(2)(C)(iv), the Parties have entered into a confidential agreement which establishes certain conditions under which Mammoth may terminate the Settlement if Settlement Class Members, who collectively purchased a specific number of shares of Mammoth common stock, request exclusion (or "opt out") from the Settlement. This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement. *See, e.g.*, *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, at *5 (N.D. Cal. Aug. 25, 2016) (observing that such "opt-out deals are not uncommon as they are designed to ensure that an objector cannot try to hijack a settlement in his or her own self-interest," and granting final approval of class action settlement).

### 4. All Settlement Class Members Are Treated Equitably

Rule 23(e)(2)(D) requires courts to evaluate whether the settlement treats class members equitably relative to one another. Fed. R. Civ. P. 23(e)(2)(D). "The proposed allocation need not meet the standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis." *Par Pharm.*, 2013 WL 3930091, at *8. Under the proposed Plan of Allocation, which was developed in coordination with Lead Plaintiffs' retained expert, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized

Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Because the proposed Plan of Allocation does not provide preferential treatment to any Settlement Class member, segment of the Settlement Class, or to Lead Plaintiff, this factor supports preliminary approval of the proposed Settlement.[10] *See In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 692-93 (D. Colo. 2014) (finding plan of allocation properly "reimburses class members based on the extent of their injuries and is otherwise fair, reasonable, and adequate" where "the Settlement Fund will be allocated pro rata among the Settlement Class based on" when class members purchased securities and the type of security purchased); *O'Dowd v. Anthem, Inc.*, No. 14-CV-02787-KLM-NYW, 2019 WL 4279123, at *15 (D. Colo. Sept. 9, 2019) (same).

For all of the foregoing reasons, Lead Plaintiffs respectfully submit that the proposed Settlement falls within the range of what could be found to be fair, reasonable, and adequate and warrants this Court's preliminary approval.

## B. THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED

In connection with final approval, the Court will be asked to certify the Settlement Class—for settlement purposes only—pursuant to Rules 23(a) and 23(b)(3). For that reason, and pursuant to the December 2018 Rule 23(e) amendments, it is proper for the Court to consider, at this stage, whether certification of the Settlement Class is appropriate.

---

[10] Pursuant to the PSLRA, Lead Plaintiffs may separately seek reimbursement of costs and expenses incurred as result of their representation of the Settlement Class. *See* 15 U.S.C. §78u-4(a)(4). As explained in the Notice, the total request for reimbursement of all expenses (including those incurred by counsel) will not exceed $150,000.

Fed. R. Civ. P. 23(e)(1)(B) (requiring court to direct notices to class if "giving notice is justified by the parties' showing that the court will likely be able to . . . certify the class for purposes of judgment on the proposal").

Courts have long acknowledged the propriety of a settlement class. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-22 (1997); *see also Nat'l Football League Players*, 775 F.3d at 583 ("*[P]reliminary* analysis of a proposed class is . . . a tool for settlement used by the parties to fairly and efficiently resolve litigation.") (emphasis in original). Rule 23(a) sets forth the following four prerequisites to class certification: (i) numerosity, (ii) commonality, (iii) typicality, and (iv) adequacy of representation. In addition, the class must meet one of the three requirements of Rule 23(b). *See* Fed. R. Civ. P. 23; *Shook v. El Paso Cty.*, 386 F.3d 963, 971 (10th Cir. 2004).

The proposed Settlement Class is defined in the Stipulation:

> All persons and entities that purchased or otherwise acquired Mammoth Energy Services, Inc. common stock between October 19, 2017 and June 5, 2019, inclusive, and were damaged thereby. Excluded from the Settlement Class are Defendants; the officers and directors of the Company during the Settlement Class Period (the "Excluded Officers and Directors"); members of the Immediate Families of the Individual Defendants and of the Excluded Officers and Directors; any entity in which any Defendant, any Excluded Officer or Director, or any of their respective Immediate Family members had during the Settlement Class Period and/or has a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person or entity, in their respective capacity as such. For avoidance of doubt, Wexford Capital LP and its affiliates and Gulfport Energy Corporation and its affiliates are Excluded from the Settlement Class. Also excluded from the Settlement Class are the persons and entities who or which timely and validly seek exclusion from the Settlement Class or whose request for exclusion is accepted by the Court.

*See* Stipulation ¶ 1(uu).

Courts routinely endorse the use of the class action device to resolve claims brought under the federal securities laws. *See e.g.*, *Lane v. Page*, 272 F.R.D. 558, 573 (D.N.M. 2011) ("Where plaintiffs allege that defendants violated federal securities laws through a common scheme or mechanism, uniformly perpetrated upon the shareholders, the action is appropriate for class treatment."), *Lerner v. Haimsohn*, 126 F.R.D. 64, 65 (D. Colo. 1989) (citing *T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth.*, 717 F.2d 1330 (10th Cir. 1983) ("[T]he United States Court of Appeals for the Tenth Circuit has endorsed class actions as an appropriate means to resolve claims under the federal securities laws."). As discussed below, Lead Plaintiffs submit that the proposed Settlement Class readily satisfies the requirements of Rules 23(a) and 23(b)(3).

### 1. Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable. The proposed Settlement Class satisfies the numerosity test because Settlement Class Members are likely to number in the thousands. The Tenth Circuit has never adopted a presumption that numerosity is established with a certain minimum number of class members, instead instructing that "there is 'no set formula to determine if the class is so numerous that it should be so certified.'" *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) (quoting *Rex v. Owens*, 585 F.2d 532, 436 (10th Cir. 1978)); *but see Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) ("[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."); *Robidoux v. Celani*, 987 F.2d 931, 935 (2nd Cir. 1993) ("[T]he difficult in joining as few as 40 class members should raise a presumption that joinder is

impracticable."). Thus, the numerosity determination "is a fact-specific inquiry best left to the district court's discretion." *Thornburg*, 912 F. Supp. 2d at 1221. In conducting this inquiry, the court "may make 'common sense assumptions' to support a finding that joined would be impracticable." *Id.* (quoting *Neiberger v. Hawkins*, 208 F.R.D. 301, 313 (D. Colo. 2002)). Numerous courts in the Tenth Circuit have come to same conclusion that the numerosity requirement is met in securities class actions involving publicly traded securities. *See, e.g.*, *Harris*, 2019 WL 5846917, at *4; *Crocs*, 2013 WL 4547404, at *5; *Thornburg*, 912 F. Supp. 2d at 1233; *Lane*, 272 F.R.D. at 574; *Qwest*, 625 F. Supp. 2d at 1136; *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 620 (D.N.M. 2008). Throughout the Class Period, Mammoth common stock actively traded on the NASDAQ. Accordingly, Settlement Class Members are sufficiently numerous that joinder of all members would be impracticable, and numerosity is met.

### 2. Commonality

Rule 23(a)(2) is satisfied where the proposed class representatives share at least one question of fact or law with the claims of the prospective class. *Crocs*, 306 F.R.D. at 686; *Lopez v. City of Santa Fe*, 206 F.R.D. 285, 289 (D.N.M. 2002). This showing can be made where the class's claims depend upon a common contention "that . . . is capable of classwide resolution" which "means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "The commonality requirement has been applied permissively in securities fraud litigation." *Thornburg*, 912 F. Supp. 2d at 1222 (quoting *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 87 (S.D.N.Y. 2004)); *see*

*also D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010) ("Factual differences between class members' claims do not defeat certification where common questions of law exist.").

The common questions of fact and law include: (a) whether Defendants' statements and omissions were materially false or misleading; (b) whether Defendants' misrepresentations were made with scienter; (c) whether the price of Mammoth common stock was artificially inflated during the Class Period; and (d) whether Defendants' misrepresentations and omissions caused economic harm to Settlement Class Members, and the proper calculation and amount of those damages.

Each of these questions focuses on Defendant' conduct and their Class-wide impact, making the core factual and legal issues subject to common proof. *See Crocs*, 306 F.R.D. at 686 (finding commonality requirement satisfied where "plaintiffs allege that defendants recklessly or knowingly made material misrepresentations or omissions regarding Crocs' inventory that artificially inflated the price of Croc's securities and led to the Settlement Class' damages"). The commonality requirement is therefore satisfied.

### 3. Typicality

The typicality requirement of Rule 23(a)(3) is satisfied when the claims or defenses of the parties representing the class are typical of the claims and defenses of other class members. *See Amchem*, 521 U.S. at 625 (common issues test readily met in securities cases). However, differences in the amount of damage, the size and manner of purchase, the nature of the purchaser, and the date of purchase are insufficient to defeat class certification. *See Devaughn*, 594 F.3d at 1198-99 ("Provided the claims of Named

Plaintiffs and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality."). In other words, "[t]ypicality 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Crocs*, 306 F.R.D. at 686.

Here, Lead Plaintiffs' claims are typical of those of Settlement Class Members— they purchased Mammoth stock during the Class Period at prices artificially inflated by Defendants' alleged misconduct and were harmed when the relevant truth was revealed. *See Thornburg*, 912 F. Supp 2d. at 1235-36 (typicality satisfied where plaintiffs alleged defendants' misstatements artificially inflated company's stock price). The legal and factual arguments that Lead Plaintiffs advance regarding Defendants' liability are the same as the arguments that other Class members would advance in support of their claims. *Harris*, 2019 WL 5846917, at *6. Thus, the typicality requirement is satisfied.

### 4. Adequacy

The representative parties must satisfy Rule 23(a)'s adequacy requirement by showing that they will fairly and adequately protect the interests of the Settlement Class. The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (1) whether the named plaintiffs and their counsel have any conflicts with other Class members; and (2) will the named plaintiffs and their counsel vigorously prosecute the action on behalf of the class. *See Rutter*, 314 F.3d at 1187–88. "In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis." *Thornburg*, 912 F. Supp. 2d at 1236. "Any doubt regarding

adequacy of representation should be resolved in favor of upholding the class." *Harris*, 2019 WL 5846917, at \*6.

Based upon their purchases of Mammoth common stock and the losses they suffered as a result of Defendants' alleged misconduct, Lead Plaintiffs' interests are aligned with the interests of the other Settlement Class Members, who were injured in the same manner. *See Howard*, 2021 WL 295882, at \*4 ("[N]amed plaintiffs fairly and adequately represent the claims of the class because they share the same claims, arising out of defendants' alleged course of conduct.").

Furthermore, Lead Counsel, Block & Leviton LLP, are highly experienced in securities litigation and have a long and successful track record of representing investors in such cases. *See* Block Decl., Ex. A. Indeed, Lead Counsel's vigorous and efficient prosecution of this Action has resulted in a substantial settlement to the benefit of all Settlement Class Members. Thus, Lead Plaintiffs are adequate representatives of the Settlement Class, and their counsel are qualified, experienced and capable of prosecuting this Action, in satisfaction of Rule 23(a)(4). *See Thornburg*, 912 F. Supp. 2d at 1237 ("Plaintiffs have vigorously prosecuted this action on behalf of the class, as the Plaintiffs successfully defended their claims through a motion to dismiss, and successfully reached a settlement with the Settling Defendants. Additionally, Co-Lead Counsel are attorneys with expertise in the field of complex class-action litigation….").

**5. Common Questions of Law Predominate And A Class Action Is The Superior Method of Adjudication**

In addition to meeting the prerequisites of Rule 23(a), this Action also satisfies Rule 23(b)(3), which requires that the proposed class representatives establish that common questions of law or fact predominate over individual questions, and that a class action is superior to other available methods of adjudication. *See Erica P. John Fund, Inc. v. Haliburton Co.*, 563 U.S. 804, 809 (2011); *Crocs*, 2013 WL 4547404, at *9.

As discussed above, the common issues relating to Defendants' liability predominate over any individualized issues. The focus of the predominance inquiry is on liability, not damages. *See Crocs*, 306 F.R.D. at 689 (finding predominance satisfied where "Plaintiffs, as well as absent class members, seek compensation for defendants' alleged material misrepresentations and omissions regarding Crocs' inventory and management systems" because "the common questions of fact and law depend entirely upon the conduct of defendants," so "they are unaffected by the particularized conduct of individual class members"). "[P]redominance is a test readily met in certain cases alleging … securities fraud." *Amchem*, 521 U.S. at 625.

Likewise, the class action device is the superior method of litigation this Action. *See e.g., Harris*, 2019 WL 5846917, at *7 ("[T]he Settlement Class satisfies the superiority requirement because 'it would be enormously inefficient for both the judicial system and the parties to engage in multiple trials in individual actions on the same issues' and 'the putative class members, each of whose … interests may be quite small, would have little inventive to prosecute their claims individually because their costs would likely exceed the

31

value of their individual claims.'"); *Thornburg*, 912 F. Supp. 2d at 1238 (quoting *In re Intelcom Grp. Sec. Litig.*, 169 F.R.D. 142, 149 (D. Colo. 1996)) ("'[T]he superiority of class actions in large securities fraud is well recognized.'"); *In re Ribozyme Pharms., Inc. Sec. Litig.*, 205 F.R.D. 572, 579 (D. Colo. 2001) ("Securities fraud actions of this type involve geographically disbursed plaintiffs and involve such costs that if this litigation was not brought via class action, the costs of litigation would likely outweigh any benefit obtained. Through the class action device, I will be able to manage the issues effectively and efficiently and ensure a speedy resolution to all issues involved.")

In light of the foregoing, all of the requirements of Rule 23(a) and (b) are satisfied, and there are no issues that would prevent the Court from certifying this Settlement Class for settlement purposes, appointing Lead Plaintiffs as class representatives, and appointing Lead Counsel as counsel for the Settlement Class.

## C. THE PROPOSED FORM AND METHOD OF NOTICE TO THE CLASS IS APPROPRIATE

Rule 23(c)(2) requires notice to be "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). With respect to the notice's form and content, courts have held that notice requires only a general summary of the case and not details specifics. *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 227 (D.N.J. 2005); *see also In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 253 (D. Del. 2002) (notice must only describe the case in general terms and is not expected to be a complete source of information). Further, "[t]he standard for the settlement notice under Rule 23(e) is that it must 'fairly apprise' the class members of the terms of the proposed settlement and of

their options. *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1111 (10th Cir. 2001); *see also Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ([N]otice [must be] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). Individual notice must be disseminated "to all [class] members who can be identified through reasonable effort." *Integra Realty*, 262 F.3d at 1110. Courts routinely find that the notice requirements are satisfied through a combination of mailing the notice to potential class members and publication, and by maintaining a case-specific website identified in the notice which contains the notice, proof of claim form, settlement agreement, and other related documents. *See e.g.*, *Crocs*, 306 F.R.D. at 693; *In re Molycorp, Inc. Sec. Litig.*, No. 12-CV-00292-RM-KMT, 2017 WL 4333997, at *8 (D. Colo. Feb. 15, 2017), *report and recommendation adopted,* No. 12-CV-00292-RM-KMT, 2017 WL 4333998 (D. Colo. Mar. 6, 2017).

The proposed Preliminary Approval Order, attached as Exhibit A to the Stipulation, requires Lead Counsel to provide notice to Class Members through mailing of the proposed Notice, substantially in the form annexed as Exhibit A-1, to all identifiable Class members. The Notice will include a Claim Form, substantially in the form annexed as Exhibit A-2, and will also direct potential Settlement Class Members to the Claims Administrator's website, which will contain additional information regarding the Settlement, along with instructions on how to submit a Claim Form or objection or request exclusion from the Settlement. Pursuant to the Preliminary Approval Order, the Claims Administrator also

shall cause a Summary Notice, substantially in the form annexed as Exhibit A-3, to be published on the internet on *PR Newswire* and published once in *Investor's Business Daily*.

The proposed Notice, annexed as Exhibit A-1, also meets the requirements of the PSLRA, 15 U.S.C. § 78u-4(a)(7). The Notice provides detailed information concerning: (i) the rights of Settlement Class Members, including the right to accept, object, or opt out of the Settlement; (ii) the nature, history, and progress of the litigation; (iii) the proposed Settlement; (iv) the process for filing a proof of claim; (v) a description of the Plan of Allocation; (vi) the fees and expenses to be sought by Lead Counsel and expenses sought by Lead Plaintiffs; and (vii) the necessary information for any Settlement Class Member to examine the Court records. The Notice also sets forth instructions to securities brokers and other nominee holders for forwarding the Notice to those for whom the nominees held shares in street name. Additionally, the proposed Notice explains procedures and deadlines for opting out of the Settlement or submitting comments or objections.

The proposed Notice is "reasonably calculated under all of the circumstances to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections." *Lachance v. Harrington*, 965 F. Supp. 630, 636 (E.D. Pa. 1997). Thus, the proposed method of notice described above satisfies the requirements of due process and the PSLRA. *See, e.g.*, *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 173 (1974).

### D.   PROPOSED SCHEDULE

If the Court grants preliminary approval, the Parties respectfully submit the following procedural schedule for the Court's consideration. The proposed Notice Order

includes blank dates that must be established by the Court to properly effectuate the Settlement. In this regard, the Parties present the following general timeline:

| Event | Proposed Timing |
|---|---|
| Deadline for mailing the Notice to Settlement Class Members (which date shall be the "Notice Date") (Preliminary Approval Order ¶ 8(b)) | Within 20 business days of the Notice Date |
| Deadline for publishing the Summary Notice (Preliminary Approval Order ¶ 8(d)) | Within 10 business days of the Notice Date |
| Deadline for filing of papers in support of final approval of the Settlement, Plan of Allocation, and Lead Counsel's application for attorneys' fees and expenses (Preliminary Approval Order ¶ 27) | 35 calendar days prior to the Settlement Hearing |
| Deadline for receipt of exclusion requests or objections (Preliminary Approval Order ¶¶14, 17) | 21 calendar days prior to the Settlement Hearing |
| Deadline for filing reply papers (Preliminary Approval Order ¶ 27) | 7 calendar days prior to the Settlement Hearing |
| Settlement Hearing (Preliminary Approval Order ¶ 6) | At least 135 days after Preliminary Approval if granted |
| Deadline for submitting Claim Forms (Preliminary Approval Order ¶ 11 | 150 calendar days after the Notice Date |

In light of the potential number of class members, the length and complexity of the Preliminary Approval Order, and to prepare fully for the final approval hearing, the parties respectfully request that the Court schedule a Settlement Hearing at least 135 days after granting preliminary approval; all other deadlines flow from those dates. If this schedule is not convenient for the Court, Lead Plaintiff requests that the Court use at least the same or greater intervals between each event listed in the proposed schedule to provide all parties sufficient time to comply with the proposed Preliminary Approval Order.

## IV. CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court grant the unopposed Motion.

April 30, 2021

Respectfully submitted,

/s/ Jeffrey C. Block
Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (*pro hac vice*)
Nathaniel Silver (*pro hac vice*)
**Block & Leviton LLP**
260 Franklin Street, Suite 1860
Boston, Massachusetts 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com

*Lead Counsel for*
*Lead Plaintiffs and the Class*

C. Michael Copeland OBA No. 13261
**Jones, Gotcher & Bogan P.C.**
3800 First Place Tower
15 East 5th Street
Tulsa, Oklahoma 74103
(918) 581-8200 phone
(918) 583-1189 fax
mcopeland@jonesgotcher.com

*Local Counsel for*
*Lead Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served upon its filing via this Court's

CM/ECF system on this 30th day of April, 2021 to all counsel of record.


By: /s/ Jeffrey C. Block
Jeffrey C. Block
